JOSEPH W. COTCHETT (36324)
jcotchett@cpmlegal.com
MARK C. MOLUMPHY (168009)
mmolumphy@cpmlegal.com
ALEXANDRA P. SUMMER (266485)
asummer@cpmlegal.com
TORIANA S. HOLMES (282600)
tholmes@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Phone: (650) 697-6000
Fax: (650) 697-0577

*Lead Counsel and Attorneys for Plaintiff Ronald A. Harris,*
*derivatively on behalf of JPMorgan Chase & Co.*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE JPMORGAN CHASE DERIVATIVE LITIGATION** | Case No. 2:13-cv-02414-KJM-EFB |
| This Document Relates  To All Actions | **CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT FOR:** |
| | 1. **BREACH OF FIDUCIARY DUTY;** |
| | 2. **CORPORATE WASTE;** |
| | 3. **UNJUST ENRICHMENT; and** |
| | 4. **VIOLATION OF SECTION 14(A) OF THE EXCHANGE ACT** |
| | **<u>JURY TRIAL DEMANDED</u>** |

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ......................................................................................... 1

II.     JURISDICTION AND VENUE ..................................................................... 7

III.    PARTIES ..................................................................................................... 9

        A.      PLAINTIFFS ................................................................................. 9

        B.      DEFENDANTS ............................................................................ 10

                1. Nominal Defendant ............................................................ 10

                2. Individual Defendants ....................................................... 10

                3. Aiding and Abetting/Conspiracy ...................................... 15

                4. Unnamed Participants ....................................................... 15

IV.     STATEMENT OF FACTS ........................................................................... 15

        A.      THE FOCUS OF THE DERIVATIVE CLAIMS ......................... 15

        B.      JPMORGAN'S LONG HISTORY OF UNLAWFUL CONDUCT OVERSEEN BY  ITS BOARD OF DIRECTORS ...................... 19

                1. The Enron Collapse ............................................................ 20

                2. The "London Whale" Fiasco ............................................. 21

                3. Rigging the Electricity Market ......................................... 22

                4. Aiding and Abetting the Madoff Ponzi Scheme .............. 23

                5. Credit Card Debt Scandal .................................................. 24

                6. The "Sons and Daughters" Program ................................. 25

        C.      THE DEFENDANTS' SUBSTANTIAL COMPENSATION ............. 25

        D.      RESIDENTIAL MORTGAGE-BACKED SECURITIZATIONS ...... 26

        E.      THE PRIVATIZATION OF RESIDENTIAL MORTGAGE-BACKED SECURITIES ............................................................ 29

                1. The Dawn of the "Securitization Machine" ...................... 29

                2. Banks Depart from Traditional Mortgage Origination Practices ..... 32

                3. Faulty Appraisals of Mortgage Pools ............................... 36

                4. Predatory Lending Practices .............................................. 38

                5. Increasing Mortgage Defaults Result in System-Wide Market Failure .......... 40

---

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**      i

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

6. Executive Management Compensation Skyrockets ............................................. 42

F.   JPMORGAN'S ROLE IN THE MARKETING AND SALE OF TOXIC
RESIDENTIAL MORTGAGE-BACKED SECURITIES TO INVESTORS ...... 42

1. The Emergence of JPMorgan in the RMBS Business................................... 42

   a.   JPMorgan Acquisition .............................................................. 46

   b.   JPMorgan Acceptance ............................................................. 46

   c.   JPMorgan Securities ................................................................ 47

   d.   JPMorgan Chase and JPMorgan Bank.......................................... 47

   e.   Chase Home Finance LLC........................................................ 48

   f.   JPMorgan as Successor to WaMu Bank ....................................... 48

   g.   JPMorgan as Successor to the Bear Stearns Companies, Inc. .................. 48

2. JPMorgan Expands Securitization Business ...................................... 49

3. JPMorgan Misrepresented the Value of the RMBS to Investors .................... 56

4. JPMorgan Knew its Representations Were False......................................... 61

G.   JPMORGAN AGREES TO PAY BILLIONS TO SETTLE CLAIMS
RELATING TO RMBS PRACTICES................................................................ 64

H.   THE RMBSs AT ISSUE IN THE $13 BILLION SETTLEMENT
DEMONSTRATE JPMORGAN'S FOCUS ON CALIFORNIA........................ 65

I.   THE MAJORITY OF LOANS IN JPMORGAN RMBSs CAME FROM
CALIFORNIA ORIGINATORS ........................................................................ 77

J.   THE SUBJECT GREENPOINT LOANS AND THE HOWLER LETTER ........ 78

   a.   Reports Showed the Poor Quality of the GreenPoint Loan Pools at JPM 79

   b.   JPMorgan Manually Clears the Loans...................................... 80

   c.   The "Howler Letter" ................................................................ 81

   d.   Fleischmann's Dealings with GreenPoint in California Are Focus of
Government Settlement ............................................................. 82

K.   THE INDIVIDUAL DEFENDANTS KNEW THE JPMORGAN RMBS
PORTFOLIO WAS TARGETING RISKY CALIFORNIA MORTGAGES....... 82

1. JPMorgan Pursues Growth in RMBS Including Large Portions in California  82

2. JPMorgan's Board Knew That Loans Within its RMBSs Originated Primarily
in California .............................................................................................. 86

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**     ii

V.    THE INDIVIDUAL DEFENDANTS CAUSE THE COMPANY TO ISSUE FALSE AND MISLEADING PROXY STATEMENTS IN 2011 AND 2012 ............................ 88

VI.   RESPONSIBILITIES OF OFFICERS AND DIRECTORS ............................................. 101

VII.  DEMAND FUTILITY ALLEGATIONS ............................................................. 104

      A.    DEMAND IS FUTILE AS TO DEFENDANTS BELL, BOWLES AND JACKSON ................................................................................... 105

      B.    DEMAND IS FUTILE AS TO DEFENDANT DIMON .................................. 115

      C.    DEMAND IS FUTILE AS TO DEFENDANTS CROWN AND FLYNN ........ 118

      D.    DEMAND IS FUTILE AS TO DEFENDANT BURKE ................................. 128

      E.    DEMAND IS FUTILE AS TO DEFENDANT RAYMOND ............................ 129

      F.    DEMAND IS FUTILE AS TO DEFENDANT WELDON ............................... 130

      G.    JPMORGAN'S CURRENT BOARD OF DIRECTORS VIOLATED THE FIDUCIARY DUTIES THEY OWED TO THE COMPANY AND TO ITS SHAREHOLDERS ...................................................................... 130

VIII. CAUSES OF ACTION ...................................................................... 131

FIRST CLAIM FOR RELIEF
BREACH OF FIDUCIARY DUTY ............................................................... 131
AGAINST THE INDIVIDUAL DEFENDANTS ................................................. 131

SECOND CLAIM FOR RELIEF
CORPORATE WASTE ............................................................................. 134
AGAINST THE INDIVIDUAL DEFENDANTS ................................................. 134

THIRD CLAIM FOR RELIEF
UNJUST ENRICHMENT ........................................................................... 135
AGAINST THE INDIVIDUAL DEFENDANTS ................................................. 135

FOURTH CLAIM FOR RELIEF
VIOLATION OF SECTION 14(A) OF THE EXCHANGE ACT ........................... 135
AGAINST INDIVIDUAL DEFENDANTS DIMON, BELL, BOWLES, BURKE, COTE, CROWN, FUTTER, GRAY, JACKSON, NOVAK, RAYMOND, AND WELDON ............... 135

PRAYER FOR RELIEF ........................................................................... 142

JURY TRIAL DEMAND ........................................................................... 146

Plaintiffs derivatively on behalf of JPMorgan Chase & Co. (hereby referred to as "JPMorgan" or "the Company")) bring this action against Defendants Jaime Dimon ("Dimon"), James A. Bell ("Bell"), Crandall C. Bowles ("Bowles"), Stephen B. Burke ("Burke"), James S. Crown ("Crown"), Ellen V. Futter ("Futter"), William B. Harrison, Jr. ("Harrison"), Laban P. Jackson, Jr. ("Jackson"), Robert I. Lipp ("Lipp"), David C. Novak ("Novak"), Lee R. Raymond ("Raymond"), William C. Weldon ("Weldon"), and Timothy P. Flynn ("Flynn") (hereinafter referred to collectively as "Defendants" or "Individual Defendants") for violations of the law. Except as to the allegations pertaining to themselves, which are alleged upon Plaintiffs' personal knowledge, Plaintiffs allege the following upon information and belief  based on the investigation of Plaintiffs and their counsel, including, among other things, a review of legal and regulatory filings, press releases, media reports about JPMorgan, interviews of witnesses, and court-ordered discovery of JPMorgan internal records.

# I.

## INTRODUCTION

1. This action arises out of JPMorgan's creation and sale of subprime residential mortgage-backed securities ("RMBS") to investors, which has subjected JPMorgan to $13 billion dollars in civil and regulatory fines and penalties, as well as potential criminal liability.  Court-ordered jurisdictional discovery, an analysis of the specific RMBS referred to in JPMorgan's $13 billion settlement with federal and state regulators, and information provided from JPMorgan's whistleblower, have confirmed the underlying defective loans were purchased from a Novato, California-based originator, GreenPoint Mortgage Funding.  Thus, JPMorgan not only targeted California for its illegal RMBS activities, California was the absolute epicenter of the RMBS-related damages that are at issue in this case.

2. JPMorgan's decision to push aggressively into the subprime RMBS market, in terms of originating subprime mortgage loans, securitizing subprime mortgage loans and then marketing and selling those subprime RMBS, was made at a time when JPMorgan's financial operations were suffering.  This aggressive change in JPMorgan's business and JPMorgan's

extensive involvement in the subprime RMBS crisis could not have occurred absent Defendants' knowledge or their bad faith disregard of their fiduciary obligations to JPMorgan.

3.      On <u>August 7, 2013</u>, JPMorgan announced in its Form 10-Q filing with the U.S. Securities and Exchange Commission ("SEC") that it was under **criminal investigation in the Eastern District of California** for its involvement in the subprime mortgage crisis:

> "The Firm [JPMorgan] is responding to parallel investigations being conducted by the **Civil and Criminal Divisions** of the United States Attorney's Office for the Eastern District of California relating to MBS offerings securitized and sold by the Firm and its subsidiaries. In May 2013, the Firm [JPMorgan] received a notice from Civil Division stating that it has preliminarily concluded that the Firm violated certain federal securities laws in connection with its subprime and Alt-A residential MBS offerings during 2005 to 2007."

4.      This public filing constituted the first public disclosure that JPMorgan's own misconduct in the subprime RMBS market may have involved criminal misconduct and that the Government had concluded that JPMorgan itself violated federal securities laws.

5.      Shortly thereafter, on Friday, <u>November 15, 2013</u>, JPMorgan announced a $4.5 billion settlement with 21 major institutional investors relating to RMBS trusts issued by JPMorgan.  The following Tuesday, <u>November 19, 2013</u>, JPMorgan and the U.S. Department of Justice separately announced a $13 billion settlement resolving claims against JPMorgan by the Justice Department, several State Attorneys General, the Federal Deposit Insurance Corporation, the National Credit Union Administration and the Federal Housing Finance Agency relating to RMBS activities by JPMorgan.  That same day, the California Attorney General, Kamala Harris, announced that JPMorgan will pay $298,973,000 of that total to California, based on JPMorgan's misrepresentations in RMBS sold to California's public employee and teacher pension funds, CalPERS and CalSTRS, between 2004 and 2008.  **The total agreement, reached after an extensive investigation conducted by the Sacramento, California U.S. Attorney's office, is the largest settlement ever between the government and a U.S. company**.  JPMorgan also acknowledged that the criminal investigation conducted by the same office was not resolved. Copies of the Justice Department's Release, Settlement Agreement, and Statement of Facts are

attached hereto as <u>Exhibit A</u>.  A copy of the California Attorney General's Release is attached hereto as <u>Exhibit B</u>.

6.      As part of the civil settlement, JPMorgan also admitted to a Statement of Facts that outlined how it failed to disclose risks of buying RMBS from 2005 to 2008.  JPMorgan acknowledged that it told investors the mortgage loans in securities it packaged and sold complied with underwriting guidelines, while bank employees knew – and reported to bank "Managing Directors" in due diligence, trading and sales – that, in a number of instances, the loans in question did not.  While not identified in the Statement of Facts, discovery has revealed that the JPMorgan whistleblower was Alayne Fleischmann, who handled quality control for RMBS at JPMorgan, and the originator that she dealt with was GreenPoint Mortgage Funding, based in Novato, California.

7.      Prior to the 2013 settlement, JPMorgan had denied that JPMorgan itself had engaged in wrongdoing in the subprime mortgage crisis, and instead blamed all of the misconduct on Washington Mutual, Inc. ("WaMu") and the Bear Stearns Companies, Inc. ("Bear Stearns"), two companies that JPMorgan had acquired in the aftermath of the subprime mortgage crisis.  Prior to these announcements, there was no publicly-available information indicating that JPMorgan's misconduct in the subprime mortgage industry may have risen to the level of criminal misconduct or that JPMorgan or its employees faced the prospect of criminal prosecution.  Indeed, the sheer size of JPMorgan's settlement with the Justice Department, $13 billion, reveals the true extent and seriousness of the misconduct by JPMorgan and that the evidence establishing such misconduct is substantial.

8.      In November 2015, after the Court ruled on motions to dismiss in this case, the Wall Street Journal reported that "federal prosecutors are actively pursuing criminal cases against executives from . . . J.P. Morgan Chase & Co. for allegedly selling flawed mortgage securities."  According to the Journal, "the J.P. Morgan criminal probe flows directly from the Sacramento civil investigation, in which prosecutors unearthed a 2007 memo written by a bank employee warning her bosses before the financial crisis hit that they were putting bad loans into securities – warnings that were ignored.  That memo helped the Justice Department develop a

1    legal basis for the then-record 2013 settlement."  Based on Plaintiffs' investigation, the "memo"

2    refers to Fleischmann's warning about the GreenPoint loans and was sent to the bank's managing

3    directors.  The memo was also internally known as the "Howler Letter" and has still not been

4    produced by JPMorgan in this case.

5           9.     Plaintiffs bring this action against the Defendants for their misconduct in

6    exposing JPMorgan to substantial harm, including but not limited to billions of dollars in

7    settlements and potential prosecution.  This misconduct relates to JPMorgan's origination of

8    subprime mortgage loans and the later securitization of those subprime mortgage loans into

9    subprime RMBS.  Those subprime RMBS were ultimately marketed and sold by JPMorgan to

10   both private and government investors, who suffered billions of dollars in losses.

11          10.    RMBS were pools of mortgages deposited into trusts.  Shares of RMBS Trusts

12   were sold as securities to investors, such as Fannie Mae and Freddie Mac, for tens of billions, if

13   not hundreds of billions, of dollars.  These investments provided a stream of income from the

14   payments on the mortgages underlying them.  If these mortgages were of high quality, the

15   RMBS Trusts would have been solid investments in the housing market and helped the housing

16   market in the United States to prosper and grow.  However, the mortgages that JPMorgan

17   originated, pooled, securitized and sold were not high quality, but instead were subprime and of

18   low quality, and the RMBS for which it was responsible were dangerous investments.  It is

19   JPMorgan's central role in the subprime mortgage crisis that is the subject of the criminal

20   investigation pending in Sacramento, California and the subject of this derivative action.

21          11.    The Defendants knowingly authorized or recklessly allowed JPMorgan to commit

22   multiple fraudulent and deceptive acts in promoting and selling subprime RMBS that the

23   company created and packaged.  For example, in publicly filed documents and in marketing

24   materials, JPMorgan led investors to believe that JPMorgan had carefully evaluated – and would

25   continue to monitor – the quality of the loans in their RMBS.  In reality, JPMorgan

26   systematically failed to fully evaluate the loans, largely ignored the defects that its limited review

27   did uncover, and concealed from investors both the inadequacy of the company's review

28   procedures and the defects in the underlying mortgage loans.  As a result, the loans contained

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**        4

within the RMBS created by JPMorgan included many that had been made to borrowers who were unable to repay and were highly likely to default.  In fact, these borrowers did default in large numbers.  At a minimum, the Defendants breached their fiduciary duties by abdicating their responsibilities to properly supervise and adequately oversee JPMorgan's subprime mortgage business.  As alleged above, this misconduct exposed JPMorgan or its employees to potential criminal prosecution and has resulted in JPMorgan paying or agreeing to pay billions of dollars in settlements.

12.     At the center of JPMorgan's  fraudulent conduct was its failure to comply with the representations the company made to the public regarding the steps it took to ensure that the quality of the mortgage loans underlying its RMBS were safe.  For example, JPMorgan represented that it checked to confirm that the loans were originated in accordance with the applicable underwriting guidelines, *i.e.,* the standards in place to ensure, among other things, that loans were extended to borrowers who demonstrated the willingness and ability to repay.  The Defendants were aware of the substantial legal and financial ramifications of packaging subprime mortgages into RMBS and then selling those RMBS to investors, such as Fannie Mae and Freddie Mac.  The Defendants were also aware of the massive profits that JPMorgan stood to realize from its involvement in the subprime mortgage market, profits that could bolster JPMorgan's stock price and therefore the value of the JPMorgan stock owned by the Defendants. JPMorgan opted for the massive profits and, in the process of obtaining them, the Defendants intentionally or recklessly failed to implement appropriate controls to ensure that this business was done in a legal and appropriate manner.

13.     JPMorgan represented that the "due diligence" review that it undertook appropriately assessed the quality of the loans deposited into the RMBS but this representation was not accurate. JPMorgan's actual due diligence process, however, was very different from its public representations about it.  JPMorgan not only failed to conduct appropriate due diligence in order to identify and eliminate the many defective loans that were acquired from mortgage loan originators, but also, in order to preserve its relationships with loan originators, routinely overlooked defective loans that it did identify through its due diligence review process.  In

---

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT     5**

1  addition, JPMorgan ignored deficiencies that it knew existed in the due diligence review process

2  itself.  JPMorgan was aware of the need to reform its due diligence process in regards to

3  reviewing loans packaged in the RMBS that it created.  Despite this awareness, Defendants made

4  no efforts to improve the due diligence process.  Defendants also failed to disclose to investors

5  the defects in the mortgage loans and the deficiencies in the due diligence process itself.

6          14.     According to a Complaint filed on behalf of the State of New York by its

7  Attorney General Eric T. Schneiderman, an internal Bear Stearns document (dated July 2007)

8  states that, in addition to having "wide guidelines," JPMorgan "abused the controls of them."

9  This, as the document put it, created a "perfect storm."  Defendants knew or should have known

10  of these grotesque systematic problems within JPMorgan.  However, because of the profits being

11  generated, those systemic problems were ignored.

12          15.     JPMorgan also failed to properly respond to defects identified in the mortgage

13  loan process after securitization.  Those defects were identified by JPMorgan's post-purchase

14  quality control process.  JPMorgan represented that this post-purchase quality control process

15  would result in the identification of problematic loans.  Those problematic loans would then be

16  removed from the RMBS created by JPMorgan.  The truth, however, was that JPMorgan's

17  quality control department was so overwhelmed by the sheer number of defects in the underlying

18  mortgage loans that it could not properly function.  JPMorgan was fully aware that this post-

19  purchase quality control process, which JPMorgan represented would identify and weed out bad

20  mortgage loans, was unable to respond to the enormous number of defects identified in the

21  underlying mortgage loans.  Despite this knowledge, JPMorgan did nothing to reform the

22  process and did nothing to inform investors about these problems.  Defendants, as senior officers

23  and/or directors of JPMorgan, either knew about these serious internal control problems in the

24  subprime mortgage business, which was a huge contributor to JPMorgan's profits, or they were

25  reckless in not knowing.   The Defendants failed to discharge their fiduciary obligations to

26  JPMorgan by failing to implement any oversight or supervision over JPMorgan's subprime

27  mortgage business, no doubt because the subprime mortgage business was a major contributor to

28  JPMorgan's profitability.

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**       6

16.     JPMorgan's failure in connection with its due diligence and quality control processes constituted or operated as a systemic fraud on thousands of investors.  As a result of JPMorgan's fraudulent misconduct, investors were deceived about the fundamentally defective character of the mortgage loans underlying the RMBS they purchased, which drastically changed the risk profile of the RMBS themselves.  Instead of being the low risk investments that JPMorgan represented they were, the RMBSs were high risk investments containing subprime, high risk mortgage loans that had a high probability of default.  When mortgagors defaulted on their loans at an unprecedented rate, the value of these securities plummeted, and the RMBS investors incurred monumental losses.  This massive default rate was not unexpected to JPMorgan, however, as it knew that the vast majority of the mortgages in the RMBS Trusts were low quality, subprime loans.

17.     All of this has caused substantial harm to JPMorgan and its shareholders as JPMorgan faces substantial criminal and civil liability.  Again, JPMorgan has already reached settlements with institutional investors and a $13 billion settlement with the Department of Justice related specifically to JPMorgan's role in the subprime mortgage crisis, and it potentially faces the possibility of paying billions of dollars more in fines, penalties and claims.  The potential criminal charges against JPMorgan remain unresolved, the disposition of which could result in substantial additional harm to JPMorgan.  Defendants' misconduct caused the harm that has already materialized and has given rise to potential criminal charges that could further adversely impact JPMorgan's ability to successfully conduct future business.  This derivative action is being brought in order to recoup those losses that have been caused by the Defendants and obtain redress for any and all associated harm the Defendants' misconduct has wrought on JPMorgan.

## II.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action under Article III of the United States Constitution and 28 U.S.C. § 1332 because Plaintiffs reside in different states than Defendants and the amount in controversy exceeds the jurisdictional minimum of this Court.

The Court also has subject matter jurisdiction in this action arising under Article III of the United States Constitution and 28 U.S.C. § 1331 because of claims arising under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a), and SEC regulation 14a-9 promulgated thereunder.  The Court has exclusive jurisdiction under Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

19.     This Court has jurisdiction over the Defendants.  Each Defendant has sufficient contacts with California in order to render the exercise of jurisdiction by this Court over them permissible under traditional notions of fair play and substantial justice.  JPMorgan has substantial business operations in California, and a substantial portion of JPMorgan's mortgage lending operations is based out of and is conducted in California.  California, as one of the largest and fastest growing states in the United States is, and at all relevant times was, one of the states with the largest number of subprime loan originations.  All of the Defendants were involved with or responsible for JPMorgan's policies and procedures in regards to the origination and securitization of subprime mortgage loans, and the marketing and sale of subprime RMBS in California.  The Defendants either knowingly or with reckless disregard of the truth concealed information from persons in California regarding JPMorgan's own misconduct in the subprime RMBS market.

20.     Furthermore, through their misconduct, the Defendants caused substantial harm and injury in California.  A substantial portion of JPMorgan's shareholders, including certain of the Plaintiffs, are citizens of California.

21.     Venue is proper in this Court.  As alleged above, a substantial part of the events or omissions giving rise to the claims alleged occurred in California.  Venue in this District is also appropriate as the criminal investigation into the misconduct of JPMorgan in the origination, securitization, marketing and sale of RMBS that is at the heart of this action is being conducted in the Eastern District of California by the United States Attorney for the Eastern District of California.  On August 7, 2013, JPMorgan stated in its filing on Form 10-Q that "[t]he Firm [JPMorgan] is responding to parallel investigations being conducted by the Civil and Criminal Divisions of the United States Attorney's Office for the **Eastern District of California** relating

to MBS offerings securitized and sold by the Firm [JPMorgan] and its subsidiaries.  In May 2013, the Firm [JPMorgan] received a notice from Civil Division stating that it has preliminarily concluded that the Firm [JPMorgan] violated certain federal securities laws in connection with its subprime and Alt-A residential MBS offerings during 2005 to 2007."  On <u>November 19, 2013,</u> the Justice Department announced the settlement of claims based on the investigation conducted by the U.S. Attorney in Sacramento, as well as related investigations conducted by the California Attorney General related to institutional purchasers in California.

22.     The action is not a collusive one to confer jurisdiction that the court would otherwise lack.

### III.

### PARTIES

**A.     PLAINTIFFS**

23.     Plaintiff **RONALD A. HARRIS ("Harris")** is a California citizen and the sole beneficial owner though the Survivor's Trust under The Ronald A. and Laine C. Harris Trust, of which he is sole trustee, of about 459 shares of JPMorgan stock, at least 300 of which have been owned as community property since 2001.  Harris has thus owned JPMorgan shares at all times relevant hereto, and he continues to be a JPMorgan shareholder through the aforementioned trust.

24.     Plaintiff **JEFFREY SHLOSBERG ("Shlosberg")** is a New Jersey citizen and the beneficial owner of JPMorgan stock, which he has continuously owned since at least 1994, and continues to be a JPMorgan shareholder.

25.     Plaintiff **RICHARD RATCLIFF ("Ratcliff")** is a California citizen and the sole beneficial owner of 400 shares of JPMorgan stock, which have been owned as since 2005. Plaintiff has thus owned JPMorgan shares at all times relevant hereto, and he continues to be a JPMorgan shareholder.

**B.    DEFENDANTS**

**1.    Nominal Defendant**

26.    **JPMORGAN CHASE & CO. ("JPMorgan")** is a financial holding company incorporated in Delaware with its principal place of business located in New York.  A citizen of the states of Delaware and New York, JPMorgan does business worldwide.  JPMorgan conducts a majority of its business in the United States and substantial business in the State of California.  JPMorgan is involved in all aspects of the financial markets, including investment banking, asset management, private banking, and private wealth management.  As alleged above, JPMorgan is currently the subject of a criminal investigation in the Eastern District of California, located in Sacramento, California.

**2.    Individual Defendants**

27.    The Individual Defendants consist of the following current or former members of the Board of Directors of JPMorgan, and current officers of JPMorgan:

28.    Defendant **JAMES "JAMIE" DIMON ("Dimon")** is the current CEO, President and Chairman of the Board of JPMorgan.  Defendant Dimon has been JPMorgan's CEO and President since December 31, 2005 and Board Chairman since December 31, 2006.  He has been a director of the company since 2004.  Dimon has been President and Chief Operating Officer since JPMorgan's merger with Bank One Corporation in July 2004.  At Bank One, he had been Chairman and Chief Executive Officer since March 2000.  Prior to joining Bank One, Dimon had extensive experience at Citigroup Inc., the Travelers Group, Commercial Credit Company and American Express Company.  Dimon is on the Board-level Executive Committee and also on the Stock Committee for JPMorgan.  The authority of the latter includes the declaration of dividends, authorization of the issuance of stock within Board-approved limitations, administration of the dividend reinvestment plan and implementation of share repurchase plans in accordance with Board-approved capital plans.  Dimon is a citizen of the state of New York.

29.    Defendant **JAMES A. BELL ("Bell")** is currently a director of JPMorgan and has been one since 2011.  Bell is a member of the JPMorgan Audit Committee.  Bell was an Executive Vice President of The Boeing Company, the world's largest aerospace company, from

2003 until his retirement in April 2012.  He had been Corporate President of Boeing from June 2008 until February 2012, and was its Chief Financial Officer from November 2003 until February 2012.  While serving as Boeing's Chief Financial Officer, he oversaw two key Boeing businesses, Boeing Capital Corporation, the company's customer-financing subsidiary, and Boeing Shared Services, an 8,000-person, multi-billion dollar business unit that provides common internal services across Boeing's global enterprise.  Bell has been a director of Dow Chemical Company since 2005.  Bell is a citizen of the state of Illinois.

30.     Defendant **CRANDALL C. BOWLES ("Bowles")** is a director of JPMorgan and has been a director since 2006.  Bowles is a member of the Audit Committee, Chairman of the Public Responsibility Committee and a member of the Board-level Executive Committee of JPMorgan.  Bowles has been Chairman of Springs Industries, Inc., a manufacturer of window products for the home, since 1998 and a member of its board since 1978.  From 1998 until 2006, she was also Chief Executive Officer of Springs Industries, Inc.  Subsequent to a spinoff and merger in 2006, and until July 2007, she was Co-Chairman and Co-CEO of Springs Global Participacoes S.A., a textile home furnishing company based in Brazil.  Bowles is a director of Deere & Company (since 1999 and previously from 1990 to 1994). She also previously served as a director of Sara Lee Corporation (2008-2012) and of Wachovia Corporation (1991–1996). Bowles is a citizen of the state of North Carolina.

31.     Defendant **STEPHEN "STEVE" B. BURKE ("Burke")** is a current director of JPMorgan has been a director of JPMorgan since 2004.  Burke is a member of the Compensation & Management Development Committee and the Corporate Governance & Nominating Committee of JPMorgan.  Burke has been Chief Executive Officer of NBCUniversal, LLC and Executive Vice President of Comcast Corporation since January 2011. He had been Chief Operating Officer of Comcast Corporation from 2004 until 2011, and was President of Comcast Cable Communications, Inc. from 1998 until January 2010.  Before joining Comcast, he served with The Walt Disney Company as President of ABC Broadcasting.  Burke is a citizen of the state of Pennsylvania.

32.     Defendant **JAMES "JIM" SCHINE CROWN ("Crown")** is a current director of JPMorgan and has been one since 2004.  Crown is Chairman of the Risk Policy Committee and a member of the Board-level Executive Committee of JPMorgan.  He also had been a director of JPMorgan Chase Bank, N.A., a wholly-owned subsidiary of JPMorgan since 2010.  Crown joined Henry Crown and Company, a privately-owned investment company that invests in public and private securities, real estate and operating companies, in 1985 as Vice President, and he became President in 2002.  Crown is a director of General Dynamics Corporation (since 1987).  He previously served as a director of Sara Lee Corporation (1998–2012).  Crown is a citizen of the state of Illinois.

33.     Defendant **ELLEN FUTTER ("Futter")** was a director of JPMorgan from 2001 through July, 2013, and a director of J.P. Morgan & Co. Incorporated from 1997 to 2000.  Futter served on JPMorgan's Risk Policy Committee during 2005 to 2008.  Defendant Futter, who served as a director of JPMorgan during the relevant time period alleged herein in this Complaint, retired from the JPMorgan Board of Directors in July 2013, along with David Cote, who served alongside her on the Risk Policy Committee in 2008.  Futter is a director of Consolidated Edison, Inc. (since 1997) and was previously a director of American International Group Inc. (1999–2008) and Viacom (2006–2007).  Futter is a citizen of the state of New York.

34.     Defendant **WILLIAM B. HARRISON, JR. ("Harrison")** was a director of JPMorgan or one of its predecessor entities from 1991-2006.  Harrison began his career in banking at Chemical Bank, which acquired Chase Manhattan Corporation in 1996.  Harrison served as the President and Chief Executive Officer of Chase Manhattan Corporation from June 1999 to December 1999, and as its Chairman up through the merger with JPMorgan in December 2000, when he became President and Chief Executive Officer of the merged entity, JPMorgan Chase & Co.  Harrison was President and Chief Executive Officer of JPMorgan from December 2000 until November 2001, and became Chairman of the Board in November 2001.  After the 2004 merger of JPMorgan and Bank One Corp., Harrison was named Chairman of the Board and Chief Executive Officer of the combined company and former Bank One chief, Defendant Dimon, was named to be Harrison's successor.  Dimon replaced Harrison as Chief Executive

Officer of JPMorgan in December 2005 and as Chairman of JPMorgan's Board in December 2006.  Harrison is a citizen of the state of Connecticut.

35.     Defendant **LABAN P. JACKSON, JR. ("Jackson")** is currently a director of JPMorgan and has been a director since 2004.  Jackson is Chairman of the Audit Committee and a member of the Board-level Executive Committee.  Jackson has been Chairman of Clear Creek Properties, Inc., a real estate development company, since 1989.  He has been a director of J.P. Morgan Securities plc and of JPMorgan Chase Bank, N.A., wholly-owned subsidiaries of JPMorgan since 2010.  He previously served as director of The Home Depot (from 2004 to 2008).  Jackson is a citizen of the state of Michigan.

36.     Defendant **ROBERT I. LIPP ("Lipp")** was a director of JPMorgan from 2003 to 2008.  Lipp became a Senior Advisor to JPMorgan in September 2005.  He was Executive Chairman of the Board of The St. Paul Travelers Companies, Inc. from April 2004 until September 2005 and was Chairman and Chief Executive Officer of its predecessor company, Travelers Property Casualty Corp., from December 2001 to April 2004.  Lipp was Chairman of the Board of Travelers Insurance Group Holdings Inc. from January 2001 to October 2001 and from 1996 until 2000, and was its Chief Executive Officer and President from 1996 until 1998.  Lipp was Vice Chairman and Member of the Office of the Chairman of Citigroup Inc. during 2000.  Prior to that time, he held a number of senior executive positions at Citigroup Inc. and Travelers Group.  Lipp is a citizen of the state of Colorado.

37.     Defendant **DAVID C. NOVAK ("Novak")** was a director of JPMorgan from 2001 through 2011.  Novak has been Chairman of Yum! Brands, Inc. since 2001, its Chief Executive Officer since 2000 and Vice Chairman and President of Tricon Global Restaurants, Inc. (as Yum! Brands was formerly named) from June 1997 until January 2000.  Previously, he had been Group President and Chief Executive Officer of KFC and Pizza Hut, North America, subsidiaries of PepsiCo, from August 1996 until June 1997; and President of KFC North America, a subsidiary of PepsiCo, from 1994 until 1996.  Novak has been a director of Yum! Brands, Inc. since 1997.  Novak is a citizen of the state of Georgia.

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**          13

38.     Defendant **LEE R. RAYMOND ("Raymond")** is a current director of JPMorgan and has been one since 2001.  He served as a director of J.P. Morgan & Co. Incorporated from 1987 to 2000.  Raymond is Chairman of the Compensation & Management Development Committee, member of the Corporate Governance & Nominating Committee and member of the Board-level Executive Committee of JPMorgan.  Raymond was Chairman of the Board and Chief Executive Officer of ExxonMobil from 1999 until he retired in December 2005.  He had been Chairman of the Board and Chief Executive Officer of Exxon Corporation from 1993 until its merger with Mobil Oil Corporation in 1999, having begun his career in 1963 with Exxon.  He was a director of Exxon Mobil Corporation (1984–2005).  Raymond is a citizen of the state of Texas.

39.     Defendant **WILLIAM "BILL" C. WELDON ("Weldon")** is a current director of JPMorgan and has been since 2005.  Weldon is a member of the Compensation & Management Development Committee, Chairman of the Corporate Governance & Nominating Committee and member of the Board-level Executive Committee of JPMorgan.  Weldon was Chairman and Chief Executive Officer of Johnson & Johnson from 2002.  He retired as J&J's Chief Executive Officer in April 2012 and as its Chairman in December 2012.  He served as J&J's Vice Chairman from 2001 and Worldwide Chairman, Pharmaceuticals Group from 1998 until 2001.  Weldon has been a director of CVS Caremark Corporation since March 29, 2013.  Weldon is a citizen of the state of Pennsylvania.

40.     Defendant **TIMOTHY P. FLYNN ("Flynn")** is a current director of JPMorgan and has been a director since 2012.  Flynn is a member of the Board's Risk Policy Committee, and was Chairman of KPMG International from 2007 until October 2011.   He was also Chairman (2005–2010) and Chief Executive Officer (2005–2008) of KPMG LLP, the U.S. and largest individual member firm of KPMG International.  Flynn is a director of Wal-Mart Stores, Inc. (since 2012). Flynn has extensive experience in financial services and risk management. Prior to serving as KPMG's Chairman and Chief Executive Officer, Flynn served, among other positions, as Vice Chairman, Audit and Risk Advisory Services, with operating responsibility for the audit practice, as well as the Risk Advisory and Financial Advisory Services practices.  Flynn

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**     14

holds a bachelor's degree in accounting from The University of St. Thomas, St. Paul, Minnesota and is a member of its Board of Trustees.  He has previously served as a trustee of the Financial Accounting Standards Board and a member of the World Economic Forum's International Business Counsel.  Flynn is a citizen of the state of Arizona.

### 3.  Aiding and Abetting/Conspiracy

41.     Defendants, and each of them, are sued as participants and as aiders and abettors in the conduct herein alleged.  At all relevant times, each Defendant was the agent of each of the remaining Defendants and, in doing the acts alleged herein, was acting within the course and scope of such agency.  Each Defendant ratified and/or authorized the wrongful acts of each of the other defendants.  There is a unity of interest and ownership between the Defendants listed above, such that the acts of the one are for the benefit and can be imputed as the acts of the others.

### 4.  Unnamed Participants

42.     Numerous individuals and entities participated actively during the course of and in furtherance of the scheme described herein.  The individuals and entities acted in concert by joint ventures and by acting as agents for principals in order to advance the objectives of the scheme to benefit Defendants and themselves to the detriment of JPMorgan and its shareholders, including the named Plaintiffs in this action.

### IV.

### STATEMENT OF FACTS

### A.    THE FOCUS OF THE DERIVATIVE CLAIMS

43.     The direct focus of the derivative claims alleged herein is the misconduct of JPMorgan in the origination, securitization, marketing and sale of subprime RMBS.  The Defendants, the senior officers and directors of JPMorgan, either knowingly authorized or recklessly permitted JPMorgan to engage in substantial wrongdoing in the subprime mortgage market, in which JPMorgan originated subprime mortgage loans with little concern for the ability of the borrowers to repay the mortgages and then packaged those bad loans into high risk,

subprime RMBS, which it marketed and sold through fraud and the concealment of material facts. At a minimum, the Defendants knowingly failed to implement policies or procedures sufficient to protect JPMorgan from engaging in misconduct in the subprime mortgage market and thus failed to discharge their fiduciary obligations to JPMorgan. This includes the failure to put in place any process for reporting on JPMorgan's actions in the subprime mortgage market. The Defendants owed a duty to the corporation to put the protection of JPMorgan above their own personal financial interests. However, since JPMorgan's reckless expansion into the JPMorgan inflated JPMorgan's profits, which inflated JPMorgan's stock price, and therefore, inflated the value of the JPMorgan stock owned by the Defendants, the Defendants put their own financial interests above those of the company itself.

44. JPMorgan was one of the principal actors in the subprime RMBS crisis, operating at every level of the subprime mortgage loan process. Since this became such a significant part of JPMorgan's business, the Defendants either knew or should have known that JPMorgan's lack of strong policies and procedures to ensure that JPMorgan engaged in legal and ethical conduct placed the company at a substantial risk of exposure to criminal and/or civil charges and liability. As a mortgage lender, and either with the knowledge of JPMorgan's officers and directors or as a result of their reckless disregard of JPMorgan's business operations, JPMorgan ignored and overrode its own underwriting standards, loaning hundreds of millions, if not billions of dollars, to subprime borrowers who had no history of repayment and were high risks for foreclosure. JPMorgan engaged in this high risk lending in order to maximize loan volume.

45. JPMorgan was able to maximize the number of mortgage loans to subprime borrowers because it was also one of the largest actors in the mortgage securitization market. JPMorgan transformed its massive exposure to high risk subprime lenders into RMBS, which it then turned around and marketed and sold to investors, many of whom are residents of California. JPMorgan's pervasive wrongdoing in the subprime mortgage industry, which has resulted in billions of dollars in settlements, could not have escaped the notice of the Defendants, who were the top officers and directors of JPMorgan, had they been appropriately discharging their fiduciary duties to the company. The subprime mortgage business had a massive impact on

JPMorgan's profitability, transforming JPMorgan at the relevant time from having subpar financial performance into a hugely profitable institution. The senior officers and directors of JPMorgan either knowingly allowed JPMorgan to drive those profits through wrongful acts, or chose not to implement policies and procedures adequate and necessary to ensure such wrongful acts did not occur.

46.   For years, JPMorgan had claimed that the wrongdoing emanated from the businesses it had acquired, such as WaMu and Bear Stearns. However, the officers and directors of JPMorgan knew or should have known that JPMorgan itself was directly culpable for its own misconduct in the subprime mortgage industry. JPMorgan's own direct involvement in the subprime mortgage crisis was concealed and minimized by the Defendants and it was not until recently that it was revealed that JPMorgan itself had been deeply involved in the fraudulent marketing and sales of subprime RMBS. Because of their positions at JPMorgan, Defendants knew that the mortgage loans JPMorgan was securitizing were bad, high risk loans with a high risk of default. Defendants also knew in turn that the securities the company was creating and marketing were extremely risky. By manipulating the system, however, JPMorgan created the illusion that its securities were creditworthy investments. JPMorgan actively misrepresented the quality of the mortgage loans underlying the securities it was selling, both by making material misstatements and by concealing material facts from investors. Given JPMorgan's pervasive involvement in the subprime mortgage industry, the Defendants could only have lacked knowledge of JPMorgan's misconduct through willful effort to ignore all information regarding the financial operations of JPMorgan.

47.   This derivative claim is in regards to the misconduct of the Defendants in their roles as the officers and directors of JPMorgan during the height of the subprime mortgage boom, in which the Defendants put short-term profitability above the substantial risk that JPMorgan would face having to pay billions of dollars in settlements and fines, as well as be exposed to potential criminal liability, which would impact JPMorgan's ability to conduct business. The Defendants in this case were the directors of JPMorgan who were responsible for ensuring that JPMorgan was responsible and diligent in its business operations, including its

mortgage lending, mortgage securitization and securities marketing and sales business.  The importance of the subprime mortgage business to JPMorgan's profitability made it particularly important that the Defendants implement policies and procedures to ensure that JPMorgan conducted its business in a lawful and appropriate manner.  The Defendants failed in that responsibility, by implementing policies and creating a culture in which JPMorgan had no risk management policies, or knowingly ignored those policies, in order to maximize profits from the subprime mortgage loan and securitization business.

48.     The Defendants, in their drive to pump up JPMorgan's profits, and therefore their own compensation, knowingly authorized and/or recklessly permitted JPMorgan to cut its underwriting standards in lending money on mortgages, allowed JPMorgan to securitize those high risk subprime loans into RMBS investments and then sell those RMBS to private and public investors as high quality, low risk investments.  The Defendants breached their fiduciary duties by knowingly authorizing and/or recklessly permitting JPMorgan to implement policies or ignore policies that subjected JPMorgan to substantial financial risk as well as the risk of civil and criminal penalties and fines.  The Defendants also breached their fiduciary duties by failing to put in place internal controls necessary to protect JPMorgan from engaging in the misconduct set forth in this Complaint relating to its significant involvement in the subprime RMBS crisis, thus knowingly failing to discharge their fiduciary obligations to JPMorgan.

49.     This derivative action became ripe in November 2013, when the harm suffered by the Defendants' misconduct was revealed in the form of the entry of settlements with institutional investors and a $13 billion settlement with the Justice Department.  Assuming no responsibility for themselves, the Defendants instead foisted the burden of their own wrongdoing on the shoulders of shareholders and JPMorgan.  Furthermore, it was not until August 7, 2013 that the public learned of criminal investigations in this District, as well as the Government's conclusion that JPMorgan itself, as opposed to WaMu and Bear Stearns, had violated federal securities laws in the sale of RMBSs.  Previously, Defendant Dimon claimed the latter two companies were principally involved in wrongdoing that occurred during the height of the subprime mortgage crisis.  It was also on August 7, 2013 that the public learned that the criminal

investigation relating to JPMorgan's sale of RMBSs was being conducted out of the Eastern District of California.

## B.   JPMORGAN'S LONG HISTORY OF UNLAWFUL CONDUCT OVERSEEN BY ITS BOARD OF DIRECTORS

50.   Operating under the control and direction of JPMorgan's Chief Executive Officer, Defendant Dimon, and purportedly under the watchful eye of its Board of Directors, JPMorgan has been linked to many of the world's most devastating instances of financial fraud, manipulation, and wrongdoing.  Many of these acts have jeopardized the financial stability and future of the national, if not the global, economy.  JPMorgan's officers and directors have been obligated to ensure that JPMorgan's operations are conducted in a lawful manner such that JPMorgan is not subjected to billions of dollars in criminal and civil penalties, fines and settlements.  However, and well prior to the 2008 explosion of the subprime mortgage crisis, they knowingly approved and/or recklessly permitted JPMorgan to operate with little effective oversight and supervision, and thereby put the company at substantial risk.

51.   The following summary of the criminal and civil prosecutions that have been brought by U.S. and European prosecutors against JPMorgan over recent years demonstrates a pattern of bad faith or dereliction of duty by JPMorgan's officers and directors, who failed to implement rules, regulations or internal controls necessary to ensure that the company operated in a lawful manner.  Although the nature of this complaint is focused on JPMorgan's role in the RMBS market, JPMorgan's long history of misconduct is important to understand the failure of the Defendants in this action.  Members of the JPMorgan Board of Directors have allowed JPMorgan to embark on this unprecedented course of recklessness and unlawful conduct in order to increase their own personal fortunes.  During this time period, in which JPMorgan engaged in substantial fraudulent and illegal misconduct, compensation packages for JPMorgan executives soared and JPMorgan directors' wealth was substantially enhanced based on their ownership of JPMorgan stock, which was inflated in value due in significant part to JPMorgan's illegal and wrongful conduct.  Defendant Dimon, the CEO of JPMorgan and the Chairman of JPMorgan's Board of Directors, has continued to be one of the highest paid executives in the United States.

From 2005 through 2012, **Defendant Dimon earned in excess of $130 million**.   These financial benefits were all paid out of a company that was driven to increase profits with little regard for the legality and propriety of its conduct, or the harm that such conduct would inflict on JPMorgan itself, its shareholders and the American people.

### 1.  The Enron Collapse

52.     In 2003, the SEC filed charges against JPMorgan for aiding and abetting Enron in disguising loans as commodity trades in order to meet accounting expectations.  Following legal proceedings and investigations, JPMorgan, along with other Wall Street banks, paid billions of dollars in fines for helping Enron hide its debt until just before its collapse.  Enron and its bankers had created entities to engage in complex transactions that generated fictitious earnings, disguised debt as sales and derivative transactions, and understated the firm's leverage. According to a July 28, 2003 SEC press release:

> ". . . . JPMorgan Chase knew that Enron engaged in prepays to match its so-called mark-to-market earnings (paper earnings based on changes in the market value of certain assets held by Enron) with cash flow from operating activities. By matching mark-to-market earnings with cash flow from operating activities, Enron is alleged to have sought to convince analysts and credit rating agencies that its reported mark-to-market earnings were real, i.e., that the value of the underlying assets would ultimately be converted into cash.
>
> The [SEC] further alleges that J.P. Morgan Chase also knew that prepays yielded another substantial benefit to Enron: they allowed Enron to hide the true extent of its borrowings from investors and rating agencies because sums borrowed in prepay transactions appeared as "price risk management liabilities" rather than "debt" on Enron's balance sheet. In addition, Enron's obligation to repay those sums was not otherwise disclosed. Significantly, according to the Commission's allegations, J.P. Morgan Chase considered prepays to be unsecured loans to Enron, rather than commodity trading contracts, and based its decisions to participate in these transactions primarily on its assessment of Enron's credit."

53.     Ultimately JPMorgan reached an agreement with the SEC whereby an entry of a final judgment was issued against JPMorgan permanently enjoining it from future violations of Section 10(b) of the Securities Exchange Act of 1934 and Exchange Act Rule 10b-5.  The agreement also required JPMorgan to pay disgorgement, penalties and interest in the amount of

$135 million.  JPMorgan, CIBC, Lehman Brothers, and Bank of America paid another $6.9 billion to investors to settle class action lawsuits.

## 2.  The "London Whale" Fiasco

54.     In July of 2012, the U.S. Senate Permanent Subcommittee on Investigations initiated a bipartisan investigation into the "massive bet" JPMorgan made on a complex set of synthetic credit derivatives that ultimately resulted in its loss of at least $6.2 billion.  The "massive bet" arose out of JPMorgan's London-based offices, and became known world-wide as the "London Whale" trades.  According to U.S. prosecutors, JPMorgan's committed securities fraud by hiding the true extent of losses.  The effort to conceal the true nature of the gamble was found to extend all the way up to JPMorgan's CEO Dimon, who initially dismissed the massive trade losses as a "tempest in a teapot."  The Risk Policy Committee's failure to develop, implement, execute and supervise a risk management program to protect against the "London Whale" fiasco is a microcosm of the larger failure by JPMorgan, its entire Board of Directors and the Risk Policy Committee to develop, implement, execute and supervise a risk management program in the company.  JPMorgan's profits were earned by engaging in dangerous and improper business practices that exposed JPMorgan to billions of dollars in losses, and put JPMorgan's reputation and ability to function as an American bank at risk.

55.     In March of 2013, the U.S. Subcommittee issued a scathing report that placed responsibility for the "London Whale" trading fiasco squarely on JPMorgan's highest officers.  According to the Senate Report:

> "JPMorgan Chase's Chief Investment Office used its Synthetic Credit Portfolio (SCP) to engage in high risk derivatives trading; mismarked the SCP book to hide hundreds of millions of dollars of losses; disregarded multiple internal indicators of increasing risk; manipulated models; dodged OCC oversight; and misinformed investors, regulators, and the public about the nature of its risky derivatives trading. The Subcommittee's investigation has exposed not only high risk activities and troubling misconduct at JPMorgan Chase, but also broader, systemic problems related to the valuation, risk analysis, disclosure, and oversight of synthetic credit derivatives held by U.S. financial institutions."

56.     The Senate Report also identified several specific and material misrepresentations and omissions made by CEO Dimon to the press about the extent of JPMorgan's losses, and in JPMorgan's public filings with the SEC.  According to the Report:

> "[T]hese misstatements and omissions about the involvement of the bank's risk managers in putting on SCP [Synthetic Credit Portfolio] positions, the SCP's transparency to regulators, the long-term nature of its decision making, its VaR totals, its role as a risk-mitigating hedge, and its supposed consistency with the Volcker Rule, misinformed investors, regulators, and the public about the nature, activities, and riskiness of the CIO's credit derivatives during the first quarter of 2012."

57.     In the fall of 2013, JPMorgan reached agreements with U.S. and British regulators, including the Commodity Futures Trading Commission, pursuant to which JPMorgan admitted to committing securities violations and agreed to pay approximately $1 billion in penalties and fines as a result of the "London Whale" trade losses.

### 3.   Rigging the Electricity Market

58.     On November 14, 2012, the Federal Energy Regulatory Commission ("FERC") suspended the electric market-based rate authority of JPMorgan Ventures Energy Corporation ("JPMVEC"), a wholly owned and controlled JPMorgan subsidiary, for submitting false information to the Commission.  According to the FERC news release:

> "[JPMorgan] made factual misrepresentations and omitted material information over the course of several months of communications with the California Independent System Operator (California ISO) and in filings to the Commission in connection with requests for information involving bidding activities in the California market."

59.     In July of 2013, the Federal Energy Regulatory Commission ("FERC") issued a "Staff Notice of Alleged Violations" wherein the FERC found that JPMorgan violated the Commission's Prohibition of Electric Energy Market Manipulation, 18 C.F.R. § lc.2 (2012), by engaging in eight manipulative bidding strategies.  The Staff Notice reported that a JPMorgan trading unit had gamed wholesale electricity markets for years, focusing on the time period from September 2010 to November 2012.  According to the FERC, JPMorgan's conduct led to overpayment of "tens of millions of dollars at rates far above market prices" in California alone.

The manipulation of the electricity markets was said to include not only California, but also states in the Midwest.

60.     A confidential government document sent to JPMorgan in March of 2013 from the FERC warned the bank that government investigators had determined that JPMorgan devised "manipulative schemes" that transformed "money-losing power plants into powerful profit centers," and that one of its most senior executives gave "false and misleading statements" under oath.  Again, the rigging of the electricity market by JPMorgan demonstrates that the Board of Directors, including the Defendants in this case, fostered an environment in which JPMorgan put profits over the implementation of internal controls and systems designed to prevent JPMorgan from engaging in illegal conduct.  This lax oversight also contributed to JPMorgan's substantial involvement in the subprime crisis, and the harm that followed.

61.     According to a July 2013 announcement, JPMorgan agreed to pay $410 million to settle accusations that it manipulated electricity prices. The amount consisted of a $285 million civil penalty and the return of $125 million in allegedly improper profits.  Again, the Defendants' conduct may have resulted in short-term profits for JPMorgan but has led to long-term financial harm to the company.

### 4.     Aiding and Abetting the Madoff Ponzi Scheme

62.     On October 23, 2013, newspapers reported that the Federal Bureau of Investigation ("FBI"), in conjunction with the United States Attorney's Office, is preparing to bring criminal charges against JPMorgan, and certain JPMorgan employees, arising out of their role as the custodian of the multi-billion dollar slush fund used by Bernie Madoff in his notorious Ponzi scheme.  The potential charges are reportedly based on violations of the Bank Secrecy Act, a law that requires financial institutions to report suspicious activity to the government. Evidence collected by the FBI and the U.S. Attorney's Office reportedly suggests that JPMorgan was aware that Madoff was operating a Ponzi scheme.  Madoff himself reportedly admitted that senior officers and at least one board member from JPMorgan had direct knowledge of serious irregularities in the SEC filings of Madoff's investment vehicle Bernard L. Madoff Investment Securities LLC ("BMLIS").  However, reports indicate that over the twenty-year period when

1   JPMorgan served as the primary bank for BMLIS, JPMorgan turned a blind eye to collect

2   approximately $1 billion in pretax profits by servicing the Madoff checking account.

3        63.    In addition to the pending criminal charges described above, the U.S. Office of

4   the Comptroller of the Currency ("OCC") sent a notice to JPMorgan indicating that the agency

5   intends to assess a fine on the bank for conduct related to the Madoff Ponzi scheme.  This is

6   further evidence of the culture at JPMorgan and the failure of the company to implement

7   adequate internal controls.

8            **5.  Credit Card Debt Scandal**

9        64.    On September 20, 2013, the Consumer Financial Protection Bureau ("CFPB")

10   announced that JPMorgan agreed to pay refunds totaling $309 million to more than 2.1 million

11   credit card customers.  In addition, the U.S. Office of the Comptroller of Currency assessed a

12   $60 million civil penalty against JPMorgan.  The joint investigation by the CFPB and the Office

13   of the Comptroller resulted in a September 19, 2013 Consent Order that "found that [JPMorgan]

14   engaged in unfair billing practices for certain credit card 'add-on products' by charging

15   consumers for credit monitoring services that they did not receive."

16        65.    On May 9, 2013, the California Attorney's General Office filed a separate

17   complaint against JPMorgan for its unlawful credit card debt collection practices.  According to

18   the complaint, JPMorgan engaged in widespread "robo-signing" of faulty affidavits in credit card

19   collection lawsuits, and created a "debt collection mill that abus[ed] the California judicial

20   process" by "flood[ing] California's courts with collection lawsuits against defaulted credit card

21   borrowers based on patently insufficient evidence."  According to the California Attorney

22   General, JPMorgan's practice of filing bogus lawsuits against consumers was simply a "bet that

23   borrowers would lack the resources or legal sophistication to call [JPMorgan's] bluff."

24        66.    The unlawful debt collection practices outlined in the California Attorney's

25   General complaint are reported to have occurred nationwide, and are currently under

26   investigation by the CFPB and the U.S. Office of the Comptroller of Currency.

27

28

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**    24

**6.   The "Sons and Daughters" Program**

67.     In August 2013, reports surfaced that the SEC is coordinating a civil investigation with federal prosecutors and the FBI about a JPMorgan hiring program, created in 2006, that allegedly offered to exchange employment in JPMorgan positions overseas for business. According to reports, JPMorgan offered over 250 high-ranking positions to sons and daughters of high level Asian business partners and government officials in order to obtain lucrative business deals.  The investigation is based on the Foreign Corrupt Practices Act of 1977, which essentially bans United States companies from giving "anything of value" to a foreign official to win "an improper advantage" in retaining business.

**C.     THE DEFENDANTS' SUBSTANTIAL COMPENSATION**

68.     The Defendants received substantial compensation from JPMorgan during the relevant time period, at the same time JPMorgan became highly exposed to liability through the origination, securitization, marketing and sale of subprime RMBS.  These activities, and the revenues derived therefrom, allowed Defendants to justify huge executive compensation packages.  As such, all of the Defendants had a personal interest not to implement or enforce adequate internal controls at JPMorgan which would have slowed down the company's lucrative RMBS sales.  Defendants' misconduct allowed JPMorgan to increase its profits, but, in doing so, JPMorgan was exposed to substantial financial and regulatory risk and exposure.

69.     Defendants' decisions, which risked JPMorgan's business, financial condition, stock price and reputation, were made in light of JPMorgan's good but unspectacular financial operations prior to 2005.  In order to aggressively boost JPMorgan's profits, the decision was made to push into the subprime mortgage market, which resulted in underwriting standards being ignored, and bad mortgages being securitized and then marketed and sold to investors through fraudulent means.

70.     Defendant Dimon's highest compensation since becoming President and CEO of JPMorgan was in 2007, at the height of JPMorgan's wrongdoing.  From 2005 through 2012,

Defendant Dimon made approximately $134 million, $67 million of which he made from 2005 through 2007.

71.     Director Defendants also benefitted from the company's illegal conduct, and received generous compensation packages for their tenure on the Board and approval of Dimon's activities.  At all relevant times, the Directors received both cash and stock-based compensation and, as a matter of Board policy, the most significant portion of director compensation was linked to the Firm's common stock price.  The Board's total compensation included approximately one-third cash and two-thirds stock-based compensation, including annual stock grants.  According to JPMorgan's 2013 Proxy Statement, for the period between 2003 and 2012, each non-management director received an annual cash retainer of $75,000 and an annual grant of stock units valued at $170,000 on the date of the grant.  In addition, each member of the Audit Committee receives an additional $10,000 cash retainer, and each chair of a Board committee receives an additional retainer of $15,000 per year.

72.     Defendant Dimon was and is the sole member of the Board's "Stock Committee." As a Committee of one, Dimon has the authority to declare dividends, authorize the issuance of stock within Board-approved limits, administer the dividend reinvestment plan and implement share repurchase plans.

**D.     RESIDENTIAL MORTGAGE-BACKED SECURITIZATIONS**

73.     Residential mortgage-backed securities ("RMBS") provide investors with an interest in the stream of income generated by one or more designated pools of residential mortgages.  The actual securities themselves represent an interest in an "issuing trust" that holds the designated mortgage pools.  The financial company creating the securitization, such as JPMorgan, creates the "issuing trust" and selects the mortgage loans to be placed into the mortgage pool.  The underlying borrowers continue to make their payments to a loan servicer and those payments are distributed, through the "issuing trust," to holders of the certificates at regular distribution intervals throughout the life of the loan pool.  The investors in RMBS are the certificate holders who have a right to mortgage payments.  The exact right of any investor to

such payments is governed by the RMBS creation documents.  Therefore, the value of the RMBS depends largely on the quality of the mortgages in the designated pools, including the ability of the borrowers to timely make their mortgage payments, as well as the value of the collateral supporting the mortgages.

74.     The most common form of securitization of mortgage loans involves a sponsor or seller.  The sponsor or seller is the entity that acquires or originates the mortgage loans and initiates the securitization, as well as the entity that creates the trust, to which the sponsor directly or indirectly transfers a portfolio of mortgage loans.  JPMorgan played multiple roles in this process since it both originated mortgage loans, as well as securitized those mortgage loans into RMBS.

75.     The trust that is established is established pursuant to a pooling and servicing agreement entered into by, among others, the "depositor" for that securitization.  In most cases, the transfer of assets to the trust "is a two-step process: the financial assets are transferred by the sponsor first to an intermediate entity, often a limited purpose entity created by the sponsor . . . and commonly called a depositor, and then the depositor will transfer the assets to the [trust] for the particular asset-backed transactions."  Asset-Backed Securities, Securities Act Release No. 33-8518, Exchange Act Release No. 34-50905, 84 SEC Docket 1624 (Dec. 22, 2004).

76.     Some residential mortgage-backed securitizations are created from more than one cohort of loans.  These are called "collateral groups" and, in those cases, the trust issues securities backed by different groups of mortgage loans.  For example, a securitization may involve two groups of mortgages, with some securities supported primarily by one group of mortgage loans, while other securities are supported primarily by a second group of mortgage loans.  Those who purchase the securities acquire an ownership interest in the assets of the trust. The trust owns the mortgage loans.  The purchasers of the RMBS acquire rights to the cash-flows from the designated mortgage group.  That cash-flow includes such things as the payments made by homeowners of the principal and interest on the mortgage loans held by the related trust.

77.     RMBS are issued pursuant to registration statements that are filed with the SEC. These registration statements include prospectuses that explain the general structure of the investment.  Prospectus supplements, which are also filed with the SEC, contain detailed descriptions of the mortgage groups underlying the certificates.  Certificates are issued by the trust pursuant to the registration statement and the prospectus and prospectus supplement. Underwriters sell the certificates to investors.

78.     A loan servicer manages the proceeds from the mortgage loans.  The loan servicer is responsible for collecting homeowners' mortgage loan payments.  The loan servicer then remits those payments to the trustee of the "issuing trust," after deducting its monthly servicing fee.  Besides collecting payments, the loan servicer's duties include making collection efforts on delinquent loans, initiating foreclosure proceedings, and determining when to charge off a loan by writing down its balance.  The servicer periodically reports key information about the mortgage loans to the trustee.  The trustee (or trust administrator) administers the trust's funds and ensures that the certificate holders receive the monthly payments owed to them as investors in the RMBS.

79.     The following graphic illustrates the process by which residential home mortgages are converted into RMBS and then sold to investors:



**E.    THE PRIVATIZATION OF RESIDENTIAL MORTGAGE-BACKED SECURITIES**

### 1.    The Dawn of the "Securitization Machine"

80.    Historically, mortgage loan originators did not sell or securitize the mortgage loans they originated.  Operating in a conservative manner, mortgage loan originators conducted business and made their profit on the down payments made by borrowers, as well as the principal and interest they received on a monthly basis.  Traditionally, the mortgage loan originators received and retained the monthly mortgage payments themselves.  However, because these mortgage loan originators retained ownership of the mortgages through the life of the loan, the risk of loss on those mortgage loans was born by the mortgage loan originator.  This was particularly problematic if the collateral was insufficient to cover the cost of the loan.  If mortgage loan originators made a bad loan, they suffered the loss.  In this scenario, and in view of the potential for experiencing losses directly, mortgage loan originators had a powerful economic incentive to verify the borrowers' creditworthiness through strict compliance with prudent underwriting guidelines and an accurate appraisal of the underlying property.

81.    However, between 1995 and 2005, the mortgage lending business shifted from an "originate-to-hold" model (as described above) to what has been referred to as a "securitization machine."  In the "securitization machine" model, mortgage loan originators no longer held mortgage loans to maturity.  Instead, mortgage loan originators sold the mortgage loans to banks for the sole purpose of securitization.  Under this new model, mortgage loan originators were paid at the time they sold mortgage loans, and after the sale bore none of the risk of non-payment.  In this scenario, mortgage loan originators were incentivized to issue loans without conducting any due diligence since they were paid upfront for issuing the mortgage loan.  The long-term risk of these mortgage loans were transferred to the investors in the securities.  At the time, this was a line of business predominately conducted by government agencies, such as the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac").  This system relied on the good faith and honesty of the mortgage loan originators and the mortgage loan securitizers, both in terms of maintaining prudent

underwriting policies and accurately representing the nature and risk characteristics of the RMBS that were being created.

82.     Beginning by at least 2004, commercial banks, thrifts, and investment banks (such as JPMorgan) were aggressively pushing into the market of securitizing home loans in order to take advantage of Fannie Mae and Freddie Mac's role in the mortgage loan securitization and investment process.  With the promise of immediate, short-term profits and little to no long-term risks, mortgage loan originators, of which JPMorgan was one of the largest, began to aggressively increase their volume of home loans without regard to prospective borrowers' creditworthiness.

83.     As the Federal Crisis Inquiry Commission ("FCIC")[1] concluded in its January 2011 report, this new "originate-to-distribute" or "originate-to-securitize" model "undermined responsibility and accountability for the long-term viability of mortgages and mortgage-related securities and contributed to the poor quality of mortgage loans."

84.     In the short term, the new "originate-to-distribute" or "originate-to-securitize" model was highly profitable for the mortgage loan originators.  By securitizing and then selling mortgage loans to investors, the mortgage loan originators shifted loans and credit risk off their books, earned fees and, thus, were able to issue more loans.  Put simply, the mortgage loan originators pushed the risk of default and loss onto the investors.  In addition, the securitization process enabled the mortgage loan originators to earn most of their income from transaction and loan-servicing fees, rather than (as in the traditional model) from the spread between interest rates paid on deposits and interest rates received on mortgage loans.  This new model created a huge economic incentive to originate more and more loans to feed into the "securitization machine," an incentive that was not checked or controlled.  Financial institutions such as JPMorgan eliminated or ignored their internal controls because of the massive profits generated from the "securitization machine."

---

[1]     The Financial Crisis Inquiry Commission was created by the Fraud Enforcement and Recovery Act of 2009, and was established to examine the causes, domestic and global, of the current financial and economic crisis in the United States.

85.     Sheila C. Bair, Chair of the Federal Deposit Insurance Corporation ("FDIC"), in testimony before the FCIC, explained both the misalignment of incentives arising from the sale of loans and the misalignment created by flawed compensation practices within the mortgage loan origination industry:

> "The standard compensation practice of mortgage brokers and bankers was based on the volume of loans originated rather than the performance and quality of the loans made. From the underwriters' perspective, it was not important that consumers [were] able to pay their mortgages when interest rates reset, because it was assumed the loans would be refinanced, generating more profit by ensuring a steady stream of customers. The long-tail risk posed by these products did not affect mortgage brokers and bankers' incentives because these mortgages were sold and securitized."

86.     The Attorney General for the Commonwealth of Massachusetts reached a similar conclusion when she issued the results of an in-depth investigation into the subprime mortgage industry, *The American Dream Shattered: The Dream of Homeownership and the Reality of Predatory Lending* ("The Massachusetts Attorney General Predatory Lending Report").  This report explains that:

> "Historically, the vast majority of home mortgages were written by banks which held the loans in their own portfolios, knew their borrowers, and earned profit by writing good loans and collecting interest over many years. Those banks had to live with their "bad paper" and thus had a strong incentive to avoid making bad loans. In recent years, however, the mortgage market has been driven and funded by the sale and securitization of the vast majority of loans. Lenders now frequently make mortgage loans with the intention to promptly sell the loan and mortgage to one or more entities. . . . The lenders' incentives thus changed from writing good loans to writing a huge volume of loans to re-sell, extracting their profit at the front end, with considerably less regard to the ultimate performance of the loans."

87.     The *Seattle Times* issued a similar report that examined executives at WaMu, one of the largest originators of residential home mortgages, and which JPMorgan would acquire pursuant to a Purchase and Assumption Agreement entered on September 25, 2008.  The *Seattle Times* report discussed how WaMu executives explicitly recognized and responded to this incentive to originate mortgage loans at all costs, without regard to the creditworthiness of the borrower:

---

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**     31

"Now it [WaMu] began bundling ARMs [adjustable rate mortgages] and certain other mortgages into securities and selling them off—pocketing hundreds of millions of dollars in fees immediately, while offloading any potential repayment problems. . . . [At this time WaMu CEO] Killinger hired Craig Davis, American's director of mortgage origination, to run WaMu's lending and financial services. Davis, several former WaMu executives said, began pushing WaMu to write more adjustable-rate mortgages, especially the lucrative option ARMs. "He only wanted production," said Lee Lannoye, WaMu's former executive vice president of corporate administration. "It was someone else's problem to worry about credit quality, all the details.""

Drew DeSilver, *Reckless Strategies Doomed WaMu, Seattle Times*, Oct. 25, 2009.

88.   The above statements demonstrate that, as far as mortgage loan originators were concerned, their profits came from originating as many loans as possible.  Once those mortgage loans were packaged, securitized and sold, regardless of the creditworthiness of the borrower, repayment risk became someone else's problem.

89.   Ben Bernanke, then Chairman of the Federal Reserve Board, echoed those sentiments in testimony before Congress:

"When an originator sells a mortgage and its servicing rights, depending on the terms of the sale, much or all of the risks are passed on to the loan purchaser. Thus, originators who sell loans may have less incentive to undertake careful underwriting than if they kept the loans. Moreover, for some originators, fees tied to loan volume made loan sales a higher priority than loan quality. This misalignment of incentives, together with strong investor demand for securities with high yields, contributed to the weakening of underwriting standards."

### 2.   Banks Depart from Traditional Mortgage Origination Practices

90.   Starting in 2005, private commercial institutions took the lead in the RMBS business.  At that time, Fannie Mae and Freddie Mac, the two government-sponsored entities still maintained their monopoly on securitizing prime mortgages below their loan limits.  However, by 2005, the wave of home refinancing by prime borrowers spurred by very low, steady interest rates began to drop precipitously, meaning that mortgage loans being issued to traditional, safe borrowers were running out.  At the same time, Wall Street banks such as JPMorgan were focused on the higher-yield loans that the Fannie Mae and Freddie Mac could not purchase and securitize - loans too large, called "jumbo loans," and nonprime loans that didn't meet Fannie

Mae's and Freddie Mac's standards.  The nonprime loans soon became the biggest part of the market - "subprime" loans for borrowers with weak credit and "Alt-A" loans, with characteristics riskier than prime loans, to borrowers with strong credit.  With the prime shortage of prime borrowers, financial institutions such as JPMorgan turned to the subprime market to feed the "securitization machine."

91.     Former Citigroup CEO Charles Prince commented that, "securitization could be seen as a factory line . . .  [A]s more and more and more of these subprime mortgages were created as raw material for the securitization process, not surprisingly in hindsight, more and more of it was of lower and lower quality.  And at the end of that process, the raw material going into it was actually bad quality, it was toxic quality, and that is what ended up coming out the other end of the pipeline.  Wall Street obviously participated in that flow of activity."

92.     Even with the home financing boom of the early 2000's fading, the need for mortgage loan originators to originate large volumes of mortgage loans remained.  In order to meet that need, mortgage loan originators, like JPMorgan, invented new products that would make increasingly more expensive homes affordable to eager borrowers.  Departing from traditional mortgage loan origination procedures, mortgage loan originators such as JPMorgan offered a variety of reduced documentation programs in which the verification or substantiation of the applicants' statements of income, assets and employment history was limited or non-existent.  In other words, traditional due diligence and documentary safeguards designed to protect against lending money to high risk borrowers were being intentionally set aside.  These programs were being touted as providing for "streamlined" underwriting, but the programs - unbeknownst to investors and to JPMorgan shareholders - enabled mortgage loan originators to make loans to unqualified borrowers.   That these programs were simply "streamlining" the process was untrue.  The truth was that the due diligence process was essentially being ignored and/or set aside.

93.     When these defective loans were securitized, investors were assured that reduced documentation programs were available only where the borrower satisfied certain criteria, such as FICO scores, LTVs, and/or debt-to-income ratios ("DTIs").  These assurances, however, were

not accurate.  In reality, there was no principled basis for the mortgage loan originators to

evaluate the increased credit risk posed by what would eventually become colorfully, and

generally accurately known as "Liar Loans," or "NINJA" (for "no income, no job or assets")

loans.  The widespread granting of exceptions to underwriting standards without legitimate

compensating factors meant that the minimal safeguards associated with the reduced

documentation programs were often abandoned in the headlong rush to maximize origination

volume.  Indeed, the widespread granting of exceptions to underwriting standards made those

underwriting standards essentially meaningless.  In addition, mortgage loan underwriters would

often begin the underwriting of an applicant's loan under full documentation procedures.

However, after the process began, they would transfer the loan applicant to a "No Doc" program

as soon as they learned of information that would disqualify the applicant under the full

documentation procedures.  When faced with information that a borrower might default, the

prudent course would be to reject the loan.  Instead, the safeguards designed to protect against

default were ignored.

94.     As mortgage loan origination "factories" lowered underwriting standards and

focused on maximizing the volume of mortgage loans, subprime mortgages rose from 8% of

mortgage originations in 2003 to 20% in 2005.  About 70% of subprime borrowers used hybrid

adjustable-rate mortgages, such as 2/28s and 3/27s - mortgages whose low "teaser" rate lasts for

the first two or three years, and then adjusts periodically thereafter.  Prime borrowers also used

more alternative mortgages. From 2003 to 2005, the dollar volume of Alt-A securitization rose

almost 350%.  While these alternative mortgages made the monthly mortgage payments on

increasingly expensive homes more affordable in the short term, this deterioration of

underwriting standards was the genesis of the subprime mortgage crisis that followed.

95.     Popular Alt-A mortgage products included interest-only mortgages and option

adjustable-rate mortgages.  Option adjustable-rate mortgages let borrowers pick their payment

each month, including payments that actually increased the principal.  If there were any shortfall

on the interest payment, that was added to the principal.  This is called negative amortization.  If

the balance got large enough, the loan would convert to a fixed-rate mortgage, which would

increase the monthly payment - sometimes dramatically.  Option adjustable-rate mortgages rose from 2% of mortgages in 2003 to 9% in 2006.

96.     These riskier, more aggressive, mortgage products provided for the potential of higher yields for investors, but also correspondingly significantly increased the risk of default. While these alternative mortgages generated massive amounts of interest on paper, it also greatly increased the risk of default by borrowers.  According to a statement made in 2006 by the Center for Responsible Lending, "holding a subprime loan has become something of a high-stakes wager."

97.     This misalignment of incentives following the shift from the "originate-to-hold" model to the "originate-to-distribute" model caused mortgage loan originators, such as JPMorgan, to violate their own internal stated underwriting and appraisal standards.  JPMorgan and others went so far as to accept, encourage and even fabricate information from loan applicants.  This was a pervasive problem amongst mortgage loan originators, such as JPMorgan. For financial institutions such as JPMorgan, underwriting standards for nonprime and prime mortgages weakened.  Combined loan-to-value ratios - reflecting first, second, and even third mortgages - rose.  Debt-to-income ratios climbed significantly, as did loans made for non-owner occupied properties.

98.     One figure that captures the significant change in the RMBS market from public agencies to private investment banks is the precipitous decline in Fannie Mae and Freddie Mac's market share in the RMBS market.  In 2003, these government agencies held a 57% position in the RMBS, which shrank to 42% in 2003 and 37% in 2006.  Taking their place were private-label securitizations - meaning those not issued and guaranteed by the government agencies. JPMorgan was one of the largest private-label securitization players in the market.  Mortgage loan originators and the financial institutions that bankrolled them sought loan volume, not loan quality, in order to profit from the securitization market.

99.     John C. Dugan, Acting Comptroller of the Currency, described for the FCIC the consequences of these poor underwriting practices:

---

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**          35

"The combination of all the factors I have just described produced, on a nationwide scale, the worst underwritten mortgages in our history. When house prices finally stopped rising, borrowers could not refinance their way out of financial difficulty. And not long after, we began to see the record levels of delinquency, default, foreclosures, and declining house prices that have plagued the United States for the last two years—both directly and through the spillover effects to financial institutions, financial markets, and the real economy."

### 3. Faulty Appraisals of Mortgage Pools

100.    Further compounding the problems associated with RMBS was the failure of financial institutions to properly appraise the value of the collateralized real estate underlying the RMBS.  The LTV is the most common way that investors measure the value of an underlying mortgage pool.  An LTV is the ratio of the amount of the mortgage loan to the lower of the appraised value or the sale price of the mortgaged property when the loan is made.  The LTV is highly predictive of the borrowers' likelihood of defaulting.  As a borrower's equity decreases and the corresponding LTV increases - and particularly when equity drops to less than 10% of the property's value and LTVs are greater than 90% - the borrower's incentive to keep the mortgage current, or to maintain the collateral in good condition, decreases dramatically. Consequently, aggregate LTV calculations are among the most significant characteristics of a mortgage pool because LTVs both define the extent of the investor's "equity cushion" (*i.e.*, the degree to which values may decline without the investor suffering a loss), and are strongly indicative of a borrower's incentive to pay.  In the absence of properly prepared appraisals, the value component of the LTV is unreliable and misleading.  The appraisal practices of the mortgage loan originators who issued the mortgage loans that are placed into the RMBS mortgage pools, plus the accuracy of the representations in the offering documents regarding those practices, were critically important to the value of the certificates, and to the investors' decisions to purchase the certificates.

101.    Testifying before the Senate Committee of Banking, Alan Hummel, Chair of the Appraisal Institute's Government Relations Committee and Past President of the Appraisal Institute, stated that the dynamic between mortgage originators and appraisers created a "terrible conflict of interest" where appraisers "experience[d] systemic problems with coercion" and were "ordered to doctor their reports or else never see work from those parties again."

102.    Jim Amorin, President of the Appraisal, testified similarly before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit:

> "In recent years, many financial institutions have lost touch with fundamental risk management practices, including the separation between loan production and risk management. Unfortunately, parties with a vested interest in a transaction are often the same people managing the appraisal process within many financial institutions: a flagrant conflict of interest."

103.    Pressure was placed on appraisers to pump up the value of mortgage loans to increase the size and quantity of mortgage loans being issued by mortgage loan originators.  One coercion tactic that was used was the threat of being placed on a "blacklist" (also known as an "exclusionary appraiser list").  This coercion tactic was commonly used to blackball appraisers that insisted upon more conservative standards for valuation of properties.

104.    Demonstrating the extent of the problem, a survey of 1,200 appraisers conducted by October Research Corp. found that 90% of appraisers reported that mortgage brokers and others pressured them to raise property valuations to enable deals to go through during the relevant time period.  The October Research Corp. study also found that 75% of appraisers reported negative ramifications if they did not cooperate, alter their appraisal, and provide a higher valuation, including being blackballed from doing further appraisal business with other financial institutions.

105.    This widespread appraisal abuse resulted, in 2010, with the passage of the Dodd-Frank Wall Street Reform and Consumer Protection Act, section 1472, amended Chapter 2 of the Truth in Lending Act, 15 U.S.C. §§ 1631 *et seq.*, which specifically prohibits actions that violate "appraisal independence."  Pursuant to this section, acts or practices that violate appraisal independence include:

> (1)    any appraisal of a property offered as security for repayment of the consumer credit transaction that is conducted in connection with such transaction in which a person with an interest in the underlying transaction compensates, coerces, extorts, colludes, instructs, induces, bribes, or intimidates a person, appraisal management company, firm, or other entity conducting or involved in an appraisal, or attempts, to compensate, coerce, extort, collude, instruct, induce, bribe, or intimidate such a person, for the

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**       37

purpose of causing the appraised value assigned, under the appraisal, to the property to be based on any factor other than the independent judgment of the appraiser;

(2)      mischaracterizing, or suborning any mischaracterization of, the appraised value of the property securing the extension of the credit;

(3)      seeking to influence an appraiser or otherwise to encourage a targeted value in order to facilitate the making or pricing of the transaction; and

(4)      withholding or threatening to withhold timely payment for an appraisal report or for appraisal services rendered when the appraisal report or services are provided for in accordance with the contract between the parties.

106.    All of the abuses that were targeted by Congress were widespread during the time frame that JPMorgan was a major player in the mortgage loan origination business and when it securitized, issued and sold RMBS.  Many of these abuses were, in fact, carried out by JPMorgan.  These abuses caused the appraisals of the collateralized real estate backing the RMBS being sold during the relevant time period, to be wholly unreliable.

### 4.  **Predatory Lending Practices**

107.    JPMorgan and other financial institutions that issued and underwrote RMBS needed a steady stream of higher interest subprime loans in order to drive the "securitization machine."  This often resulted in JPMorgan and other financial institutions engaging in predatory lending practices.  Scott Stem, the CEO of Lenders One, testified before the Senate Banking Committee:  "The truth is that many of us in the industry were deeply distressed by the growing practice of pushing high risk loans on borrowers who had no reasonable expectation of being able to repay the mortgage. Disclosures were often less than adequate, and faced with a bewildering array of loan terms, borrowers tended to trust their mortgage banker or broker . . . In our industry, we have frankly seen too much mortgage malpractice."

108.    Federal Reserve Board Chairman Bernanke similarly explained how mortgage loan originators such as JPMorgan were engaging in predatory lending practices:  "[a]lthough the high rate of delinquency has a number of causes, it seems clear that unfair or deceptive acts and practices by lenders resulted in the extension of many loans, particularly high-cost loans that were inappropriate for or misled the borrower."

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**      38

109.    During this time period, too often mortgage loans were issued to "a borrower who ha[d] little or no ability to repay the loan from sources other than the collateral pledged," a predatory practice explicitly identified by the Expanded Guidance for Subprime Lending Programs issued by the OCC, the Board of Governors of the Federal Reserve System ("FRB"), the FDIC and the Office of Thrift Supervision ("OTS").  The Expanded Guidance stated:

> "Loans to borrowers who do not demonstrate the capacity to repay the loan, as structured, from sources other than the collateral pledged are generally considered unsafe and unsound. Such lending practices should be criticized in the Report of Examination as imprudent."

Expanded Guidance for Subprime Lending Programs at 11 (Jan. 31, 2001).

110.    The OCC added:

> "When a loan has been made based on the foreclosure value of the collateral, rather than on a determination that the borrower has the capacity to make the scheduled payments under the terms of the loan, based on the borrower's current and expected income, current obligations, employment status, and other relevant financial resources, the lender is effectively counting on its ability to seize the borrower's equity in the collateral to satisfy the obligation and to recover the typically high fees associated with such credit. Not surprisingly, such credits experience foreclosure rates higher than the norm.

> [S]uch disregard of basic principles of loan underwriting lies at the heart of predatory lending . . . ."

OCC 2003 Predatory Lending Advisory Letter at 2.

111.    The Massachusetts Attorney General Predatory Lending Report also explains the impact of predatory lending practices:

> "Subprime ARM loans typically carry an artificially low, fixed interest rate for two or three years, sometimes called a "teaser" rate. That initial rate eventually adjusts to a higher, variable rate for the remaining term of the loan, causing monthly payments to increase, often dramatically. In recent years, many subprime lenders qualified borrowers based only on their ability to make payments during the "teaser" rate period, ignoring the fact that the borrowers would not be able to make payments when the rate adjusted upwards. As a result, many borrowers had to continually refinance. Borrowers were forced to obtain new loans, each one higher than the last, at increasingly high loan to value (LTV) ratios . . . . Exacerbating the effects of serial refinancing, subprime mortgages often carry burdensome prepayment penalties, as well as high transaction costs including lender and broker commissions and other fees. . . . [T]his cycle could continue only so long as home valuations continued to increase []. As soon as real estate

prices flattened, however, homeowners—especially those who used high LTV loans—no longer had the same options when monthly payments began to adjust upward."

112.    The Massachusetts Attorney General Predatory Lending Report, singling out one specific common practice in the mortgage lending business during that period, noted that "[w]hen lenders qualify borrowers for ARM loans based only on the 'teaser' rate period, [which] reflects an utter lack of diligence in determining whether the borrower could actually pay back the loan. This problem is systemic."  According to the Report, this practice was permitted by lax underwriting standards and apparently reached its peak in 2006 and into 2007, and was directly in violation of the Interagency Guidance on Nontraditional Mortgage Product Risks issued in 2006, which stated that for "nontraditional" loans, "analysis of a borrower's repayment capacity should include an evaluation of their ability to repay the debt by final maturity at the fully indexed rate, assuming a fully amortizing repayment schedule." 71 Fed. Reg. 58,609, 58,614 (Oct. 4, 2006).

113.    As FDIC Chairman Sheila C. Bair explained in her testimony before the FCIC:

"The well-publicized benefits associated with legitimate rate-reducing mortgage refinancing and rising housing prices conditioned consumers to actively manage their mortgage debt. An unfortunate consequence of this favorable environment for refinancing was fraud. Many consumers have only a limited ability to understand details of standard mortgage contracts let alone the complex mortgages that became common during this period. In this environment, unscrupulous mortgage providers capitalized on the widely advertised benefits associated with mortgage refinance, and took advantage of uninformed consumers by refinancing them into mortgage loans with predatory terms that were not readily transparent to many borrowers."

### 5.    Increasing Mortgage Defaults Result in System-Wide Market Failure

114.    The widespread departure by mortgage loan originators, such as JPMorgan, from prudent and conservative underwriting standards resulted in skyrocketing default and delinquency rates.  High payment defaults and delinquency rates are reflective of a systematic disregard for underwriting guidelines by mortgage loan originators.  When there is effective underwriting, poor credit risks are screened out and removed from the system.  In the absence of effective underwriting, loans are made to unqualified borrowers and fraud is not detected.  When

money is lent to borrowers without regard to their ability to repay, loan delinquencies (and foreclosures) are not only possible but are also highly likely.

115.     Academic studies have shown that the departure from sound and prudent underwriting practices and standards, which occurred during the explosion in securitizations, contributed to substantial increases in early payment defaults and delinquencies. *See* Benjamin J. Keys *et al.*, *Did Securitization Lead to Lax Screening? Evidence from Subprime Loans,* 125 Q. J. Econ. 307 (2010) ("[W]e show that a doubling of securitization volume is on average associated with about a 10% - 25% increase in defaults . . . within two years of origination . . . [and] a decline in screening standards . . .").

116.     Data collected on the performance of loans over the past several years, which was analyzed in these studies show that payment default and delinquency rates have in fact soared as a result of faulty and imprudent underwriting.  In the chart below, the X axis reflects months since issuance of the loan; the Y axis reflects the percentage of loans delinquent.



1

### 6. Executive Management Compensation Skyrockets

2    117.    During the time this fraudulent and predatory conduct was occurring in the

3  financial industry, compensation skyrocketed.  According to a 2011 FCIC report, Wall Street

4  paid workers in New York roughly $33 billion in year-end bonuses in 2007.  That same year,

5  total compensation for the major U.S. banks and securities firms was estimated at $137 billion.

6

7

8

9

10



**Compensation in Financial and Nonfinancial Sectors**

*Compensation in the financial sector outstripped pay elsewhere, a pattern not seen since the years before the Great Depression.*

ANNUAL AVERAGE, IN 2009 DOLLARS

$102,069 — Financial
$58,666 — Nonfinancial

NOTE: Average compensation includes wages, salaries, commissions, tips, bonuses, and payments for government insurance and pension programs. Nonfinancial sector is all domestic employees except those in finance and insurance.

SOURCES: Bureau of Economic Analysis, Bureau of Labor Statistics, CPI-Urban, FCIC calculations

21

22  **F.    JPMORGAN'S ROLE IN THE MARKETING AND SALE OF TOXIC RESIDENTIAL MORTGAGE-BACKED SECURITIES TO INVESTORS**

23      ### 1.    The Emergence of JPMorgan in the RMBS Business

24      118.    JPMorgan entered into the RMBS market beginning in or about 2000 and it

25  continued to be heavily involved in the origination, securitization, marketing and sale of RMBS

26  from 2000 through 2007.  During this time, JPMorgan actively and aggressively increased its

27  role and position in the RMBS market by dramatically increasing the volume of mortgage loans

28

it purchased and securitized.  At the same time, JPMorgan was publically touting its leading

underwriter and market-maker roles in residential mortgages.

119.   Establishing a greater presence in the RMBS market was a deliberate choice made

by JPMorgan in order to improve its financial performance.  In 2005, JPMorgan was seriously

underperforming the overall market.  Pre-2005, JPMorgan's overall financial results were

mediocre.  By October 2005, JPMorgan's share price was down significantly from past years and

JPMorgan's stock was severely underperforming the S&P 500, the Dow Jones Industrial

Average, the NASDAQ Composite averages.  More importantly, JPMorgan had underperformed

every other major financial institution, including Bear Stearns, WaMu, Morgan Stanley, and

Goldman Sachs, all of which were arguably peers of JPMorgan.  This created intense pressure at

JPMorgan to increase revenues and profits as quickly as possible.  The senior officers and

directors of JPMorgan, including the Defendants, were desperate to improve JPMorgan's

financial performance, and as a result, the internal controls and protocols put in place at

JPMorgan to ensure that JPMorgan acted in a legal and appropriate manner were pushed aside,

ignored or minimized.  This was done in order to boost profits.

120.   JPMorgan's CEO, Jaime Dimon, articulated JPMorgan's need to push profits at

all costs in JPMorgan's 2005 Annual Report:

> "We are underperforming financially in many areas. We need to understand the
> reasons and focus our energy on making improvements, not excuses. We cannot
> afford to waste time justifying mediocrity. Each line of business now assesses its
> performance in a rigorous and very detailed way. Each compares results to targets
> in a variety of areas, including sales force productivity, customer service and
> systems development."

121.   Defendant Dimon emphasized that it was "imperative" for JPMorgan to begin

"designing the right products that are also profitable" to improve performance.  As a result,

JPMorgan began to expand its high risk loan origination and securitization activities with a focus

on "new product expansion initiatives."  All of these were euphemisms for JPMorgan's newly

aggressive move into the origination and securitization of subprime mortgages and the marketing

and sale of subprime RMBS through fraudulent means.

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**     43

122.    On September 15, 2010, William Collins Buell VI, formerly of J.P. Morgan Securities, testified before the FCIC that there was intense pressure at JPMorgan to compete with other firms involved in the mortgage-backed securities market.  This pressure came from the highest levels of JPMorgan, with senior executives and JPMorgan's directors pushing the company to pump up profits, regardless of whether that involved entering a high risk business area.  Despite that risk, the decision was made not to implement high levels of supervision and oversight, lest such supervision and oversight prevent JPMorgan from boosting its profits to the levels it could otherwise reach if allowed to operate in an unsupervised manner.  Buell testified that JPMorgan and other investment banks believed that there had "been a long period of stability, there [was] a great appetite for people who want to borrow money, and there's a great appetite for investors and others who want to employ their money.  And so there was a competition among a large variety of participants in the market to try to expand the range of products that were available." "[T]here was a very competitive process to offer a wider and wider array of products to borrowers . . . there was a tremendous amount of competition to try to make products that people could actually get . . . and that investors and lenders would be interested in buying."  Buell confirmed that this competition led to a reduction in diligence and oversight on the part of JPMorgan.  Buell stated that from 2005 to 2007, JPMorgan's underwriting guidelines and origination standards were "deteriorating," a fact that was known at all levels throughout JPMorgan.

123.    However, in 2006, JPMorgan's performance was still trailing the performance of its major competitors, such as Bear Steams, Morgan Stanley, and Goldman Sachs.  Desperate to reverse JPMorgan's underperformance, the Defendants decided to increase revenues and profits through increasing origination and securitization of residential mortgages.  As stated by Defendant Dimon in JPMorgan's 2006 Annual Report, this was a key area for JPMorgan's growth in 2007:

> "Historically, our two businesses, Home Lending and the Investment Bank, barely worked together.  In 2004, almost no Home Lending mortgages were sold through our Investment Bank.  This past year, however, our Investment Bank sold 95% of the non-agency mortgages (approximately $25 billion worth) originated by Home

Lending.  As a result, Home Lending materially increased its product breadth and volume because it could distribute and price more competitively.  This arrangement obviously helped our sales efforts, and the Investment Bank was able to build a better business with a clear, competitive advantage.  In 2006, our Investment Bank moved up several places in the league-table rankings for mortgages.  (Importantly, Home Lending maintained its high underwriting standards; more on this later.)"

124.    Because JPMorgan was expanding its loan origination and securitization practices and because this expansion was a major factor in increasing JPMorgan's revenues and profits, JPMorgan understood that investors would be particularly focused on the underwriting practices with respect to the mortgage loans that JPMorgan was securitizing into RMBS mortgage pools. Accordingly, JPMorgan's 2006 Annual Report reassured investors that JPMorgan had "materially tightened" its underwriting standards and would be "even more conservative" in originating mortgages.  The 2006 Annual Report was signed by Defendant Dimon.

125.    Similarly, Defendants Dimon, Bowles, Burke, Crown, Futter, Jackson, Lipp, Novak, Raymond and Weldon all signed JPMorgan's filing on Form 10-K for the fiscal year ended 2006 which repeated that purportedly strong underwriting standards were in place at JPMorgan in regards to mortgage loans.  That filing concealed the fact that JPMorgan was not complying with its underwriting standards in the origination of mortgage loans and was becoming more aggressive in ignoring such standards in maximizing subprime loan volume. The filing also concealed that JPMorgan was maximizing subprime loan volume in order to maximize the number of high risk subprime RMBS that JPMorgan could later create and then sell through fraudulent means.

126.    JPMorgan generated mortgage loans in order to securitize those subprime mortgage loans through its own mortgage origination platform operated by Chase Home Finance LLC ("CHF"), the home mortgage division of JPMorgan Chase Bank, N.A.  CHF originated far more of the mortgage loans that supported RMBS created by JPMorgan than any other mortgage loan originator.  JPMorgan worked diligently to increase its own origination practices because it allowed JPMorgan "not only" to "secur[e] a permanent pipeline of product," but also "to control the quality of what [they were] creating."

127.     JPMorgan also purchased loans for securitization from financial institutions and other secondary mortgage-market sellers.  Beginning in or around 2001, JPMorgan purchased mortgage loans for securitization through a bulk and a flow channel.  "Bulk" acquisitions referred to purchases of loans in bulk from large third-party originators.  "Flow" acquisitions referred to smaller-scale purchases of loans, typically on a loan-by-loan basis.  JPMorgan often facilitated the origination and purchase of loans through both the bulk and flow channels by extending what was known as "warehouse" financing - essentially a line of credit - to originators with whom JPMorgan had a relationship.  This was another mechanism by which JPMorgan inflated the volume of subprime mortgage loans to increase the number and dollar size of RMBS that JPMorgan could sell by misrepresenting the nature and risk characteristics of the RMBS and the subprime mortgage loans underlying the RMBS.

128.     JPMorgan's residential mortgage "securitization machine" involved numerous subsidiaries and/or sub-entities, including, but not limited to, the following:

### a.     *JPMorgan Acquisition*

129.     JPMorgan Acquisition has been involved in the securitization of a variety of different assets since its incorporation. For fiscal years 2003, 2004, 2005 and 2006, JPMorgan Acquisition securitized approximately $545 million, $4.5 billion, $24.1 billion, and $40.6 billion worth of residential mortgage loans, respectively.

130.     JPMorgan Acquisition was actively involved in all aspects of the mortgage loan securitization process.  It determined the structure of the securitizations that were sold to investors, initiated the securitizations, purchased the mortgage loans to be securitized, determined distribution of principal and interest, and provided data to the credit rating agencies to secure investment grade ratings for the certificates.  JPMorgan Acquisition also selected the depositor that would be used to transfer its mortgage loans to the trusts, and selected the underwriter for the securitizations.

### b.     *JPMorgan Acceptance*

131.     JPMorgan Acceptance has similarly been engaged in the securitization of mortgage loans as a depositor since its incorporation.  JPMorgan Acceptance was incorporated in

1998 as a special purpose entity formed solely for the purpose of purchasing mortgage loans, filing registration statements with the SEC, forming issuing trusts, assigning mortgage loans and all of its rights and interests in such mortgage loans to the trustee for the benefit of the certificate holders, and depositing the underlying mortgage loans into the issuing trusts.

132.     In its capacity as the depositor, JPMorgan Acceptance purchased the mortgage loans from the sponsor pursuant to an Assignment Agreement or Assignment, Assumption and Recognition Agreement, as applicable.  These agreements gave JPMorgan temporary ownership of the mortgage loans from the sponsor.  Immediately thereafter, JPMorgan Acceptance then sold, transferred, or otherwise conveyed the mortgage loans to the trusts for securitization purposes.  JPMorgan Acceptance, together with the other JPMorgan subsidiaries, was also responsible for preparing and filing the registration statements pursuant to which the RMBS certificates were offered for sale.  The trusts held the mortgage loans for the benefit of the certificate holders, and issued the certificates in public offerings for sale to large institutional investors.

### c.     *JPMorgan Securities*

133.     JPMorgan Securities was the lead underwriter for JPMorgan's RMBS business. In its role as the lead underwriter, it was responsible for underwriting and managing the offer and sale of certificates to investors.  In addition, as the lead underwriter, JPMorgan Securities was also obligated to conduct meaningful due diligence to ensure that the registration statements did not contain any misstatements or omissions of material fact, including any misstatements or omissions regarding the manner in which the underlying mortgage loans were originated, transferred, and/or underwritten.

### d.     *JPMorgan Chase and JPMorgan Bank*

134.     JPMorgan Chase and JPMorgan Bank, through their wholly-owned subsidiaries, JPMorgan Acquisition (a direct subsidiary of JPMorgan Bank), JPMorgan Securities (a direct subsidiary of JPMorgan Chase), and JPMorgan Acceptance (a direct subsidiary of J.P. Morgan Securities Holdings LLC, which is, in turn, a direct subsidiary of JPMorgan Chase), played key roles in the securitization process.  Unlike typical arms' length securitizations, the JPMorgan

securitizations involved various JPMorgan subsidiaries and affiliates at virtually every step in the chain.  JPMorgan Chase and JPMorgan Bank, either individually or through their subsidiaries, were involved in the origination of subprime mortgage loans, the securitization of subprime mortgage loans into subprime RMBS and then the marketing and sale of those subprime RMBS

### e.   Chase Home Finance LLC

135.    Many of the residential home mortgage loans that served as the foundation for JPMorgan-sponsored securitizations were originated by Chase Home Finance LLC, the home mortgage division of JPMorgan.  CHF originated far more of the mortgage loans underlying the JPMorgan securitizations than any other mortgage loan originator and allowed JPMorgan to pump up mortgage loan volumes when necessary to increase the number of mortgage loan securitizations that JPMorgan needed or wanted.

136.    By 2007, CHF was one of the top overall mortgage originators by volume in the United States with an 8.6% market share.  CHF was also one of the top overall subprime mortgage originators by volume in the United States in 2007 with a 6.0% market share.

### f.   JPMorgan as Successor to WaMu Bank

137.    On September 25, 2008, JPMorgan Bank entered into a Purchase and Assumption Agreement (the "PAA") with the FDIC, under which JPMorgan agreed to assume substantially all of WaMu Bank's liabilities and purchase substantially all of WaMu Bank's assets, including WaMu Capital, WaMu Acceptance, and WaMu Securities.  These WaMu entities served similar roles as the various JPMorgan sub-entities, in that various subsidiaries and sub-entities acted as depositor, trustee or sponsor of the RMBS securities.

138.    WaMu, like JPMorgan, had been involved in the securitization of a variety of assets since its incorporation. During the 2004, 2005 and 2006 fiscal years, WaMu Bank securitized approximately $34.7 billion, $71.6 billion, and $70.8 billion of residential mortgage loans, respectively.

### g.   JPMorgan as Successor to the Bear Stearns Companies, Inc.

139.    Pursuant to a March 16, 2008 Agreement and Plan of Merger (the "Merger") between JPMorgan and Bear Stearns, JPMorgan is the successor-in-interest to Bear Stearns.

---

Bear Stearns, through its wholly-owned subsidiaries, sold billions of dollars of toxic RMBS to investors.

140.   Unlike typical arms' length securitizations, many of the Bear Stearns securitizations involved various Bear Stearns subsidiaries and affiliates at virtually each step in the process.  Bear Stearns major affiliates and subsidiaries include:

- **EMC Mortgage LLC (f/k/a EMC Mortgage Corporation)**.  During the 2003, 2004, 2005 and 2006 fiscal years EMC securitized approximately $20.9 billion, $48.4 billion, $74.5 billion, and $69.1 billion of residential mortgage loans, respectively.

- **Structured Asset Mortgage Investments II Inc. ("SAMI") and Bear Stearns Asset Backed Securities LLC ("BSABS")** were engaged in the securitization of mortgage loans as depositors since their incorporations in 2003 and 2004, respectively.  They are special purpose entities formed for the solely for the purpose of purchasing mortgage loans, filing registration statements with the SEC, forming issuing trusts, assigning mortgage loans and all of its rights and interests in such mortgage loans to the trustee for the benefit of the certificate holders, and depositing the underlying mortgage loans into the issuing trusts.

- **Bear Stearns & Co. Inc. ("BSC")** was the lead underwriter for RMBS. In that role, it was responsible for underwriting and managing the offer and sale of Certificates to investors. BSC was also obligated to conduct meaningful due diligence to ensure that the Registration Statements did not contain any material misstatements or omissions, including the manner in which the underlying mortgage loans were originated, transferred, and underwritten.

## 2.   JPMorgan Expands Securitization Business

141.   At the same time that JPMorgan was selling out of its own subprime positions because it understood that these securities could "go up in smoke," JPMorgan was aggressively expanding the origination and securitization of high risk mortgages.  JPMorgan was acting to protect its own interests by reducing its own exposure to the subprime markets but was content to continue to profit from the subprime market as long as it could shift the risk away from itself and onto investors.  From 2006 to 2007, JPMorgan nearly doubled its securitizations of residential mortgage loans - from $16.8 billion in 2006 to $28.9 billion in 2007.  To generate this enormous amount of securities, JPMorgan incentivized CHF, the mortgage loan origination arm of

JPMorgan, to pump out subprime mortgage loans to high risk borrowers, loosened underwriting standards, and pressured appraisers to generate a large volume of subprime mortgage loans with inflated dollar figures.  These poor-quality mortgages were then included into JPMorgan securitizations which were fraudulently marketed to investors as high quality investments.

142.    Many of the reports of JPMorgan's deficient underwriting practices come from JPMorgan's own employees and documents.  For example, former regional vice-president, James Theckston, was a recipient of the CHF "sales manager of the year" award.  He explained to the *New York Times* that 60% of his 2006 performance review depended on him increasing the origination of high-risk loans.  A Banker Speaks, With Regret, *New York Times*, Nov. 30, 2011.  In other words, it was built into the system of JPMorgan to pump out subprime mortgage loans regardless of the true creditworthiness of the borrower.

143.    Theckston also stated that CHF account executives could earn a commission for the origination of subprime loans that was seven times higher than for prime mortgages.  As a direct result of JPMorgan's incentive program, CHF account executives intentionally looked for less savvy borrowers - those with less education, without previous mortgage experience, or without fluent English - and directed them toward subprime loans.  According to Theckston, these borrowers were disproportionately minority borrowers who, as a result of CHF practices, ended up paying higher mortgage rates and were more likely to default and lose their homes.  JPMorgan did not care about any of this, however, since the mere act of lending the money was profitable, since the subprime mortgage loans were packaged into subprime RMBS and then the risk sold off to others.

144.    In an undated JPMorgan internal memorandum, a JPMorgan employee working in generating new RMBS circulated tips for using "Cheats & Tricks" to allow JPMorgan mortgage loan originators to circumvent the in-house automated loan underwriting system to get risky loans approved.  This memorandum states that the secret to getting risky loans approved is to inflate the borrower's income or to otherwise falsify their loan application.  This was a well-known phenomenon within JPMorgan which had designed a system that was knowingly subject to frequent abuse.

---

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**          50

145.    The JPMorgan memorandum also suggests that the automated loan-origination system, called "Zippy," could be adjusted.  According to the "Zippy Cheats & Tricks" memorandum:

> "If you get a 'refer' or if you DO NOT get Stated Income / Stated Asset findings. . . .
> Never Fear!! ZiPPY can be adjusted (just ever so slightly).  Try these steps next time you
> use Zippy! You just might get the findings you need!!:
>
> (1)    In the income section of your 1003, make sure you input all income in
> base income. DO NOT break it down by overtime, commissions or bonus.
>
> (2)    NO GIFT FUNDS! If your borrower is getting a gift [to cover some or all
> of the down payment], add it to a bank account along with the rest of the
> assets.  Be sure to remove any mention of gift funds on the rest of your
> 1003.
>
> (3)    If you do not get Stated/Stated, try resubmitting with slightly higher
> income. Inch  it up $500 to see if you can get the findings you want.  Do
> the same for assets."

146.    These were step-by-step instructions on how to engage in fraudulent and potentially criminal conduct, all of which were contained within a JPMorgan internal memorandum.  Mechanisms for bypassing JPMorgan's internal mortgage loan controls were well-known within JPMorgan during this time period and were routinely used and abused by JPMorgan during this time period.  According to the memo, employees in JPMorgan's origination department should "never fear" if they "do not get stated income / stated asset findings" on the first attempt because they can try and try again until they get their desired result.  For example, by lumping contingent income with base income, concealing the receipt of gifts (which are typically required to be specifically disclosed in loan applications), and artificially inflating income, JPMorgan loan originators were able to approve countless loans that otherwise would not have satisfied Zippy's stated underwriting guidelines.  All of these mechanisms created a false picture of the mortgage loan borrower's risk characteristic.  The pervasive misuse of these mechanisms by JPMorgan infected not only the risk characteristic of individual mortgage loan borrowers, but also the risk characteristic of the JPMorgan RMBS that were created using these subprime mortgage loans.  This was misrepresented to investors.

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**          51

147.     Government investigations into JPMorgan's unsound loan origination practices have confirmed the existence of a prevailing attitude within JPMorgan of using "cheats and tricks" to game the system and approve loans that are not in accordance with stated underwriting guidelines.  These investigations also found that:  (1) JPMorgan employees faced intense pressure to close loans at any cost; (2) JPMorgan employees manipulated loan data in order to close loans; (3) JPMorgan approved loans based upon inflated appraisal values; and (4) JPMorgan failed to adhere to sound underwriting guidelines.  This failure of internal control and the lack of mechanisms to identify such problems demonstrate that the Defendants knowingly or recklessly failed to meet their fiduciary obligations to JPMorgan.

148.     A loan processor and assistant to the branch manager at a Florida branch of CHF who was at CHF from April 2006 until August 2007, stated that CHF employees faced enormous pressure to close loans because their salaries were dependent solely upon quantity, not quality. For example, loan officers only received a salary their first two months at CHF.  After the second month, their income was based upon commissions for the number of loans they closed.  If they did not close loans, they did not receive a paycheck.  No incentive existed for CHF employees to ensure that the mortgage loans at issue were of good quality.  The statements of another JPMorgan employee were consistent with the statements of this CHF employee, stating that staff underwriters at JPMorgan received a salary plus bonus pay that was based on the quantity of funded loans.

149.     Other reports confirm that branch and regional managers within JPMorgan and CHF pressured loan officers across the United States to meet monthly quotas.  This pervasive pressure to pump up mortgage loan values and volume existed throughout JPMorgan.  If a JPMorgan loan officer worked two months without closing a loan, he or she could be fired. According to sources within JPMorgan, "loan officers walked around on eggshells at month end" for fear of losing their jobs or not receiving the commission they needed to support themselves and their families.  In other words, the issues at JPMorgan relating to subprime mortgage loans and subprime RMBS were systemic and not the result of bad acts by a few low-level JPMorgan employees.

150.    Underwriters at CHF also received monthly bonuses based upon the volume of loans closed, and management pressured CHF underwriters to close loans.  Government investigations discovered that one regional manager would send the branch managers below him to CHF's underwriting office in New Jersey "to work the magic" and close the loans.

151.    Due to this intense pressure from the highest levels of the JPMorgan hierarchy, many CHF employees inflated borrowers' incomes and modified loan files in order to push loans through.  "It was very common to take stuff out of the loan file" in order to get a loan approved, said one unnamed CHF employee.  For example, loan officers removed bank statements, paystubs, or other documents which showed the borrower's income so that the loans would not be hindered in closing.

152.    This created a systemic problem within JPMorgan in which JPMorgan employees at different stages in the securitization process knew that everything was falsified but continued to feed the "securitization machine."  JPMorgan employees have stated that "loan officers knew [the borrowers] were making less income" than was stated on the loans because, acting on orders from the branch manager, the loan officers inflated the borrowers' income.

153.    CHF officers knew that incomes were routinely inflated because loan officers often brought their loans to the branch manager for help and instruction on how to make them close.  In fact, one unnamed employee said that, "[t]he branch manager often fixed the loan . . . [he] figured out what LTV [the borrower] needed to close the loan and inflated the income to make the loan work."  Branch managers also called the regional managers above them to help close problem loans.

154.    The statements of another CHF senior loan underwriter, further illustrate the systemic problems at JPMorgan and CHF, mainly that CHF closed loans based upon stated incomes that were false and inflated so that JPMorgan could securitize those subprime mortgage loans and profit off the sale of RMBS filled with these subprime, high-risk mortgage loans.  This CHF senior loan underwriter recalled circumstances in which mortgage brokers changed applicants' stated incomes before they submitted the loan files to CHF.  It was common, after the

loans closed and weren't performing that, when CHF would contact the borrower, CHF would "hear the borrower say, 'I never said I make that much.'"

155.    In addition to approving loans based upon inflated incomes, CHF employees have admitted approving loans based upon inflated appraisal values. In fact, CHF employees were reportedly "not allowed to contest appraisals that appeared to be inflated." As a result of the housing bubble, appraisers over-adjusted and ensured that the appraisals came in at or above the sales price. For example, there are reports of one subdivision in California in which homes sold in the second phase of the subdivision build-out doubled the value of those sold in the first phase, which had occurred just a few months earlier. In this instance, according to a CHF employee, "[t]he first phase appraisals were valued at $200,000. The second phase, based on speculative investors buying and selling, pushed the values to $400,000. You'd look at the comps and there would be two inside the 'division' and one outside, but you couldn't contest the value."

156.    A senior underwriter at JPMorgan Chase Bank, N.A., who worked for JPMorgan from April 2001 to June 2008, stated that managers at JPMorgan Chase Bank, N.A. often overturned the decisions of lower-level underwriters to reject stated-income loans. This was consistent with the overall policy at JPMorgan which was to push through subprime mortgage loans at any cost. The complete absence of any mechanism for supervising JPMorgan's origination and securitization of subprime mortgage loans, as well as the sale and marketing of subprime RMBS constituted an abdication of the Defendants' responsibilities as JPMorgan officers and directors.

157.    JPMorgan's complete departure from sound underwriting standards has been confirmed by JPMorgan's own CEO and Board Chairman, Jaime Dimon. In testimony given before the FCIC on January 13, 2010, Defendant Dimon stated that "the underwriting standards of our mortgage business should have been higher." Defendant Dimon confessed that JPMorgan "misjudged the impact of more aggressive underwriting standards and should have acted sooner and more substantially to reduce the loan-to-value ratios."

158.    In his March 30, 2012 annual letter to shareholders, Defendant Dimon reaffirmed that JPMorgan, during the relevant time period, had materially loosened its underwriting

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**          54

standards and issued problematic loans to borrowers.  Defendant Dimon acknowledged that "avoiding making bad loans - as we all learned again in this crisis - also is important" and that "traditional mortgage underwriting loosened over time."  All Defendants, including Dimon, knew or should have known that JPMorgan's underwriting standards were deteriorating but this was allowed to occur because JPMorgan's profitability was significantly boosted because of this.

159.    Defendant Dimon, however, was not prepared to tell the whole truth yet.  In the March 30, 2012 letter to shareholders, Defendant Dimon deflected blame away from himself and the other Defendants and blamed the subprime mortgage crisis on "unscrupulous mortgage officers" who were "miss-selling mortgages" and on "some mortgage borrowers" who were "lying on mortgage documents."  Defendant Dimon wrote in that letter that "[w]e [JPMorgan] were one of the better actors in this situation - but not good enough; we made too many mistakes. We generally were a better underwriter."  Defendant Dimon went on to write that "[m]any of our problems were inherited from Bear Stearns and WaMu."  In this manner, Defendant Dimon sought to deflect the blame on a few "rogue" mortgage officers and "bad" mortgage borrowers, concealing the massive systematic problems at JPMorgan that led the company to the massive settlements announced in November 2013.  These systematic problems were not the result of the actions of a few low-level JPMorgan employees but rather the systemic breach of fiduciary duties owed by the Defendants, as senior officers and directors of JPMorgan.

160.    Relying on poor underwriting, JPMorgan originated hundreds of millions if not billions of dollars' worth of mortgage loans that were destined to fail.  Theckston, a former JPMorgan regional vice-president, stated to the *New York Times*, "[i]f you had some old bag lady walking down the street and she had a decent credit score, she got a loan."  The *New York Times* noted that, when asked for a response to Theckston's account, JPMorgan "didn't deny the accounts of manic mortgage-writing . . . and noted that Chase no longer writes subprime or no-document mortgages."

161.    Far from following prudent and cautious underwriting guidelines and making occasional, targeted and justified exceptions when other evidence of ability to repay justified a deviation from the guidelines, variance from the stated standards was the norm at JPMorgan, and

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT          55**

many loans were made with essentially little to no underwriting or effort to evaluate ability to repay. The reality of JPMorgan's mortgage lending process was in significant variance from what JPMorgan was representing to the public, and to its shareholders and investors.

### 3. JPMorgan Misrepresented the Value of the RMBS to Investors

162. Alongside JPMorgan's defective underwriting practices, JPMorgan also had enormous financial incentives to complete as many securities offerings as quickly as possible without regard to ensuring the accuracy or completeness of the registration statements, or conducting adequate and reasonable due diligence of the underlying investments. The securitization of these high-risk subprime mortgage loans into RMBS not only provided JPMorgan with massive profits, it was also necessary to move the risks off of JPMorgan's books and dump them on someone else. Through these RMBS securitizations, JPMorgan's depositors received a percentage of the total dollar amount of the offerings upon completion of the securitizations, and JPMorgan Securities, as the lead underwriter, received a commission based on the amount that was received from the sale of the certificates to the public. Since none of the JPMorgan entities assumed the credit risk or default risk of the underlying mortgage loans, there was little, if any, incentive, for JPMorgan to conduct full, complete, and meaningful due diligence of the statements in the RMBS registration statements relating to the creditworthiness of the underlying mortgage loans.

163. JPMorgan's drive to securitize large volumes of mortgage loans contributed to the absence of internal controls necessary to prevent JPMorgan from issuing registration statements and prospectuses that included untrue statements of material facts and omitting material facts, in particular about JPMorgan's deteriorating underwriting standards and the use of fraudulent statements and marketing to sell subprime RMBS. This absence of internal controls has also subjected JPMorgan and/or its employees to potential criminal liability. During the 2005 to 2007 time period, JPMorgan utterly failed to conduct adequate due diligence of the underlying subprime mortgage loans and failed to ensure the accuracy of statements contained in the registration statements pertaining to the RMBS securitizations.

164.     During the relevant time period, JPMorgan retained third-parties, including Clayton Holdings, Inc. ("Clayton") and The Bohan Group, Inc. ("Bohan"), to analyze the loans they were considering placing in their securitizations.  While this superficially created a layer of due diligence, in reality, JPMorgan waived a significant number of loans into the securitizations that these firms had recommended for exclusion.  JPMorgan did so without taking adequate steps to ensure that these loans had in fact been underwritten in accordance with applicable guidelines or had compensating factors that excused the loans' non-compliance with those guidelines.

165.     On January 27, 2008, Clayton revealed to the public that it had entered into an agreement with the New York Attorney General (the "NYAG") to provide documents and testimony regarding its due diligence reports, including copies of the actual reports provided to its clients.  The *New York Times* reported on January 27, 2008 that Clayton told the NYAG "that starting in 2005, it saw a significant deterioration of lending standards and a parallel jump in lending expectations" and "some investment banks directed Clayton to halve the sample of loans it evaluated in each portfolio."

166.     The documents that were released by Clayton show that JPMorgan was aware - on a daily basis - of material weaknesses in the loan pools and in the underwriting standards of the mortgage loan originators they used to support their RMBS securitizations.  According to an internal Clayton "Trending Report," JPMorgan was told that a significant portion of the loans that Clayton reviewed for their respective sponsor entities "failed to meet guidelines."  Moreover, these loans were not properly approved as "exception loans" because they did not have any "compensating factors."  JPMorgan was also informed that 27% of the loans reviewed by Clayton for JPMorgan Acquisition were not underwritten according to represented underwriting standards.  JPMorgan was therefore well aware that it was securitizing bad loans and it was well aware that its representations to investors that the RMBS were safe, low risk investments, were false.

167.     Confronted with such a high failure rate on these mortgage loans, Defendants, as the executive management of JPMorgan, should have either rejected the mortgage pool outright, increased oversight of the company's internal underwriting, or investigated whether the third-

party mortgage loan originators involved could be considered a trusted source of loans in the future.

168.    Instead, JPMorgan chose to continue and maintain its own poor internal underwriting standards and policies, and to continue to work with problematic and potentially unscrupulous mortgage loan originators.  All of these mortgage loan originators, based on the economic incentives created by JPMorgan, were driven to maximize the dollar value and volume of subprime mortgage loans to create subprime RMBS that could be sold to third-party investors. Moreover, JPMorgan failed to disclose the red flags revealed by Clayton's review to investors in the RMBS.  According to Clayton's "Trending Report," JPMorgan "waived in" to its pools over 50% of the defective loans that Clayton had identified as being outside the guidelines.

169.    Clayton's "Trending Report" is compelling evidence that JPMorgan and the Directors knew the company was securitizing defective loans and selling the resulting high-risk securities to investors.  Beyond the high risk nature of the RMBS, however, was the misrepresentations made by JPMorgan to investors that these RMBS investments were safe and low risk.  On September 23, 2010, Clayton's Vice President Vicki Beal testified that, through its numerous roles as underwriter and sponsor, JPMorgan was made fully aware on a regular basis that a significant percentage of its loans failed to meet stated underwriting guidelines, but were being included anyway in the mortgage pools underlying residential mortgage-backed securities sold to investors.

170.    JPMorgan not only let poor loans pass into its securitizations in exchange for underwriting and securitization fees, it also took the fraud further by affirmatively seeking to profit from this knowledge of the low quality nature of the mortgage loans.  Rather than rejecting these loans from the mortgage loan pool, as it should have, JPMorgan used the evidence of underwriting defects to negotiate lower prices for the loans from third-party mortgage originators, thus boosting its own profits.  According to the September 2010 testimony of Clayton's former president, D. Keith Johnson, before the FCIC, the banks, such as JPMorgan, used the exception reports to demand a lower price for themselves, which provided no benefit to investors:

---

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**      58

"I don't think that we added any value to the investor, the end investor, to get down to your point. I think only our value was done in negotiating the purchase between the seller and securitizer. Perhaps the securitizer was able to negotiate a lower price, and could maximize the line. We added no value to the investor, to the rating agencies."

FCIC Staff Int'v with D. Keith Johnson, Clayton Holdings, LLC (Sept. 2, 2010), available at http://fcic.law.stanford.edu/resource/interviews.  Rather than exclude defective and high risk mortgage loans from the collateral pools, or cease doing business with consistently failing mortgage loan originators, the information provided by companies like Clayton was instead used to insist on a lower price from the mortgage loan originators.

171.    JPMorgan allowed into the RMBS securitizations a substantial number of defective and high risk mortgage loans that, as reported to them by Clayton and other third-party due diligence firms, did not conform to the underwriting standards that JPMorgan represented in registration statements, prospectuses and prospectus supplements were in place at JPMorgan. Even after learning from these third-party due diligence firms that there were high percentages of defective or at least questionable loans in the sample of loans reviewed by the third-party due diligence firms, JPMorgan made no effort to take any additional steps to verify or evaluate the accuracy of these reports from these third-party due diligence firms.

172.    The FCIC later confirmed the accuracy and truth of the Clayton report, finding that during the period from the first quarter of 2006 to the second quarter of 2007, 27% of the mortgage loans that JPMorgan submitted to Clayton to review for inclusion in RMBS mortgage loan pools were rejected by Clayton as falling outside the applicable underwriting guidelines.  Of the mortgage loans that Clayton found defective, 51% were subsequently "waived in" by JPMorgan without proper consideration and analysis of compensating factors and included in securitizations.  *See* The Financial Crisis Inquiry Report, at 167, Jan. 2011, available at http://fcic-static.law.stanford.edu/cdn_media/fcic-reports/fcic_final_report_full.pdf.

173.    A report generated as part of the New York Attorney General's ongoing investigation of investment banking misconduct in underwriting mortgage-backed securities stated that Clayton routinely provided the banks with detailed reports of loans that were not

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**          59

compliant with underwriting guidelines, but that the banks, including JPMorgan, routinely ignored Clayton and other third-party due diligence firms and overrode the exclusion of a significant percentage of rejected loans from purchase and securitization.

174. JPMorgan was one of the largest issuers of private mortgage-backed securities in 2007 with a 5.7% market share. From 2000 to 2007, JPMorgan increased its volume of subprime RMBS issuances from a negligible amount in 2000 to $11.4 billion in 2007, with a total issuance of $22.8 billion from 2005-2007. For the 2005-2007 time period, JPMorgan was the eleventh largest issuer of subprime RMBS in the United States.

175. On September 1, 2010, JPMorgan's Chief Risk Officer, Barry Zubrow, told the FCIC that "there was a tradeoff between certain financial covenants and protections versus a desire to maintain market share." In this case, JPMorgan, through its senior officers and directors, chose to maintain market share instead of protecting JPMorgan and ensuring that the company did not engage in illegal misconduct.

176. In an April 15, 2008 report, the Federal Reserve of New York concluded that JPMorgan needed to "strengthen [its] exposure measurement and limit framework around leveraged lending." The Federal Reserve also reported that JPMorgan's "deterioration in the quality of the firm's consumer portfolios" resulted from "loosened underwriting standards" and "shortcomings in oversight and controls governing third party mortgage loan origination activities," as well as "breakdowns in the 'originate to distribute' model, namely weak underwriting standards and investor concentration risk in collateralized loans obligations."

177. In his January 13, 2010 testimony before the FCIC, Defendant Dimon confirmed CHF's overreliance on third parties to originate loans, testifying that these broker-loans performed markedly worse: "We've also closed down most—almost all of the business originated by mortgage brokers where credit losses have generally been over two times worse than the business we originate ourselves." Dimon went on testify that "there were some unscrupulous mortgage salesmen and mortgage brokers. And, you know, some people missold." These misrepresentations, however, concealed the fact that the subprime problem at JPMorgan was a systemic crisis created, facilitated or tolerated by the Defendants' failure to properly

discharge their duties, and not simply by the result of bad acts of a few unscrupulous mortgage salesmen and mortgage brokers.  With his testimony, Dimon sought to conceal and minimize the fact that JPMorgan's problems were systemic and reached the highest levels of the company, problems that would subject JPMorgan to criminal investigation and billions in settlements.

178.   When Dimon was asked whether JPMorgan conducted stress tests in order to prevent its exposure to these systemic risks and what risk management procedures were in place, he replied: "[i]n mortgage underwriting, somehow we just missed, you know, that home prices don't go up forever and that it's not sufficient to have stated income in home [loans]."  Dimon was later quoted as saying,"[t]here was a large failure of common sense" because "[v]ery complex securities shouldn't have been rated as if they were easy-to-value bonds."  This was not something that somehow JPMorgan missed.  This failure occurred because the Defendants in this case failed to perform their fiduciary duties to the company.

### 4.    JPMorgan Knew its Representations Were False

179.   The evidence discussed above shows that JPMorgan was falsely marketing its RMBSs, including:

- by the pervasive misrepresentations it made relating to basic information about the underlying mortgage loans, such as owner occupancy and LTV ratios, and knowledge of inaccurate and misleading credit ratings;

- in view of third-party due diligence providers such as Clayton and Bohan informing JPMorgan that significant percentages of loans in the pools did not adhere to underwriting guidelines.  For example, Clayton admitted that in the period from the first quarter of 2006 to the second quarter of 2007, 27% of the mortgage loans JPMorgan submitted for review in RMBS loan pools were rejected by Clayton as falling outside the applicable underwriting guidelines; and

- given that of the 27% of mortgage loans that Clayton found defective, 51% were subsequently waived in by JPMorgan without proper consideration and analysis of compensating factors and included in securitizations such as the ones in which Fannie Mae and Freddie Mac invested. JPMorgan's waiver of over half of the defective loans shows that JPMorgan knew of or recklessly disregarded the systemic failure in underwriting and the fraudulent misrepresentations in the offering materials received by the GSEs.

---

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**        61

180.    The strikingly high number of JPMorgan's loans that were rejected by third-party due diligence firms, yet were then subsequently "waived" into securitizations by JPMorgan, shows JPMorgan's knowledge that defective loans were being included in its offerings.  It further shows that JPMorgan knowingly and intentionally misrepresented the risk profile and quality of the RMBS that it was selling to investors, with the knowledge or reckless disregard of the Defendants.

181.    JPMorgan, directly and through its various affiliates and subsidiaries, participated in every step of the securitization process, from the origination and servicing of the mortgage loans, to the sponsoring and structuring of the securitization, to the underwriting and marketing of the certificates that represented an investment in the RMBS.  This vertical integration at all levels of the process allowed JPMorgan to control and manipulate the loan level documentation and the value at which properties were appraised, and to ensure that loans would be approved by its loan underwriters.  It also shows that JPMorgan was deeply involved with this process, such that it would be impossible for JPMorgan and the Defendants to claim that they were the unwitting victims of unscrupulous third-party actors.

182.    Similarly, in the purchase of mortgage loans from third-party originators, Defendants willfully ignored internal controls, red flags and warnings from third-party due diligence firms and pushed high risk mortgage loans into RMBS securitizations despite express warnings not to do so.  JPMorgan could have examined the loan files as part of its due diligence process but instead used third-party due diligence firms like Clayton to examine only a small percentage of the loan files.  In instances where the third party due diligence firms rated the loans as failing to meet the underwriting standards, JPMorgan often chose to include such defective loans in the securitizations anyway, thereby passing the risk of delinquency and default to investors.  The purported use of these third-party due diligence firms became another part of the fraud.  The use of these third-party due diligence firms was meaningless since JPMorgan essentially ignored their work.

183.    JPMorgan's reckless behavior continued through the subprime mortgage crisis.  When investors demanded that JPMorgan's newly acquired subsidiary, Bear Stearns, repurchase

mortgage loans that were not underwritten to represented standards of quality, JPMorgan denied those repurchase requests while simultaneously making repurchase demands for the very same loans from the mortgage loan originator, Capital One Financial Corp.

184.    In a June 26, 2008 letter to Capital One, Allison Malkin, an executive director with JPMorgan Securities (the entity with which Bear Stearns was eventually merged), stated "that it is [Bear Stearns'] position that these breaches materially and adversely affect the value" of the mortgage loans.  "JPMorgan Refused Mortgage Repurchases It Also Sought, Ambac Says," *Bloomberg* (Jan. 24, 2011).

185.    Under Defendants' watch, JPMorgan abandoned its underwriting standards and condoned fraud by encouraging its employees to ignore and manipulate JPMorgan's automated underwriting system, called "ZiPPY." "Chase mortgage memo pushes 'Cheats & Tricks,'" *The Oregonian* (March 27, 2008).  CHF went so far as to explicitly instruct loan originators to falsify loan information in order to elicit approval from the ZiPPY automated underwriting system for stated income loans of poor quality.

186.    By 2006, however, JPMorgan had grown alarmed at the increasing rate of late payments in its own subprime portfolio.  With full knowledge that the company's own subprime portfolio was at risk of losses, JPMorgan decided to exit its own subprime positions.  This decision came from JPMorgan's CEO and Board Chairman Jaime Dimon, with the knowledge and consent of the other Defendants, demonstrating knowledge of the perilous state of the JPMorgan's subprime assets by JPMorgan own senior management and Board of Directors.

187.    An article in *Bloomberg* on February 17, 2010 revealed that Dimon was fully aware that its RMBSs were of poor and deteriorating credit quality and that he directed JPMorgan to shed the associated risk from JPMorgan's own balance sheet.  The article reported that "[i]n October 2006, Mr. Dimon, JPMorgan's CEO, told William A. King, its then head of securitized products, that [JPMorgan] needed to start selling its subprime-mortgage positions."

188.    In late 2008, *Fortune Magazine* reported on the same October 2006 phone conversation, where Dimon allegedly instructed Mr. King to sell JPMorgan's positions:  "I really want you to watch out for subprime! . . . We need to sell a lot of our positions.  I've seen it

before.  This stuff could go up in smoke!"  By the end of 2006, JPMorgan had unloaded $12 billion in subprime assets that JPMorgan itself had originated.  Despite Dimon's view that JPMorgan's subprime holdings "could go up in smoke!" and JPMorgan's decision to sell its own holdings in subprime assets, JPMorgan continued to originate and securitize low quality, high risk mortgage loans and vouch for their quality.

## G. JPMORGAN AGREES TO PAY BILLIONS TO SETTLE CLAIMS RELATING TO RMBS PRACTICES

189.    On August 7, 2013, JPMorgan issued a Form 10-Q and acknowledged that the Civil and Criminal Divisions of the United States Attorney's Office for the Eastern District of California had concluded that JPMorgan violated certain federal securities laws in connection with its securitization and sale of subprime and Alt-A residential MBS offerings issued during 2005 to 2007.

190.    Shortly thereafter, on November 15, 2013, JPMorgan announced a $4.5 billion settlement with 21 major institutional investors relating to RMBS trusts issued by JPMorgan.

191.    On November 19, 2013, JPMorgan announced a $13 billion settlement with the U.S. Department of Justice, resolving claims by the Justice Department, several State Attorneys General, including the California Attorney General, the Federal Deposit Insurance Corporation, the National Credit Union Administration and the Federal Housing Finance Agency relating to RMBS activities by JPMorgan.

192.    The settlements collectively represent more than half of the record setting $21.3 billion profit JPMorgan achieved in 2012.

193.    JPMorgan's settlement with the Justice Department amounts to the largest fine ever assessed against an American bank.  The deal includes $9 billion in cash relief, including $4 billion to settle claims by the Federal Housing Finance Agency ("FHFA"), acting as conservator of Fannie Mae and Freddie Mac, that JPMorgan misled Fannie Mae and Freddie Mac about the quality of loans it sold them in the run-up to the 2008 financial crisis.  Notably, the $13 billion settlement would not resolve the criminal investigation by the U.S. Attorney's Office that relates

to JPMorgan's securitization and sale of RMBS and which is currently pending in the Eastern District of California.

## G.   THE RMBSs AT ISSUE IN THE $13 BILLION SETTLEMENT DEMONSTRATE JPMORGAN'S FOCUS ON CALIFORNIA

194.    The Justice Department's $13 billion settlement with JPMorgan was based on 10 RMBSs listed in the Settlement Agreement Statement of Facts: "JPALT 2007-A1, JPMAC 2006-WMC1, JPMAC 2006-WMC2, JPMAC 2006-CW1, JPMAC 2006-ACC1, JPMAC 2006-CW2, JPMAC 2006-WMC3, JPMAC 2006-RM1, JPMAC 2006-HE3, JPMAC 2006-WMC4."  Each of these RMBSs consisted of loan pools containing loans securing mortgages on California properties and originated or acquired by California originators such as GreenPoint Mortgage Funding, Inc. and Countrywide Home Loans, Inc.  According to the Statement of Facts: "The securitizations in question were issued between 2006 and 2007 and **had an original unpaid balance of $10.28 billion**."  A review of these RMBSs demonstrates JPMorgan's decision to target California for its RMBS practices.

**JPMorgan Alternative Loan Trust 2007-A1 ("JPALT 2007-A1")**[2]

195.    JPMorgan Alternative Loan Trust 2007-A1 ("JPALT 2007-A1"), Prospectus dated February 26, 2007, is made up of Pool 1 (consisting of Pool 1A and Pool 1B) and Aggregate Pool A (consisting of Pool 2 and Pool 3).

196.    As indicated in the following table below from the Prospectus, **57.78% of the aggregate principal balance for Aggregate Pool A came from loans made on mortgaged properties in California** (269 loans).  The next highest state was Florida, with only 4.55% of the aggregate principal balance, and down from there:

---

[2] Given the size of the prospectus for JPALT 2007-A1, Plaintiffs have not attached a copy, which can be found publicly at the following site: http://www.sec.gov/Archives/edgar/data/1388550/000116231807000236/jpalt2007a1prospectuss upplem.htm.

## Geographic Distribution of Mortgaged Properties[1]

| State | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Aggregate Principal Balance Outstanding |
|---|---|---|---|
| California | 269 | $ 152,555,374.06 | 57.78% |
| Florida | 28 | 12,007,808.62 | 4.55 |
| Maryland | 24 | 10,638,356.37 | 4.03 |
| Michigan | 43 | 9,707,336.83 | 3.68 |
| New York | 14 | 9,312,793.39 | 3.53 |
| Arizona | 20 | 7,214,546.42 | 2.73 |
| Virginia | 14 | 7,009,851.87 | 2.66 |
| New Jersey | 12 | 6,043,614.69 | 2.29 |
| Illinois | 11 | 5,440,366.99 | 2.06 |
| Connecticut | 9 | 4,835,398.33 | 1.83 |
| Washington | 10 | 3,765,811.20 | 1.43 |
| Georgia | 11 | 3,003,212.53 | 1.14 |
| Ohio | 8 | 2,894,994.01 | 1.10 |
| Nevada | 6 | 2,658,465.16 | 1.01 |
| Colorado | 5 | 2,479,482.20 | 0.94 |
| Pennsylvania | 4 | 2,386,964.39 | 0.90 |
| North Carolina | 8 | 2,211,858.56 | 0.84 |
| Oregon | 5 | 2,208,958.62 | 0.84 |
| Massachusetts | 6 | 2,130,951.82 | 0.81 |
| Tennessee | 8 | 1,856,280.42 | 0.70 |
| Texas | 8 | 1,760,731.64 | 0.67 |
| Alabama | 6 | 1,713,144.20 | 0.65 |
| Minnesota | 3 | 1,471,402.76 | 0.56 |
| South Carolina | 4 | 1,313,636.87 | 0.50 |
| Hawaii | 1 | 1,155,000.00 | 0.44 |
| Idaho | 2 | 1,043,296.33 | 0.40 |
| Iowa | 3 | 782,720.57 | 0.30 |
| Kentucky | 2 | 676,750.00 | 0.26 |
| Montana | 2 | 564,525.00 | 0.21 |
| Maine | 2 | 523,600.00 | 0.20 |
| Delaware | 1 | 449,858.00 | 0.17 |
| Missouri | 3 | 390,419.77 | 0.15 |
| Vermont | 1 | 373,605.05 | 0.14 |
| Indiana | 2 | 355,875.00 | 0.13 |
| Wisconsin | 2 | 321,575.00 | 0.12 |
| West Virginia | 1 | 216,300.00 | 0.08 |
| Oklahoma | 1 | 214,218.20 | 0.08 |
| Nebraska | 1 | 124,975.00 | 0.05 |
| New Mexico | 1 | 110,400.00 | 0.04 |
| Kansas | 1 | 100,000.00 | 0.04 |
| **Total** | **562** | **$264,024,459.87** | **100.00%** |

(1)   As of the Cut off Date, no more than approximately 2.23% of the Aggregate Pool A Mortgage Loans will be secured by Mortgaged Properties in any one postal zip code area.

A-1-2

197.    As indicated in the following table below from the Prospectus, **44.39% of the aggregate principal balance for Pool 1 came from loans made on mortgaged properties in**

**California** (573 loans).  The next highest state was Florida, with only 12.61% of the aggregate

principal balance, and down from there:

### Geographic Distribution of Mortgaged Properties[1]

| State | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Aggregate Principal Balance Outstanding |
|---|---|---|---|
| California | 573 | $ 322,025,754.53 | 44.39% |
| Florida | 235 | 91,511,755.54 | 12.61 |
| Nevada | 194 | 79,867,050.50 | 11.01 |
| Arizona | 62 | 25,779,306.15 | 3.55 |
| New York | 44 | 25,533,038.12 | 3.52 |
| Maryland | 42 | 21,008,630.45 | 2.90 |
| Virginia | 44 | 19,866,207.96 | 2.74 |
| New Jersey | 38 | 17,192,188.78 | 2.37 |
| Washington | 35 | 16,292,253.56 | 2.25 |
| Colorado | 22 | 13,050,888.10 | 1.80 |
| Illinois | 35 | 10,321,832.07 | 1.42 |
| Utah | 15 | 9,324,748.02 | 1.29 |
| Georgia | 20 | 6,589,848.44 | 0.91 |
| Massachusetts | 12 | 6,127,307.74 | 0.84 |
| Michigan | 22 | 6,115,054.76 | 0.84 |
| Oregon | 17 | 5,940,810.82 | 0.82 |
| North Carolina | 21 | 5,435,062.97 | 0.75 |
| Connecticut | 7 | 4,586,684.52 | 0.63 |
| Texas | 23 | 4,261,888.55 | 0.59 |
| Pennsylvania | 12 | 3,831,156.92 | 0.53 |
| Hawaii | 8 | 3,551,653.76 | 0.49 |
| Minnesota | 10 | 3,027,505.81 | 0.42 |
| South Carolina | 10 | 2,964,843.03 | 0.41 |
| Montana | 3 | 2,906,263.87 | 0.40 |
| District of Columbia | 6 | 2,769,968.58 | 0.38 |
| Tennessee | 9 | 2,072,018.03 | 0.29 |
| Indiana | 16 | 1,886,150.29 | 0.26 |
| Missouri | 11 | 1,866,213.62 | 0.26 |
| Idaho | 7 | 1,521,671.33 | 0.21 |
| Alabama | 4 | 1,441,607.32 | 0.20 |
| New Mexico | 5 | 1,340,637.62 | 0.18 |
| Rhode Island | 2 | 1,144,467.74 | 0.16 |
| Ohio | 5 | 984,104.45 | 0.14 |
| Iowa | 3 | 700,060.83 | 0.10 |
| Delaware | 3 | 691,890.47 | 0.10 |
| Wyoming | 1 | 579,996.10 | 0.08 |
| New Hampshire | 2 | 392,723.03 | 0.05 |
| Mississippi | 2 | 349,175.00 | 0.05 |
| Louisiana | 2 | 343,749.69 | 0.05 |
| Oklahoma | 2 | 203,576.00 | 0.03 |
| West Virginia | 2 | 123,254.36 | 0.02 |
| **Total** | **1,586** | **$725,522,999.43** | **100.00%** |

(1)   As of the Cut off Date, no more than approximately 7.48% of the Pool 1
       Mortgage Loans will be secured by Mortgaged Properties in any one postal
       zip code area.

A-2-2

198.    Further, **51.72% of the aggregate principal balance for JPALT 2007-A1 Pool**

**1 came from loans "originated or acquired by"** GreenPoint Mortgage Funding, Inc. and

Countrywide Home Loans, Inc., both originators headquartered in California.  GreenPoint

originated 38.90% of the loans in Pool 1 itself.  Countrywide originated 12.82% of the loans in

Pool 1.  The rest of the loans were originated or had been previously acquired by the "Chase

Originators" – Chase Home Finance LLC and JPMorgan Chase Bank, National Association –

and "other originator(s)" that went unnamed in the Prospectus.

199.  **45.94% of the aggregate principal balance for JPALT 2007-A1 Aggregate

Pool A came from loans "originated or acquired by" GreenPoint and Countrywide**.

GreenPoint originated 35.03% of the loans in Aggregate Pool A itself.  Countrywide originated

10.91% of the loans in Aggregate Pool A.  The rest of the loans were originated or had been

previously acquired by the "Chase Originators" and "other originator(s)" that went unnamed in

the Prospectus.

200.  The executive offices of GreenPoint Mortgage Funding, Inc. were located at 100

Wood Hollow Drive, Novato, California, 94945.  The executive offices of Countrywide Home

Loans, Inc. were located at 4500 Park Granada, Calabasas, California 91302.

**JPMorgan Mortgage Acquisition Corp. 2006-WMC1 ("JPMAC 2006-WMC1")[3]**

201.  The next RMBS reviewed by the Justice Department, J.P. Morgan Mortgage

Acquisition Corp. 2006-WMC1 ("JPMAC 2006-WMC1"), Prospectus dated August 25, 2005

(Supplement dated March 16, 2006), consisted entirely of mortgage loans originated or acquired

by WMC Mortgage Corp., a mortgage banking company incorporated in the State of California.

The Prospectus notes that in April 2005, WMC Mortgage Corp.'s headquarters relocated to

Burbank, California from Woodland Hills, California, and "a majority of its business operations

are presently conducted at Burbank."

202.  **California properties accounted for 45.54%** – measured by current principal

balance – of the aggregate principal balance of the mortgage loans included in the RMBS.  The

next highest state was Florida, with only 6.54% of the aggregate principal balance, and down

from there:

---

[3] The prospectus for JPMAC 2006-WMC1 can be found publicly at the following site:
http://www.sec.gov/Archives/edgar/data/1355696/000116231806000403/combined424b5.htm.

2/20/2015   JPMAC 2006-WMC1 Prospectus Supplement

| | # of Loans | Current Principal Balance ($) | Pct by Curr Prin Balance (%) | Weighted Average Gross Coupon (%) | Weighted Average Stated Remaining Term | Weighted Average Combined Orig LTV (%) | Weighted Average FICO | Weighted Average DTI (%) |
|---|---|---|---|---|---|---|---|---|
| Total | 5,783 | 814,277,084,819.96 | 100.00% | 7.854% | 338 | 81.83% | 638 | 41.72% |

| Credit Grade | # of Loans | Current Principal Balance ($) | Pct by Curr Prin Balance (%) | Weighted Average Gross Coupon (%) | Weighted Average Stated Remaining Term | Weighted Average Combined Orig LTV (%) | Weighted Average FICO | Weighted Average DTI (%) |
|---|---|---|---|---|---|---|---|---|
| A | 2,721 | 404,809,199.51 | 24.70% | 8.995% | 306 | 85.78% | 633 | 42.06% |
| AA | 1,762 | 565,169,361.52 | 12.92 | 7.324 | 337 | 80.58 | 680 | 41.27 |
| A- | 478 | 107,745,291.13 | 0.15 | 7.789 | | | | |

| State | # of Loans | Current Principal Balance ($) | Pct by Curr Prin Balance (%) | Weighted Average Gross Coupon (%) | Weighted Average Stated Remaining Term | Weighted Average Combined Orig LTV (%) | Weighted Average FICO | Weighted Average DTI (%) |
|---|---|---|---|---|---|---|---|---|
| Arizona | 151 | $25,267,929.10 | 2.15% | 8.022% | 341 | 80.86% | 629 | 42.14% |
| Arkansas | 5 | 458,004.79 | 0.04 | 8.851 | 321 | 94.25 | 666 | 37.76 |
| California | 1,996 | 536,089,585.68 | 45.54 | 7.681 | 337 | 81.11 | 642 | 41.83 |
| Colorado | 46 | 6,884,496.44 | 0.58 | 8.078 | 336 | 85.21 | 617 | 40.34 |
| Connecticut | 62 | 11,874,811.01 | 1.01 | 8.178 | 341 | 83.88 | 637 | 44.33 |
| Delaware | 11 | 1,948,776.69 | 0.17 | 7.441 | 344 | 79.45 | 645 | 40.59 |
| District Of Columbia | 36 | 8,594,730.93 | 0.73 | 7.784 | 342 | 76.51 | 646 | 39.64 |
| Florida | 445 | 76,934,974.66 | 6.54 | 7.797 | 342 | 80.80 | 638 | 41.12 |
| Georgia | 60 | 6,088,521.93 | 0.78 | | | 86.60 | 621 | 40.81 |

| State | # of Loans | Current Principal Balance ($) | Pct by Curr Prin Balance (%) | Weighted Average Gross Coupon (%) | Weighted Average Stated Remaining Term | Weighted Average Combined Orig LTV (%) | Weighted Average FICO | Weighted Average DTI (%) |
|---|---|---|---|---|---|---|---|---|
| Maine | 3 | 2,830,052.51 | 0.22 | 7.843 | 345 | 84.33 | 632 | 35.16 |
| Maryland | 95 | 62,910,987.95 | 5.35 | 7.925 | 339 | 81.38 | 629 | 42.21 |
| Massachusetts | 103 | 41,708,905.61 | 3.55 | 7.701 | 342 | 82.45 | 637 | 42.84 |
| Michigan | 22 | 2,119,095.06 | 0.18 | 8.902 | 339 | 85.95 | 600 | 41.05 |
| Minnesota | 11 | 1,404,744.81 | 0.12 | 7.888 | 309 | 82.08 | 607 | 45.84 |
| Mississippi | 61 | 4,963,062.61 | 0.42 | 8.673 | 349 | 86.52 | 612 | 38.78 |
| Missouri | 21 | 2,219,641.81 | 0.19 | 8.566 | 338 | 85.00 | 601 | 37.21 |
| Montana | 10 | 1,063,388.44 | 0.09 | 7.881 | 349 | 84.51 | 623 | 39.30 |
| Nebraska | 5 | 283,218.27 | 0.05 | 8.065 | 323 | 88.81 | 623 | 21.60 |
| Nevada | 102 | 19,866,053.95 | 1.69 | 7.856 | 358 | 82.89 | 635 | 41.04 |
| New Hampshire | 15 | 2,625,547.54 | 0.22 | 7.990 | 347 | 80.60 | 630 | 39.96 |
| New Jersey | 268 | 59,703,175.69 | 5.07 | 7.889 | 343 | 82.08 | 632 | 42.75 |
| New Mexico | 13 | 1,916,961.78 | 0.16 | 8.133 | 350 | 85.85 | 680 | 28.55 |
| New York | 289 | 74,177,604.46 | 6.30 | 7.741 | 339 | 81.73 | 641 | 42.87 |
| North Carolina | 38 | 3,808,287.39 | 0.32 | 8.591 | 330 | 81.19 | 621 | 40.29 |
| Ohio | 37 | 5,013,175.61 | 0.26 | 8.550 | 330 | 87.85 | 610 | 40.90 |
| Oklahoma | 22 | 1,892,510.03 | 0.16 | 8.388 | 328 | 86.00 | 616 | 36.85 |
| Oregon | 73 | 9,068,906.47 | 0.82 | 7.974 | 332 | 82.22 | 627 | 38.42 |
| Pennsylvania | 61 | 9,752,741.62 | 0.83 | 8.059 | 342 | 83.01 | 648 | 40.20 |
| Rhode Island | 54 | 7,746,895.70 | 0.66 | 7.449 | 349 | 82.59 | 629 | 43.53 |
| South Carolina | 15 | 1,878,543.23 | 0.16 | 8.449 | 339 | 81.77 | 634 | 37.54 |
| South Dakota | 2 | 119,921.43 | 0.01 | 7.647 | 353 | 82.69 | 663 | 53.65 |
| Tennessee | 85 | 7,481,769.54 | 0.64 | 8.009 | 335 | 85.96 | 625 | 42.14 |
| Texas | 270 | 33,050,112.11 | 2.81 | 7.826 | 340 | 81.50 | 641 | 38.92 |
| Utah | 9 | 1,658,347.97 | 0.14 | 7.732 | 354 | 85.83 | 635 | 39.91 |

http://www.sec.gov/Archives/edgar/data/1355069/000116231806000403/combined42b5.htm   30/180

## JPMorgan Mortgage Acquisition Trust 2006-WMC2 ("JPMAC 2006-WMC2")[4]

203.    The next RMBS reviewed by the Justice Department, J.P. Morgan Mortgage Acquisition Trust 2006-WMC2 ("JPMAC 2006-WMC2"), Prospectus dated April 24, 2006 (Supplement dated June 8, 2006), consisted entirely of mortgage loans originated or acquired by WMC Mortgage Corp., a mortgage banking company incorporated in the State of California, conducting a majority of its business operations in Burbank.

204.    **California properties accounted for 41.22%** – measured by current principal balance – of the aggregate principal balance of the mortgage loans included in the RMBS.  The next highest state was Florida, with only 8.21% of the aggregate principal balance, and down from there:

---

[4] The prospectus for JPMAC 2006-WMC2 can be found publicly at the following site: http://www.sec.gov/Archives/edgar/data/1085309/000116231806000823/m563_424b5.htm.

| 2/20/2015 | Prospectus Supplement | | | | | | |
|---|---|---|---|---|---|---|---|
| Credit Grade | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
| AA | 2,943 | $612,953,617.80 | 48.07% | 8.041% | 334 | 81.33% | 677 |
| A | 2,060 | 385,269,792.04 | 30.22 | 8.332 | 334 | 82.84 | 620 |
| A- | 713 | 112,045,923.30 | 8.86 | 8.436 | 338 | 82.02 | 595 |
| B+ | 366 | 77,510,822.01 | 6.08 | 8.697 | 337 | 83.15 | 568 |

| Geographic Location | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| Alabama | 9 | $ 732,254.18 | 0.06% | 8.179% | 288 | 84.84% | 629 |
| Arkansas | 14 | 915,538.93 | 0.07 | 8.443 | 338 | 84.13 | 657 |
| Arizona | 173 | 26,616,431.32 | 2.09 | 8.505 | 335 | 82.13 | 631 |
| California | 1,915 | 525,575,186.51 | 41.22 | 8.099 | 335 | 82.23 | 644 |
| Colorado | 37 | 4,855,279.89 | 0.38 | 8.419 | 335 | 85.14 | 617 |
| Connecticut | 79 | 16,060,555.73 | 1.26 | 8.370 | 340 | 83.71 | 634 |
| District Of Columbia | 17 | 3,572,561.35 | 0.28 | 8.224 | 337 | 80.35 | 606 |
| Indiana | 20 | 2,200,777.25 | 0.18 | 8.958 | 332 | 84.70 | 625 |
| Kansas | 2 | 89,847.39 | 0.01 | 8.722 | 322 | 84.00 | 594 |
| Kentucky | 6 | 494,909.51 | 0.04 | 8.687 | 337 | 78.99 | 607 |
| Louisiana | 240 | 18,543,605.26 | 1.45 | 9.010 | 334 | 85.38 | 607 |
| Massachusetts | 386 | 85,821,799.78 | 6.37 | 8.032 | 345 | 80.80 | 624 |
| Maryland | 506 | 60,468,750.60 | 4.74 | 8.453 | 338 | 85.90 | 627 |
| Maine | 17 | 2,076,274.91 | 0.16 | 8.012 | 345 | 80.91 | 621 |
| Michigan | 34 | 3,543,227.26 | 0.28 | 8.985 | 343 | 85.82 | 600 |
| Minnesota | 23 | 3,598,995.13 | 0.28 | 8.794 | 339 | 82.54 | 604 |
| Montana | 16 | 2,233,820.21 | 0.17 | 8.808 | 336 | 84.35 | 612 |
| Missouri | 25 | 2,831,541.79 | 0.22 | 8.971 | 341 | 80.16 | 596 |
| Mississippi | 119 | 9,791,080.86 | 0.77 | 9.120 | 341 | 85.81 | 595 |
| North Carolina | 32 | 3,172,880.18 | 0.27 | 8.979 | 335 | 86.03 | 594 |
| Nebraska | 1 | 100,255.70 | 0.01 | 8.900 | 358 | 85.00 | 593 |
| New Hampshire | 26 | 3,956,176.72 | 0.31 | 8.505 | 337 | 84.07 | 634 |
| New Jersey | 241 | 55,543,588.95 | 4.36 | 8.373 | 340 | 81.80 | 636 |
| New Mexico | 32 | 3,866,695.14 | 0.30 | 9.270 | 343 | 85.76 | 644 |
| Nevada | 96 | 17,930,718.07 | 1.41 | 8.325 | 333 | 82.81 | 639 |
| New York | 291 | 76,895,218.78 | 6.03 | 8.166 | 337 | 82.36 | 648 |
| Ohio | 34 | 3,485,315.07 | 0.27 | 9.060 | 345 | 85.83 | 616 |
| Oklahoma | 34 | 2,910,538.69 | 0.23 | 8.660 | 340 | 84.15 | 601 |
| Oregon | 65 | 10,737,438.66 | 0.84 | 8.412 | 340 | 85.40 | 628 |
| Pennsylvania | 68 | 8,857,313.24 | 0.69 | 8.521 | 343 | 83.89 | 610 |
| Rhode Island | 8 | 4,206,892.11 | 0.33 | 8.320 | 341 | 82.50 | 619 |
| South Carolina | 18 | 3,149,095.74 | 0.25 | 9.266 | 335 | 83.76 | 600 |
| Tennessee | 100 | 8,220,695.25 | 0.65 | 8.549 | 332 | 84.57 | 608 |

http://www.sec.gov/Archives/edgar/data/1085309/000116231806000625m/563_424b5.htm     31/208

## JPMorgan Mortgage Acquisition Trust 2006-CW1 ("JPMAC 2006-CW1")[5]

205.    J.P. Morgan Mortgage Acquisition Trust 2006-CW1 ("JPMAC 2006-CW1"), Prospectus dated April 24, 2006 (Supplement dated May 23, 2006), consisted entirely of mortgage loans originated or acquired by Countrywide Home Loans, Inc., a California Corporation, with its principal place of business in Calabasas, California.

206.    California properties accounted for 24.64% – measured by current principal balance – of the aggregate principal balance of the mortgage loans included in the RMBS.  The

---

[5] The prospectus for JPMAC 2006-CW1 can be found publicly at the following site: http://www.sec.gov/Archives/edgar/data/1362075/000116231806000719/f424b5.htm.

next highest state was Florida, with 10.98% of the aggregate principal balance, and down from there.

### JPMorgan Mortgage Acquisition Trust 2006-ACC1 ("JPMAC 2006-ACC1")[6]

207.    J.P. Morgan Mortgage Acquisition Trust 2006-ACC1 ("JPMAC 2006-ACC1"), Prospectus dated April 24, 2006 (Supplement dated May 26, 2006), consisted entirely of mortgage loans originated or acquired by Accredited Home Lenders, Inc., a California Corporation, with its headquarters at 15090 Avenue of Science, San Diego, CA 92128.

208.    California properties accounted for 15.50% – measured by current principal balance – of the aggregate principal balance of the mortgage loans included in the RMBS.  The next highest state was New York, with 10.71% of the aggregate principal balance, and down from there.

### JPMorgan Mortgage Acquisition Trust 2006-CW2 ("JPMAC 2006-CW2")[7]

209.    J.P. Morgan Mortgage Acquisition Trust 2006-CW2 ("JPMAC 2006-CW2"), Prospectus dated April 24, 2006 (Supplement dated August 3, 2006), consisted entirely of mortgage loans originated or acquired by Countrywide Home Loans, Inc., a California Corporation, with its principal place of business in Calabasas, California.

210.    California properties accounted for 26.99% – measured by current principal balance – of the aggregate principal balance of the mortgage loans included in the RMBS.  The

---

[6] The prospectus for JPMAC 2006-ACC1 can be found publicly at the following site: http://www.sec.gov/Archives/edgar/data/1085309/000116231806000735/m498_424b5.htm.

[7] The prospectus for JPMAC 2006-CW2 can be found publicly at the following site: http://www.sec.gov/Archives/edgar/data/1368784/000116231806001134/jpmac2006cw2prospectussupple.htm.

next highest state was Florida, with 11.74% of the aggregate principal balance, and down from there.

**JPMorgan Mortgage Acquisition Trust 2006-WMC3 ("JPMAC 2006-WMC3")[8]**

211.    The next RMBS reviewed by the Justice Department, J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 ("JPMAC 2006-WMC3"), Prospectus dated April 24, 2006 (Supplement dated August 22, 2006), consisted entirely of mortgage loans originated or acquired by WMC Mortgage Corp., a mortgage banking company incorporated in the State of California, conducting a majority of its business operations in Burbank.

212.    **California properties accounted for 42.70%** – measured by current principal balance – of the aggregate principal balance of the mortgage loans included in the RMBS.  The

---

[8] The prospectus for JPMAC 2006-WMC3 can be found publicly at the following site: http://www.sec.gov/Archives/edgar/data/1085309/000116231806001201/m849424b5.htm.

next highest state was Florida, with 9.74% of the aggregate principal balance, and down from there:

| 2/20/2015 | | | | Prospectus Supplement | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Occupancy Status | # of Loans | Current Principal Balance | Pct by Curr Mortgage Balance | Average Current Rate | Average Stated Remaining Term | Weighted Average Combined Orig LTV | Weighted Average Credit Score | Weighted Average DTI(%) | |
| Owner | 4,526 | $914,389,055.57 | 95.31% | 8.181% | 337 | 82.00% | 639 | 42.85% | |
| Non-Owner | 70 | 12,930,50.80 | 1.35 | 8.367 | 337 | 84.13 | 676 | 40.03 | |
| Second Home | 190 | 32,058,094.10 | 3.34 | 8.266 | 331 | 85.12 | 702 | 41.58 | |
| Total | | | | | | | | | |

| Geographic Location | # of Loans | Current Principal Balance | Pct by Curr Prin Balance | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Combined Orig LTV | Weighted Average Credit Score | Weighted Average DTI (%) |
|---|---|---|---|---|---|---|---|---|
| Arkansas | 1 | $113,432.16 | 0.01% | 7.595% | 358 | 80.00% | 689 | 43.00% |
| Arizona | 145 | 23,113,820.41 | 2.41 | 8.467 | 335 | 82.53 | 638 | 42.34 |
| California | 1,501 | 409,601,532.42 | 42.70 | 7.982 | 336 | 81.73 | 649 | 43.05 |
| Colorado | 33 | 4,924,310.99 | 0.51 | 8.474 | 333 | 82.70 | 641 | 43.26 |
| Connecticut | 60 | 9,915,860.46 | 1.03 | 8.274 | 336 | 83.77 | 643 | 42.44 |
| District Of Columbia | 26 | 6,537,268.93 | 0.68 | 8.275 | 344 | 75.84 | 632 | 41.90 |
| Delaware | 6 | 1,091,399.84 | 0.11 | 7.677 | 339 | 85.02 | 617 | 40.77 |

| Connecticut | 60 | 9,915,860.46 | 1.03 | 8.274 | 336 | 83.77 | 643 | 42.44 |
|---|---|---|---|---|---|---|---|---|
| District Of Columbia | 26 | 6,537,268.93 | 0.68 | 8.275 | 344 | 75.84 | 632 | 41.90 |
| Delaware | 6 | 1,091,399.84 | 0.11 | 7.677 | 339 | 85.02 | 617 | 40.77 |
| Florida | 344 | 93,459,411.79 | 9.74 | 8.337 | 341 | 82.23 | 632 | 42.95 |
| Georgia | 76 | 9,129,627.66 | 0.98 | 9.176 | 342 | 86.00 | 604 | 40.91 |
| Hawaii | 19 | 5,701,214.56 | 0.60 | 8.522 | 332 | 85.53 | 675 | 37.41 |
| Iowa | 1 | 197,137.37 | 0.02 | 9.500 | 358 | 85.00 | 548 | 48.00 |
| Idaho | 22 | 3,231,797.72 | 0.34 | 8.491 | 333 | 82.01 | 619 | 44.05 |
| Illinois | 240 | 36,335,539.89 | 3.79 | 8.446 | 337 | 82.61 | 631 | 43.55 |
| Indiana | 10 | 1,133,697.69 | 0.12 | 8.686 | 332 | 87.55 | 605 | 26.51 |
| Kansas | 5 | 893,213.13 | 0.09 | 9.653 | 324 | 83.70 | 613 | 32.43 |
| Kentucky | 5 | 268,211.15 | 0.03 | 7.922 | 358 | 81.62 | 591 | 10.29 |
| Louisiana | 67 | 5,118,586.69 | 0.54 | 9.045 | 338 | 83.41 | 612 | 10.88 |
| Massachusetts | 124 | 26,999,074.23 | 2.81 | 7.834 | 344 | 81.16 | 639 | 43.09 |
| Maryland | 226 | 46,370,555.50 | 4.83 | 8.516 | 338 | 82.26 | 637 | 42.12 |
| Maine | 12 | 1,277,094.27 | 0.13 | 7.834 | 340 | 73.60 | 627 | 32.12 |
| Michigan | 28 | 2,614,097.19 | 0.27 | 8.979 | 347 | 84.52 | 614 | 45.14 |
| Minnesota | 20 | 3,322,985.85 | 0.35 | 8.731 | 331 | 82.79 | 625 | 40.67 |
| Montana | 3 | 358,043.67 | 0.04 | 8.010 | 358 | 67.87 | 592 | 28.11 |
| Missouri | 10 | 871,354.84 | 0.09 | 9.411 | 347 | 88.71 | 605 | 36.69 |
| Mississippi | 21 | 1,381,055.76 | 0.16 | 9.239 | 339 | 88.47 | 592 | 39.10 |
| North Carolina | 21 | 2,794,487.55 | 0.29 | 8.641 | 342 | 82.88 | 607 | 40.97 |
| Nebraska | 1 | 219,437.04 | 0.02 | 9.670 | 355 | 89.80 | 570 | 60.00 |
| New Hampshire | 16 | 2,817,195.53 | 0.29 | 8.274 | 330 | 79.66 | 602 | 41.82 |
| New Jersey | 224 | 49,460,249.17 | 5.16 | 8.325 | 340 | 82.73 | 641 | 44.22 |
| New Mexico | 15 | 1,499,710.21 | 0.16 | 8.887 | 336 | 83.53 | 633 | 40.28 |
| Nevada | 78 | 15,526,216.64 | 1.60 | 8.239 | 333 | 83.17 | 662 | 44.27 |
| New York | 267 | 70,984,498.79 | 7.40 | 7.995 | 337 | 81.69 | 635 | 43.00 |
| Ohio | 28 | 2,195,571.93 | 0.26 | 8.912 | 346 | 89.29 | 599 | 11.78 |
| Oklahoma | 20 | 1,833,443.81 | 0.19 | 8.977 | 344 | 83.79 | 607 | 58.03 |
| Oregon | 41 | 6,085,528.36 | 0.63 | 8.581 | 334 | 82.81 | 634 | 42.82 |
| Pennsylvania | 46 | 5,494,850.27 | 0.57 | 8.592 | 318 | 83.72 | 611 | 39.01 |
| Rhode Island | 18 | 5,097,119.03 | 0.32 | 7.845 | 346 | 78.19 | 641 | 37.27 |
| South Carolina | 29 | 2,016,704.58 | 0.21 | 8.617 | 339 | 85.04 | 621 | 44.25 |

http://www.sec.gov/Archives/edgar/data/1085309/000116231806001346/m996combined.htm

27/186

## JPMorgan Mortgage Acquisition Trust 2006-RM1 ("JPMAC 2006-RM1")[9]

213.    J.P. Morgan Mortgage Acquisition Trust 2006-RM1 ("JPMAC 2006-RM1"), Prospectus dated September 21, 2006 (Supplement dated September 21, 2006), consisted entirely

---

[9] The prospectus for JPMAC 2006-RM1 can be found publicly at the following site: http://www.sec.gov/Archives/edgar/data/1085309/000116231806001346/m996combined.htm.

of mortgage loans originated or acquired by ResMAE Mortgage Corporation, which was headquartered at 6 Pointe Drive, Brea, CA 92821.

214.     **California properties accounted for 53.80%** – measured by current principal balance – of the aggregate principal balance of the mortgage loans included in the RMBS.  The

next highest state was Florida, with 9.38% of the aggregate principal balance, and down from there:

| 2/20/2015 | | | | m996_combined | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| California | 1,913 | 496,879,897.46 | 53.80 | 8.376 | 338 | 81.96 | 635 | 44.30 |
| Colorado | 72 | 9,890,667.64 | 1.07 | 8.765 | 340 | 84.26 | 614 | 42.81 |
| Connecticut | 13 | 2,409,467.72 | 0.26 | 9.265 | 332 | 80.09 | 599 | 37.41 |
| Delaware | 3 | 353,827.07 | 0.04 | 6.767 | 357 | 67.30 | 654 | 39.57 |
| Florida | 518 | 86,592,993.33 | 9.38 | 8.815 | 341 | 83.01 | 623 | 42.26 |
| Georgia | 72 | 8,972,510.73 | 0.97 | 9.032 | 337 | 85.33 | 617 | 41.92 |
| Hawaii | 13 | 4,084,592.38 | 0.44 | 7.755 | 343 | 74.21 | 639 | 44.11 |
| Illinois | 305 | 77,252,247.85 | 8.36 | 9.031 | 340 | 84.97 | 626 | 44.30 |
| Indiana | 20 | 1,705,021.47 | 0.18 | 8.910 | 347 | 88.84 | 630 | 44.72 |
| Kansas | 12 | 974,874.00 | 0.11 | 9.046 | 339 | 82.66 | 644 | 40.44 |
| Kentucky | 3 | 326,286.41 | 0.04 | 8.318 | 352 | 88.42 | 599 | 45.58 |
| Louisiana | 27 | 2,226,967.18 | 0.24 | 9.155 | 341 | 88.11 | 618 | 41.16 |
| Maryland | 52 | 10,674,877.07 | 1.16 | 8.730 | 346 | 80.24 | 593 | 45.01 |
| Massachusetts | 3 | 1,102,270.83 | 0.12 | 8.873 | 337 | 92.26 | 647 | 39.32 |
| Michigan | 145 | 17,586,401.79 | 1.90 | 9.138 | 350 | 87.93 | 647 | 41.64 |
| Minnesota | 69 | 9,986,470.71 | 1.08 | 8.323 | 335 | 83.06 | 628 | 42.54 |
| Mississippi | 50 | 2,433,043.40 | 0.26 | 9.312 | 340 | 86.04 | 607 | 42.46 |
| Missouri | 50 | 5,455,508.41 | 0.59 | 9.442 | 344 | 86.51 | 617 | 40.01 |
| Nevada | 92 | 17,743,670.47 | 1.92 | 8.508 | 339 | 85.54 | 615 | 42.91 |
| New Mexico | 46 | 5,160,902.19 | 0.56 | 9.009 | 337 | 85.19 | 600 | 42.28 |
| New York | 9 | 1,923,014.01 | 0.21 | 8.009 | 348 | 79.33 | 622 | 45.14 |
| North Carolina | 23 | 3,045,055.55 | 0.33 | 8.422 | 337 | 83.69 | 632 | 39.12 |
| Ohio | 35 | 4,505,591.34 | 0.49 | 8.987 | 337 | 89.10 | 606 | 43.25 |
| Oklahoma | 26 | 2,386,254.47 | 0.26 | 8.616 | 335 | 83.55 | 620 | 44.48 |
| Oregon | 16 | 2,342,793.92 | 0.25 | 9.190 | 341 | 85.84 | 632 | 42.10 |
| Rhode Island | 3 | 1,726,410.29 | 0.19 | 9.570 | 340 | 81.30 | 598 | 40.62 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| California | 1,913 | 496,879,897.46 | 53.80 | 8.376 | 338 | 81.96 | 635 | 44.30 |
| Colorado | 72 | 9,890,667.64 | 1.07 | 8.765 | 340 | 84.26 | 614 | 42.81 |
| Connecticut | 13 | 2,409,467.72 | 0.26 | 9.265 | 332 | 80.09 | 599 | 37.41 |
| Delaware | 3 | 353,827.07 | 0.04 | 6.767 | 357 | 67.30 | 654 | 39.57 |
| Florida | 518 | 86,592,993.33 | 9.38 | 8.815 | 341 | 83.01 | 623 | 42.26 |
| Georgia | 72 | 8,972,510.73 | 0.97 | 9.032 | 337 | 85.33 | 617 | 41.92 |

| Margin (%) | # of Loans | Current Principal Balance | Pct by Curr Prin Balance | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Combined Orig LTV | Weighted Average Credit Score | Weighted Average DTI |
|---|---|---|---|---|---|---|---|---|
| 3.500 - 3.999 | 2 | $ 228,755.64 | 0.03% | 8.858% | 357 | 68.05% | 652 | 48.79% |
| 4.000 - 4.499 | 23 | 3,704,559.44 | 0.49 | 9.312 | 357 | 85.49 | 607 | 45.14 |
| 4.500 - 4.999 | 2 | 178,896.70 | 0.02 | 9.441 | 357 | 65.88 | 585 | 31.07 |
| 5.000 - 5.499 | 76 | 12,856,117.47 | 1.66 | 9.262 | 357 | 84.18 | 615 | 44.36 |
| 5.500 - 5.999 | 54 | 9,318,014.95 | 1.23 | 9.039 | 357 | 84.18 | 616 | 43.80 |
| 6.000 - 6.499 | 2,880 | 706,251,877.13 | 91.56 | 8.241 | 337 | 81.79 | 631 | 43.72 |
| 6.500 - 6.999 | 125 | 29,173,122.97 | 3.78 | 8.758 | 357 | 73.65 | 568 | 42.89 |
| 7.000 - 7.499 | 40 | 8,906,734.65 | 1.15 | 9.457 | 357 | 69.85 | 594 | 43.07 |
| 7.500 - 7.999 | 1 | 479,583.56 | 0.06 | 7.990 | 357 | 86.18 | 610 | 45.18 |
| Total: | 3,203 | $771,362,685.60 | 100.00% | 8.306% | 357 | 81.45% | 627 | 43.70% |

As of the Cut-off Date, the weighted average Margin of the Adjustable-Rate Mortgage Loans in the Aggregate Pool is expected to be approximately 6.028%.

| Minimum Rate (%) | # of Loans | Current Principal Balance | Pct by Curr Prin Balance | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Combined Orig LTV | Weighted Average Credit Score | Weighted Average DTI |
|---|---|---|---|---|---|---|---|---|
| 6.000 - 6.499 | 27 | $ 8,502,506.07 | 1.10% | 6.359% | 357 | 73.31% | 671 | 43.45% |

http://www.sec.gov/Archives/edgar/data/1085309/000116231806001346/m996combined.htm                                    27/175

## JPMorgan Mortgage Acquisition Trust 2006-HE3 ("JPMAC 2006-HE3")[10]

215.    J.P. Morgan Mortgage Acquisition Trust 2006-HE3 ("JPMAC 2006-HE3"), Prospectus dated October 27, 2006 (Supplement dated September 21, 2006), consisted of mortgage loans originated or acquired by originators as follows:

---

[10] The prospectus for JPMAC 2006-HE3 can be found publicly at the following site: http://www.sec.gov/Archives/edgar/data/1085309/000116231806001511/jpmac2006he3prospect ussupple.htm.

216.    Approximately 59.75% of the mortgage loans in the aggregate pool were originated or acquired by ResMAE Mortgage Corporation.  ResMAE Mortgage Corporation was headquartered at 6 Pointe Drive, Brea, CA 92821.

217.    Approximately 22.05% of the mortgage loans in the aggregate pool were originated or acquired by NovaStar Mortgage, Inc.  The principal offices for NovaStar's mortgage lending operations were in Lake Forest, California and Cleveland, Ohio.

218.    Approximately 16.16% of the mortgage loans in the aggregate pool were originated or acquired by Fieldstone Mortgage Company.  The remainder of the mortgage loans were originated by "various originators," each of which originated less than 10.00% of the mortgage loans.

219.    **California properties accounted for 39.21%** – measured by current principal balance – of the aggregate principal balance of the mortgage loans included in the RMBS.  The next highest state was Florida, with 8.93% of the aggregate principal balance, and down from there:

| Geographical Location | # of Loans | Current Principal Balance | Pct by Curr Prin Bal | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Orig LTV | Weighted Average Credit Score | Weighted Average DTI |
|---|---|---|---|---|---|---|---|---|
| Alabama | 51 | $4,677,960.03 | 0.57% | 9.354% | 341 | 85.22% | 609 | 36.63% |
| Alaska | 2 | 437,405.58 | 0.05 | 9.265 | 429 | 100.00 | 634 | 40.16 |
| Arizona | 224 | 35,039,579.66 | 4.27 | 8.600 | 341 | 84.43 | 636 | 43.11 |
| Arkansas | 20 | 1,884,595.75 | 0.23 | 8.932 | 333 | 86.28 | 634 | 42.45 |
| California | 1,239 | 321,520,709.94 | 39.21 | 8.456 | 336 | 83.26 | 640 | 43.77 |
| Colorado | 104 | 14,808,948.94 | 1.81 | 8.798 | 349 | 86.92 | 620 | 40.22 |
| Connecticut | 21 | 4,030,164.95 | 0.49 | 9.192 | 343 | 88.96 | 600 | 41.83 |
| Delaware | 8 | 1,287,643.57 | 0.16 | 8.277 | 340 | 84.89 | 607 | 41.48 |
| District Of Columbia | 4 | 712,376.02 | 0.09 | 8.208 | 337 | 71.83 | 607 | 33.25 |
| Florida | 424 | 73,192,383.84 | 8.93 | 8.765 | 339 | 84.42 | 632 | 41.20 |
| Georgia | 117 | 18,966,070.76 | 2.31 | 9.251 | 342 | 85.80 | 611 | 42.31 |

**JPMorgan Mortgage Acquisition Trust 2006-WMC4 ("JPMAC 2006-WMC4")[11]**

220.    The last RMBS reviewed by the Justice Department, J.P. Morgan Mortgage Acquisition Trust 2006-WMC4 ("JPMAC 2006-WMC4"), Prospectus dated September 21, 2006 (Supplement dated December 15, 2006), consisted entirely of mortgage loans originated or

---

[11] The prospectus for JPMAC 2006-WMC4 can be found publicly at the following site: http://www.sec.gov/Archives/edgar/data/1085309/000116231806001629/m1291424b5.htm.

acquired by WMC Mortgage Corp., a mortgage banking company incorporated in the State of California, conducting a majority of its business operations in Burbank.

221.   **California properties accounted for 40.30%** – measured by current principal balance – of the aggregate principal balance of the mortgage loans included in the RMBS.  The next highest state was Florida, with 10.22% of the aggregate principal balance, and down from there:



| Geographic Location (Aggregate Pool) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Geographic Location | # of Loans | Current Principal Balance | Pct by Curr Prin Balance | Weighted Average Current Mortgage Rate | Weighted Average Stated Remaining Term | Weighted Average Combined Orig LTV | Weighted Average Credit Score | Weighted Average DTI |
| Arizona | 256 | $  41,173,052.06 | 2.13% | 8.767% | 355 | 82.65% | 635 | 43.38% |
| Arkansas | 13 | 1,339,810.94 | 0.07 | 9.718 | 357 | 81.29 | 582 | 38.35 |
| California | 2,850 | 770,472,078.78 | 40.30 | 8.017 | 355 | 81.60 | 649 | 43.06 |
| Colorado | 49 | 6,693,105.68 | 0.35 | 8.395 | 357 | 85.26 | 637 | 41.04 |
| Connecticut | 90 | 16,399,800.07 | 0.86 | 8.716 | 354 | 83.30 | 624 | 42.95 |
| Delaware | 28 | 4,783,612.46 | 0.25 | 8.287 | 358 | 83.78 | 626 | 46.52 |
| District Of Columbia | 42 | 10,216,022.70 | 0.53 | 8.402 | 353 | 82.64 | 652 | 42.83 |
| Florida | 1,128 | 195,353,587.56 | 10.22 | 8.493 | 356 | 82.55 | 638 | 43.14 |
| Georgia | 168 | 22,388,679.43 | 1.17 | 8.752 | 355 | 83.10 | 626 | 42.19 |
| Hawaii | 15 | 4,442,294.15 | 0.23 | 7.621 | 358 | 82.96 | 657 | 47.69 |
| Idaho | 28 | 4,131,867.82 | 0.22 | 8.549 | 358 | 83.76 | 641 | 46.00 |

24/156

## H.   THE MAJORITY OF LOANS IN JPMORGAN RMBSs CAME FROM CALIFORNIA ORIGINATORS

222.   Attached hereto is a chart of originated loans included in RMBSs underwritten or issued by JPMorgan during the period from January 1, 2005 to December 31, 2007, including the total dollar volume of loans, measured in original principal balance of the loans.  According to information provided by JPMorgan, excluding loans securitized in RMBSs that JPMorgan did not issue itself, but for which it acted only as underwriter or depositor (for which the identity of originators was not provided), and counting the volume of total other originated loans included in RMBSs underwritten or issued by JPMorgan during this period, the total dollar volume of loans is $196,604,245,931.  Of that total, **over $100,000,000,000 were originated by originators in California**.  In other words, over half of the volume of loans in RMBSs underwritten or issued by JPMorgan during the period from January 1, 2005 to December 31, 2007 came from California.  (*See* Table of JPMorgan California Loan Originators, attached hereto as Exhibit C.)

---

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**          77

**I.     THE SUBJECT GREENPOINT LOANS AND THE HOWLER LETTER**

223.     GreenPoint Mortgage Funding, Inc. ("GreenPoint") was a loan originator that was headquartered in Novato, CA.  GreenPoint specialized in Alt-A[12] loans, offering programs for borrowers with credit scores down to 620 as well as option-arms, second mortgages, jumbo loans, and other high risk products.  Alt-A loans are types of loans that are attractive to lenders because the rates are higher than rates of prime classified mortgages, but they are still backed by borrowers with stronger credit ratings than subprime borrowers.  With the higher rates comes additional risk for lenders because there is a lack of documentation – including limited proof of the borrower's income.  The risk profile falls between prime and subprime.  The borrowers behind these loans will usually have a decent credit history, but the mortgage itself will have issues that increase its risk profile.  One of these risks includes higher loan-to-value and debt-to-income ratios.

224.     Due to GreenPoint counterparts being located in California and the majority of the loans originating from California, individuals at JPMorgan who worked with Greenpoint and other originators in California typically kept a Pacific Standard Time schedule even though they were in New York.  In other words, they came in a little later in the morning and stayed later in the evening to accommodate the California originators that they were in constant communication with.  During this time, it was common knowledge at JPMorgan that the bank was trying to "ramp up" its California-based loan originations.  To do so, JPMorgan negotiated down the prices of poor quality loans using bad diligence reports and then sold them at full price to buyers, through its RMBS, without disclosing the red flags or previous defaults.

225.     In October 2006, a mortgage pool comprised of "jumbo and Alt-A loans," worth about $905 million, came in from GreenPoint for JPMorgan's review.  It was around this time that Ralph Lenzi, the Diligence Supervisor at JPMorgan, ordered his subordinates to stop sending email communications regarding mortgage deals.

---

[12] Alt-A was a term used to describe a type of a loan in a mortgage pool marketed as being above subprime.

226.     JPMorgan Alternative Loan Trust 2007-A1 ("JPALT 2007-A1"), was a RMBS containing loans originated by GreenPoint.  JPMorgan's Alayne Fleischmann was responsible for reviewing loans originated by Greenpoint in California.  She found several defects.  First, the GreenPoint loans contained a large percentage of **old** loans, a red flag.  The standard practice at JPMorgan and other major securities firms was to take on loans of no more than two to three months since the date of origination.  Many of the "tapes" – an excel spreadsheet with loan history and summary – from GreenPoint pools showed that the loans were at least eight months old.  The age of these loans indicated that they were either early payment default ("EPD") loans or that they could not sell and were passed on by other banks who refused to purchase them. EPDs are loans sold to another bank that have been returned after the borrowers missed multiple payments.

227.     While the poor quality of the loans would have stood out very clearly to JPMorgan collateral analysts (data group), the age of the loans would have still been very apparent even without this data.  An EPD cannot get through the system without being flagged and is reported up the chain for quality control.  But because no EPDs were flagged in the GreenPoint pools, investors would not be aware that the loans in these pools were EPD loans because they would not be put into regular securities pools.

     a.     **Reports Showed the Poor Quality of the GreenPoint Loan Pools at JPM**

228.     When the GreenPoint loans were reviewed by JPMorgan's third party diligence firms, such as Clayton Holdings, Inc. ("Clayton") and The Bohan Group ("Bohan"), they noticed that the loans had a high Combined Loan to Value Ratio, as they were not arms-length transactions.  The vendors sent reports back to JPMorgan's Fleischmann and internal due diligence with a score of Event 1, 2 or 3 rating to the loan.  Event 1 meant that the loan met underwriting guidelines, 2 meant that the loan did not meet guidelines but had other factors to justify the loan, and 3 meant that the loan was high risk.  The GreenPoint loans did not meet minimum acceptable thresholds of an Event 1 or 2.

229.    When Clayton and Bohan sent their reports back to JPMorgan, they noted that a high percentage of the loans were at Event 3, with 40% showing overstated income.  The maximum set by JPMorgan was 5%.  JPMorgan eventually waived the Event 3 score on many of the poor quality loans which wound up in bonds and sold to investors who were left in the dark about what they were purchasing.

230.    In one instance, one of the diligence managers wrote an email to Ralph Lenzi reporting that 40% of GreenPoint loans in the sample pool were excessive loans that could not be cleared.  Within JPMorgan, Lenzi was notorious for refusing to put anything in writing and consequently was very angry that an employee had written him an email regarding questions about a mortgage deal.  Jeanne Faye (who was in Sales) wrote an email to a supervisor stating that GreenPoint had a reputation of overstating its loans.  Overall, these loans were poor quality with a high risk of default and due diligence was not able to clear these loans.

### b.    JPMorgan Manually Clears the Loans

231.    Despite several employees voicing concerns, GreenPoint loans were processed and approved anyway.  The JPM Diligence Managers used abusive tactics to force employees to redo reports and get the satisfied numbers to clear so they could be processed.

232.    On December 11, 2006, Diligence Managers and several high ranking executives were given a report stating that, after reviewing numerous loans in the GreenPoint pool, it was apparent that there was a high risk of defaults.

233.    At the time, Greg Boester ("Boester") was in charge of the trading desk in the Securitized Products Department at JPMorgan.  On December 15, 2006, Fleischmann (who was then a Transaction Manager for the Securitized Products Department and oversaw the purchasing process of mortgage-backed securities) went into Boester's office and told him the GreenPoint mortgage pool contained poor quality mortgage loans unfit for purchase or securitization and that selling these loans without disclosure would be fraudulent.  Lenzi was present at this time as well.  Boester said that if they could bring down the percentage of loans in the pool that showed overstated income to 10%, diligence managers would be able to clear them.

234.     A meeting was held with Lenzi, Boester, and William Buell to discuss the loans. Buell was the head of the Department and in charge of purchasing loans.  Buell reported to William King ("King"), the Global Head of the Securitized Products Group, who reported to and had direct contact with CEO Jamie Dimon.  They ultimately directed the diligence managers to **manually** change the percentage of overstated income from 40% to 10%, the minimum acceptable threshold, so they could be cleared by JPMorgan.  On December 20, 2006, the deal closed; the purchase of the pool should have taken approximately six weeks, but instead took nine weeks to close.  As noted above, the bulk of the loans in the ultimately toxic GreenPoint pool were loans originating from California.

### c.     The "Howler Letter"

235.     Fleischmann warned Buell about the consequences of reselling high risk loans from GreenPoint as part of RMBS and about the manipulation of JPMorgan's diligence process to get them approved.  On January 7, 2007, Fleischmann sent out a letter (reportedly known within JPMorgan as the "Howler Letter") that highlighted the key problems in the GreenPoint loans.  This letter was directed to Buell but also went out to other managing directors.  The letter described how JPMorgan's internal underwriting and evaluation processes had been manipulated by JPMorgan managers to close the purchase of the pools.  The Howler Letter also stated that the GreenPoint loans would lead to future issues and pled for JPMorgan to reconsider selling the loans.  In response, rather than pull the GreenPoint loans, JPMorgan went forward and purchased the pool, securitized many of the loans, then sold them to unsuspecting investors.

236.     After distributing the Howler Letter, Fleischmann was harassed at JPMorgan. She was blocked from seeing data and tapes from transactions that she ran and her deals were held up for long periods of time.

237.     Fleischmann never received any follow-up to her letter despite sending additional emails to Boester, the highest level ranking manager that Fleischmann had contact with.  Rather, Fleischmann was fired in February 2008.

### d. Fleischmann's Dealings with GreenPoint in California Are Focus of Government Settlement

238. The following excerpt from the Department of Justice Settlement Statement of Facts, agreed to by JPMorgan, refers to the GreenPoint loans and Alayne Fleischmann:

> ***In one instance***, JPMorgan's due diligence revealed that several pools from ***a single third-party originator*** contained numerous stated income loans (i.e., loans originated without written proof of the borrower's income) where the vendor had concluded that borrowers had overstated their incomes. Initially, due diligence employees and at least two JPMorgan managers decided that these pools should be reviewed in their entirety, and all unreasonable stated income loans eliminated before the pools were purchased. After the originator of the loan pools objected, ***JPMorgan Managing Directors in due diligence, trading, and sales*** met with representatives of the originator to discuss the loans, then ***agreed to purchase two loan pools without reviewing those loan pools in their entirety*** as JPMorgan due diligence employees and managers had previously decided; ***waived a number of the stated income loans into the pools; purchased the pools; and subsequently securitized hundreds of millions of dollars of loans from those pools into one security***. In addition, JPMorgan obtained an agreement from the originator to extend contractual repurchase rights for early payment defaults for an additional three months.
>
> Prior to JPMorgan purchasing the loans, ***a JPMorgan employee who was involved in this particular loan pool acquisition told an Executive Director in charge of due diligence and a Managing Director in trading that due to their poor quality, the loans should not be purchased and should not be securitized***. After the purchase of the loan pools, she submitted ***a letter memorializing her concerns to another Managing Director, which was distributed to other Managing Directors***. JPMorgan nonetheless securitized many of the loans. None of this was disclosed to investors.

***Pages 5-6.*** The "employee" is Fleischmann, and the "third-party originator" is GreenPoint.

## J. THE INDIVIDUAL DEFENDANTS KNEW THE JPMORGAN RMBS PORTFOLIO WAS TARGETING RISKY CALIFORNIA MORTGAGES

### 1. JPMorgan Pursues Growth in RMBS Including Large Portions in California

239. The Individual Defendants were well aware that JPMorgan's subprime mortgage business – primarily targeted at California – had a massive impact on JPMorgan's profitability.

---

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**   82

240.     In 2005, JPMorgan recorded steady growth in its subprime lending portfolio. During the Board of Directors Meeting held on January 17-18, 2005, the Risk Policy Committee of the Board reported to the full Board, which included Defendants Burke, Crown, Dimon, Harrison, Jackson, Lipp, and Novak in attendance, about the performance of the subprime lending business.  (*See* Board of Directors of JPMorgan Chase & Co. meeting minutes, Exhibit D hereto, page 10.)  The Board Risk Policy Committee included Defendants Crown, Flynn, and Futter, who served as the Chairman and Risk Policy Committee members, respectively, at this time.  (*See* JPMorgan Directors Committee Involvement, Exhibit E hereto.)

241.     Many of the reports of JPMorgan's continued financial growth from the subprime lending portfolio were prepared by JPMorgan's own employees and presented to Defendant Dimon in his capacity as CEO of JPMorgan, as well as to the Risk Policy Committee.  The Third Quarter Audit Committee Draft Form 10-Q dated October 31, 2005, captured the profitability of JPMorgan's efforts to accelerate its origination of subprime loans.  The October 31, 2005 Draft Form 10-Q, reported that net revenues of $2.1 billion were up $453 million in part due to "growth in home equity and subprime mortgage loan balances."  (*See* Third Quarter Audit Committee Draft Form 10-Q, Exhibit F hereto, page 23.)  By the end of September 2005, Home Finance Loans were up $10 billion from December 31, 2004, to a total of $134 billion in loan volume, and the increase was "largely due to higher retained balances in home equity and subprime mortgage loans."  (*Id.* at page 57.)

242.     In November 2005, the Vice President of JPMorgan's Investment Bank (IB) Global Risk Committee circulated internal correspondence to members of the IB Global Risk Committee and Defendant Dimon, attaching a presentation titled "2006 JPMorgan Subprime Mortgage Business Plan" for review prior to the November 18, 2005 Risk Committee meeting. The presentation discussed planned acquisition strategies aimed at "expanding [JPMorgan's] subprime business" including to "develop and build out more robust principal risk taking capabilities" as the subprime home equity sector continued to grow.  The Subprime Mortgage Business Plan also focused on the marketing efforts of the Asset-Backed Securities' (ABS) largest home equity originators, which included several California entities such as: Ameriquest,

New Century, Countrywide, Option One, and Fremont.  (*See* 2006 JPMorgan Subprime Mortgage Business Plan and cover email, Exhibit G hereto, pages 1, 11, 13).

243.    JPMorgan's interest in California mortgages was apparent in the Board of Directors Audit Committee Draft Annual Reports for the years 2004, 2005, and 2006.  All three Annual Reports identified California as the largest consumer real estate loan portfolio by geographic location.  In 2004, according to the Audit Committee Draft Report, California comprised 18% or $22.8 billion in JPMorgan's consumer real estate loan portfolio.  (*See* Exhibit H hereto, page 69.)  In 2005, according to the Audit Committee Draft Report, California comprised 18% or $24.4 billion in JPMorgan's consumer real estate loan portfolio.  (*See* Exhibit I hereto, page 73.)  In 2006, according to the Audit Committee Draft Report, California comprised 24% of JPMorgan's consumer real estate loans measured by mortgage volume.  (*See* Exhibit J hereto, page 74.)

244.    In March 2006, subprime mortgage loans made up: (1) 8.9% of loans JPMorgan serviced, (2) 6.5% of loans JPMorgan managed, and (3) 6.2% of loans JPMorgan owned in its consumer loan portfolio.  (*See* Directors Risk Policy Committee Risk Management Risk Overview Report, Exhibit K hereto, page 9.)

245.    Between 2005 and 2006, in an effort to accomplish its goal of expanding its subprime mortgage products, JPMorgan approved changes to "broaden its product offerings in a highly competitive market."  (*See* Exhibit L hereto, page 15.)  In 2006, JPMorgan approved higher limits for real estate risk concentration, setting a $60 billion exposure limit and a $2 billion capital limit.  (*See* January 16, 2007 Directors Risk Policy Committee Draft Risk Management Wholesale Risk Concentration Management Report, Exhibit M hereto, page 18.)

246.    At a September 19, 2006 presentation, the Audit Committee, of which Defendant Jackson was Chair and Defendant Bowles was a member, was updated on risk and control issues concerning JPMorgan's retail financial services portfolio.  The briefing covered expansion of JPMorgan's subprime mortgage products and changes that were approved during 2005 and 2006, including: increases in the maximum loan-to-value (LTV) ratio, increases in the maximum loan size by at least $150,000.00 per loan, introducing a 40-year mortgage product, and increases in

the maximum loan size from $1 million to $1.5 million in a pilot program only in California and New York. (*See* September 19, 2006 Audit Committee presentation, <u>Exhibit L</u> hereto, page 15.)

247.   Notably, the Audit Committee was informed in the September 19, 2006 presentation that "[r]esidential real estate continues to show signs of weakening in many regions of the country" and specifically referenced California in noting that "[r]apid build up in the inventory of homes for sale is anticipated to result in eventual sale price declines in select markets." (*Id.* at page 17.)

248.   As a result of its efforts to expand its subprime products, by the end of 2006, JPMorgan had $2.9 billion of subprime mortgage loans, selling a total $1.7 billion in the fourth quarter of 2006. (*See* January 19, 2007 Directors Risk Policy Committee Risk Management Risk Overview, <u>Exhibit N</u> hereto, page 7.)

249.   Despite what it saw as successes in the subprime market, JPMorgan's Board became aware of the risks and subpar performance of residential mortgage loans in its subprime portfolio.  As early as July 2005, JPMorgan's Board was aware of an increase in credit losses it endured as a result of its decision to retain subprime mortgage loans.  According to the Audit Committee Draft Form 10-Q dated July 28, 2005, provision for credit losses totaled $188 million, up $56 million from the last year.  The increase in part "reflected higher provision expense related to the decision to retain subprime mortgage loans." (*See* Audit Committee Draft Form 10-Q dated July 28, 2005, <u>Exhibit O</u> hereto, page 21.)

250.   A Directors Risk Policy Committee report, dated September 19, 2006, also discussed the deterioration in 2005 in the credit quality profile across most consumer credit asset classes, citing the "expansion of underwriting criteria in Sub-Prime Mortgage" as a contributing factor. (<u>Exhibit P</u> hereto, page 7.)  These results followed from JPMorgan's efforts to increase its revenue by loosening its standards for underwriting and origination of subprime mortgage loans and RMBS products.

251.   In December 2006, the Directors Risk Policy Committee focused on the deterioration in the consumer credit performance, "especially with sub-prime residential real estate."  The Risk Policy Committee also took note that house price appreciation was declining,

foreclosures were "rising off low levels," and the 2006 sub-prime mortgage vintage was showing higher absolute and early-stage delinquency deterioration than any previous vintage. (*See* December 12, 2006 Directors Risk Policy Committee Rick Management Risk Overview Report, Exhibit Q hereto, pages 7-8.) At the end of 2006, subprime lending comprised 9% of JPMorgan's consumer lending, yet performance on these loans had begun to deteriorate, with "higher delinquency, especially within the sub-prime mortgage portfolio." (*See* January 16, 2007 Directors Risk Policy Committee Meeting Minutes, Exhibit R hereto, page 3.)

### 2. JPMorgan's Board Knew That Loans Within its RMBSs Originated Primarily in California

252. The Board knew a substantial portion of the loans contained in JPMorgan's RMBS were originated in California. In April 2006, Defendant Dimon requested information from JPMorgan's home equity division regarding "geographic dispersion of the sub prime portfolio" for which a "[s]tate by state analysis [was] required." California topped the list, pulling in a total $423,313,758.47 in outstanding principal balance. This represented 23.37% of the total collateral balance, and California was the only state in the double digits by percentage, with the next lowest being Florida, with 9.63%. (*See* Email "Re: Information needed per Jamie request," Exhibit S hereto.)

253. In October 2006, Defendant Dimon and the members of the IB Global Risk Committee were informed that a substantial amount of subprime loan purchases through JPMorgan Mortgage Acquisition Corp. were from California and included California entities such as WMC, Option One, ResMae, Fremont, Countrywide, New Century, Accredited, and OWNIT. (*See* Minutes and materials from October 27, 2006 IB Global Risk Committee meeting, Exhibit T hereto, page 5.)

254. At a March 2007 meeting, the Directors Risk Policy Committee was informed that JPMorgan owned $1.9 billion outstanding sub-prime mortgage loans in California, which comprised 13.4% of the total loans owned. (*See* Exhibit U hereto, page 14.)

255. Because of their positions at JPMorgan, Defendants were not only aware that a substantial portion of JPMorgan's RMBS business was conducted in California, but also that the

---

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**      86

underlying loans were highly concentrated in California.  Numerous internal documents were prepared that singled-out California.

256.    From April 18, 2006 to September 18, 2007, at least nine reports were circulated to JPMorgan's Directors Risk Policy Committee and Defendants Crown, Lipp and Futter, that not only discussed the status of the subprime lending that comprised JPMorgan's consumer loan portfolio, but also highlighted the risk and deterioration in subprime credit performance, and the home price appreciation trends in California, which were indicative of growing problems with the housing bubble.  During this period, Defendant Crown was the Chairman of the Risk Policy Committee and Defendants Lipp and Futter were members of the committee.

257.    For example, the July 18, 2006 report identified the weakening of residential real estate and identified California, as one of only two states mentioned specifically.  This report also emphasized the decline in housing appreciation trends in both Southern and Northern California from January 2003 to May 2006, and increases in unsold inventory of detached homes in California markets.  (*See* Exhibit V hereto, pages 12, 17-19.)

258.    The October 17, 2006 report again noted the decline in residential real estate in California, and specifically discussed higher concentrations of Negative Home Price Appreciation in the Sacramento and Santa Rosa areas of California.  (*See* Exhibit W hereto, pages 8, 11-14.)

259.    In January 2007, the Directors Risk Policy Committee discussed the impact of market influences on the subprime residential real estate portfolio, raising "[c]oncerns about general home price appreciation flattening and potential significant declines in select regions" including California as one of three noted regions.  This "[w]ill most likely lead to increased delinquency and realized losses."  The committee specifically addressed subprime counterparty credit exposure, with many of the counterparties being based in California.  (*See* Exhibit X hereto, pages 2 and 6.)

260.    On January 16, 2007, the Board was provided with a Consumer Risk Management Update of Sub-Prime Consumer Lending, which captured concerns surrounding areas of the country that were experiencing a decline in housing price appreciation.  The Southern California

area including Los Angeles, Long Beach, and Glendale was called out as one of the four largest JPMorgan subprime markets experiencing slower housing price appreciation.  The presentation also emphasized that this housing price trend could exacerbate higher mortgage loan delinquency and loss. (*See* Exhibit Y hereto, page 14.)  Based on these reports, JPMorgan's Board was aware of the risks associated with the higher rates of delinquency in California and the concentration of its subprime residential loan portfolio in California.

261.    In a March 20, 2007 presentation, the Directors Risk Policy Committee was again alerted to the decline in home price appreciation in both Northern and Southern California as compared with, for example, the Midwest **region** and the Northeast **region**.  These slides not only illustrated, but identified the downward appreciation trends in California as a credit risk. (*See* Exhibit U hereto, pages 22-23.)

262.    Discussions regarding the decline in house price appreciation in California continued throughout 2007.  Several charts in the July 17, 2007 Consumer Risk Management Portfolio Review by the Directors Risk Policy Committee showed property trends specifically in Southern and Northern California from June 2004 to April 2007, and increasing trends of unsold inventories of detached homes in various California markets were discussed.  (*See* Exhibit Z hereto, pages 70-72, 76.)  The Board and the Risk Policy Committee remained focused on California and its submarkets because of their knowledge that so much of the JPMorgan RMBS portfolio was concentrated there, that their portfolio was now at great risk due to JPMorgan targeting California mortgage products aided by loosening and lacking quality standards, and fear of exposure of their own making, to the perilous state of JPMorgan's residential subprime assets in California by the end of 2007.

## V.

## THE INDIVIDUAL DEFENDANTS CAUSE THE COMPANY TO ISSUE FALSE AND MISLEADING PROXY STATEMENTS IN 2011 AND 2012

263.    **THE 2011 PROXY STATEMENT.**  On April 7, 2011, Defendants Dimon, Bowles, Burke, Cote, Crown, Futter, Gray, Jackson, Novak, Raymond and Weldon caused JPMorgan to issue its 2011 Proxy Statement, which was filed with the SEC, posted to

JPMorgan's website, and mailed to JPMorgan shareholders.  In it, such defendants and the Company urged JPMorgan shareholders to follow the Company's recommendations with respect to the matters submitted for shareholder approval at the Company's 2011 Annual Meeting, which was held on May 17, 2011 at JPMorgan's offices at the McCoy Center in Columbus, Ohio.

264.    Among the items which shareholders were asked to vote on at the 2011 Annual Meeting, the Proxy urged shareholders to vote in favor of the election of Defendants Dimon, Bowles, Burke, Cote, Crown, Futter, Gray, Jackson, Novak, Raymond and Weldon as directors of the Company; and (2) vote against a shareholder proposal which sought to require the election of a Lead Director by the independent members of the Board, since at the time the roles of Chairman and CEO at JPMorgan were (and still are) held by one person – Defendant Dimon. With respect to the election of Defendants Dimon, Bowles, Burke, Cote, Crown, Futter, Gray, Jackson, Novak, Raymond and Weldon as directors, the Proxy urged shareholders to re-elect such directors because, among other things, such directors were allegedly independent, competent, and had in the past and continued to provide diligent and effective oversight of management and the risks facing the Company.  The Proxy also noted these factors as a reason why the Company urged shareholders to vote against the shareholder proposal which sought to separate the roles of Chairman and CEO.

265.    Based on the false statements and material omissions in the 2011 Proxy, a majority of JPMorgan's shareholders voted in favor of the Company's recommended position on these items.  The relevant directors were re-elected and the shareholder proposal regarding separation of the roles of Chairman and CEO was defeated.

266.    Specifically, the 2011 Proxy Statement and soliciting materials contained the following statements regarding the Board's crucial role in risk oversight of management:

> Board oversight – The Board of Directors exercises its oversight of risk management principally through the Board's Risk Policy Committee and Audit Committee.
> •    The Risk Policy Committee oversees senior management risk-related responsibilities, including reviewing management policies and performance against these policies and related benchmarks.

- The Audit Committee reviews with management the system of internal controls that is relied upon to provide reasonable assurance of compliance with the Firm's operational risk management processes.
- In addition, the Compensation Committee is responsible for reviewing the Firm's compensation practices and the relationship among risk, risk management and compensation in light of the Firm's objectives.
- Each of the committees oversees reputation risk issues within their scope of responsibility.
- The Board of Directors also reviews selected risk topics directly as circumstances warrant.

267. Because of certain shareholders' belief that JPMorgan's corporate governance policies needed improvement, and that certain directors (including named Defendants Futter, Novak and Jackson) were not providing effective oversight of management, a shareholder successfully submitted the following proposal for inclusion in the 2011 Proxy, which in fact was included in the Proxy:

**Proposal 11 – Independent lead director**

Mr. John Chevedden, as agent for Mr. Ray T. Chevedden, on behalf of the Ray T. Chevedden and Veronica G. Chevedden Family Trust, 5965 S. Citrus Ave., Los Angeles CA 90043, the holder of 200 shares of our common stock, has advised us that he intends to introduce the following resolution:

Resolved, Shareholders request that our Board take the steps necessary to adopt a bylaw to require that our company have an independent director (by the standard of the New York Stock Exchange) serve as a Lead Director whenever possible, elected by and from the independent board members and to be expected to normally serve for more than one continuous year.

The bylaw should also specify how to select a new Lead Director if a current Lead Director ceases to be independent.

The merit of this Independent Lead Director proposal should be considered in the context of the need for improvements in our company's 2010 reported corporate governance status: The Corporate Library www.thecorporatelibrary.com, an independent investment research firm rated our company "D" with "High Governance Risk," and "High Concern" in Executive Pay - $20 million for William Winters and $10 million for Mary Erdoes. Executive pay was deferred over the long-term instead of being conditioned on achieving long-term performance goals.

Five directors had long-tenure of 13 to 23 years. As tenure increases independence declines. We had three active CEO directors who may not have had the time to devote to their board duties: David Cote of Honeywell, David Novak of Yum! Brands and William Weldon of Johnson & Johnson. Plus these CEO directors made up 50% of our Executive Pay and Nomination Committees. Lee

Raymond chaired our Executive Pay Committee and as former Exxon CEO, Raymond was entitled to $350 million.

Ellen Futter attracted our highest negative votes (10-times greater than certain other directors) and David Novak attracted our second highest negative votes. Laban Jackson had 21-years with Clear Creek Properties and no other current directorship experience. William Gray was marked as a "Flagged (Problem) Director" by The Corporate Library because of his Visteon Corporation directorship leading up to Visteon's bankruptcy.

We had no proxy access, no cumulative voting, no shareholder right to act by written consent and no independent Board Chairman.

The above concerns show there is need for improvement. Please encourage our board to respond positively to this proposal: Independent Lead Director - Yes on 11.

268.    In response to this shareholder proposal, Defendants Dimon, Bowles, Burke, Cote, Crown, Futter, Gray, Jackson, Novak, Raymond and Weldon caused JPMorgan to draft and include the following response in the Proxy, which solicited shareholders to vote "no" on the proposal:

**Board response to proposal 11:**

The Board of Directors recommends that shareholders vote AGAINST this proposal for the following reasons:

**Implementing the proposal is unnecessary because the Firm already has a Presiding Director meeting NYSE independence standards and serving the purposes described by the proponent.** The proponent essentially requests that the Board adopt a bylaw to require an independent director, independent by standards of the New York Stock Exchange (NYSE), be elected by the independent directors to serve as a Lead Director and expected to normally serve for more than one continuous year. The fundamental objective is to seek a requirement that an independent director (per NYSE rules) lead the Firm's Board of Directors and oversee management. The Firm's current governance structure provides the independent leadership and management oversight sought by the proposal. Ten of the eleven current Board members are independent according to NYSE standards, including the Presiding Director. The Presiding Director is annually appointed by the independent directors to serve a one-year term.

**Outlined below is the Firm's current board leadership structure, including a description of the authority and responsibilities of its Presiding Director, which demonstrates that our current structure provides the independent leadership and management oversight sought by the proposal.**

Roles of Chairman and Presiding Director

- While the Board has no set policy on whether or not to have an independent chairman, it has determined that the most effective leadership model for JPMorgan Chase currently is for Mr. Dimon to serve as both Chairman and CEO.
- The Board established the Presiding Director position in 2006, and in 2011 amended the description to add detail regarding specific responsibilities.
- Our Presiding Director is annually appointed by the independent directors to serve a one-year term, and unless the Board determines otherwise, rotates between the Chairs of the Compensation and Governance Committees. Prior to 2011, their terms alternated every six months.

Authority and Responsibilities of the Presiding Director

The Presiding Director:

- Presides at any meeting of the board at which the Chairman is not present and at executive sessions of independent directors.
- May call meetings of independent directors.
- Approves Board meeting agendas and schedules for each Board meeting, and may add agenda items.
- Approves Board meeting materials for distribution to and consideration by the Board.
- Facilitates communication between the Chairman and CEO and independent directors.
- Will be available for consultation and communication with major shareholders where appropriate.

- Will perform such other functions as the Board may direct.

Independent oversight of management by the Board

- Independent directors comprise more than 90% of the Board and 100% of the Audit, Governance and Compensation Committees.
- Board and Committee agendas are prepared based on discussions with all directors and recommendations of management.
- Committee Chairs, all of whom are independent, approve agendas and materials for their committee meetings.
- All directors are encouraged to request agenda items, additional information and/or modifications to schedules as they deem appropriate.
- Independent directors regularly meet in executive session.

Accordingly, the Board recommends a vote against this proposal.

(Emphasis in original.)

269.    These statement in the 2011 Proxy were false and misleading because they stated and implied that the Board, with Dimon as both Chairman and CEO, was exercising effective

oversight of management, when in fact the directors knew that was not the case and that management had in fact intentionally overridden and violated the Company's own risk management rules, the Company's underwriting standards, and other key internal controls, as alleged in more detail herein and in the Statement of Facts (Ex. A).  Had the true information been revealed or disclosed to shareholders in the Proxy soliciting materials, it would have been material because there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.

270.   **THE 2012 PROXY STATEMENT.**  On April 4, 2012, Defendants Dimon, Bell, Bowles, Burke, Cote, Crown, Futter, Jackson, Raymond and Weldon caused JPMorgan to issue its 2012 Proxy Statement, which was filed with the SEC, posted to JPMorgan's website, and mailed to JPMorgan shareholders.  In it, such defendants and the Company urged JPMorgan shareholders to follow the Company's recommendations with respect to the matters submitted for shareholder approval at the Company's 2012 Annual Meeting, which was held on May 15, 2012 at JPMorgan's offices in Tampa, Florida.

271.   Among the items which shareholders were asked to vote on at the 2012 Annual Meeting, the Proxy urged shareholders to vote in favor of the re-election of Defendants Dimon, Bell, Bowles, Burke, Cote, Crown, Futter, Jackson, Raymond and Weldon as directors of the Company, and to elect Defendant Flynn as a director of the Company; and (2) vote against a shareholder proposal which sought to separate the roles of Chairman and CEO at JPMorgan, which at the time were (and still are) held by one person – Defendant Dimon.  With respect to the re-election of Defendants Dimon, Bell, Bowles, Burke, Cote, Crown, Futter, Jackson, Raymond and Weldon as directors, the Proxy urged shareholders to re-elect such directors because, among other things, such directors were allegedly independent, competent, and had in the past and continued to provide diligent and effective oversight of management and the risks facing the Company.  The Proxy also noted these factors as a reason why the Company urged shareholders to vote against the shareholder proposal which sought to separate the roles of Chairman and CEO.

272.   Based on the false statements and material omissions in the 2012 Proxy, a majority of JPMorgan's shareholders voted in favor of the Company's recommended position on these items.  The relevant directors were re-elected and the shareholder proposal regarding separation of the roles of Chairman and CEO was defeated.

273.   Specifically, the 2012 Proxy contained the following statement and representations which were drafted, reviewed, and/or approved by Defendants Dimon, Bell, Bowles, Burke, Cote, Crown, Futter, Jackson, Raymond and Weldon :

**Board leadership structure — *The Board of Directors is responsible for the oversight of management on behalf of the Firm's shareholders. The Board accomplishes this function acting directly and through its committees.*** Directors discharge their duties at Board and committee meetings and also through telephone contact and other communications with the Chairman and Chief Executive Officer ("CEO"), management and others regarding matters of concern and interest to the Firm. Specific elements of our Board leadership structure are outlined in Appendix A and include:

***<u>Chairman of the Board</u> — The Firm's Board of Directors has no established policy on whether or not to have a non-executive chairman and believes that it should make that judgment based on circumstances and experience. The Board has determined that the most effective leadership model for the Firm currently is that Mr. Dimon serves as both Chairman and Chief Executive Officer***, and that the independent directors annually appoint an independent director to serve as the Presiding Director. The Board believes it is functioning effectively under its current structure, and that the current structure provides appropriate oversight protections. The Board does not believe that introducing a separate Chairman at this time and with this CEO would provide appreciably better direction for and performance of the Firm, and instead could cause uncertainty, confusion and inefficiency in board and management function and relations.

***<u>Independent oversight</u> — Independent directors comprise more than 90% of the Board and 100% of the Audit Committee, Compensation & Management Development Committee (the "Compensation Committee"), Governance Committee, Public Responsibility Committee and Risk Policy Committee.*** At each regularly scheduled Board meeting, the independent directors generally meet in executive session with no members of management present and may discuss

---

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**          94

any matter they deem appropriate, including evaluation of the CEO and other senior officers and determination of their compensation.

(Emphasis in italics added.)

274.    The 2012 further assured investors that the Board itself was the ultimate body responsible for risk oversight of management, and that it was exercising that responsibility effectively, including overseeing Dimon, who as CEO was the person at JPMorgan who set the Company's "overall risk appetite."  The following is an excerpt from the 2012 Proxy discussing these issues:

**Board's role in risk oversight** — The Firm's risk management is described in the Management Discussion and Analysis of the 2011 Annual Report starting at page 125. As stated there, risk is an inherent part of JPMorgan Chase's business activities and the Firm's overall risk appetite is established in the context of the Firm's capital, earnings power and diversified business model. ***The Firm's risk management framework and governance structure are intended to provide comprehensive controls and ongoing management of the major risks taken in its business activities***.

- ***Risk appetite — The Firm employs a formalized risk appetite framework to clearly link risk appetite and return targets, controls and capital management.***
    — ***The CEO is responsible for setting the overall risk appetite for the Firm***, and the line of business ("LOB") CEOs are responsible for setting the risk appetite for their respective LOBs subject to approval by the CEO and the Firm's Chief Risk Officer.
    — ***The Risk Policy Committee approves the risk appetite policy on behalf of the entire Board of Directors***.
- Risk management framework — The Firm's risk governance structure starts with each line of business being responsible for managing its own risks, with its own risk committee and a chief risk officer. Overlaying the line of business risk management are four corporate functions with risk management-related responsibilities.
    — ***Risk Management operates independently to provide oversight of firmwide risk management and controls, and is headed by the Firm's Chief Risk Officer, who is a member of the Firm's Operating Committee and reports to the CEO and is accountable to the Board of Directors, primarily through the Board's Risk Policy Committee.***

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**          95

— The Chief Investment Office and Corporate Treasury are responsible for managing the Firm's liquidity, interest rate and foreign exchange risk, and other structural risks.

— Legal and Compliance has oversight for legal risk.

— Each LOB has a risk committee which includes in its mandate oversight of the reputational risks in its business.

- *Board oversight — The Board of Directors exercises its oversight of risk management's principally through the Board's Risk Policy Committee and Audit Committee.*

  — The Risk Policy Committee oversees senior management risk-related responsibilities, including reviewing management policies and performance against these policies and related benchmarks.

  — The Audit Committee reviews with management the system of internal controls that is relied upon to provide reasonable assurance of compliance with the Firm's operational risk management processes.

  — The Compensation Committee is responsible for reviewing the Firm's compensation practices and the relationship among risk, risk management and compensation in light of the Firm's objectives.

  — *Each of the committees oversees reputation risk issues within its scope of responsibility.*

  — *The Board of Directors also reviews selected risk topics directly as circumstances warrant.*

(Emphasis in italics added.)

275.   Further, the 2012 Proxy contained a shareholder proposal recommending that Dimon be stripped of his role as Chairman and that an independent director be appointed Chairman.  One of the main purposes of this proposal was to increase Board oversight of management and risk at JPMorgan, since Dimon is admittedly not independent.  The proposal is set forth below:

**Proposal 5 — Independent director as chairman**

AFSCME Employees Pension Plan, 1625 L Street, N.W., Washington DC 20036-5687, the holder of 38,800 shares of our common stock, has advised us that it intends to introduce the following resolution:

RESOLVED: That shareholders of JPMorgan Chase ("JPMorgan" or the "Company") ask the Board of Directors to adopt a policy that the Board's

Chairman be an independent director according to the definition set forth in the New York Stock Exchange listing standards, unless JPMorgan common stock ceases being listed there and is listed on another exchange, at which point, that exchange's standard of independence should apply. If the Board determines that a Chairman who was independent when he or she was selected is no longer independent, the Board shall promptly select a new Chairman who satisfies this independence requirement. Compliance with this requirement may be excused if no director who qualifies as independent is elected by shareholders or if no independent director is willing to serve as Chairman. This independence requirement shall apply prospectively so as not to violate any Company contractual obligation at the time this resolution is adopted.

SUPPORTING STATEMENT

***JPMorgan's CEO James Dimon also serves as chairman of the Company's board of directors. We believe the combination of these two roles in a single person weakens a corporation's governance which can harm shareholder value.*** As Intel former chairman Andrew Grove stated, "The separation of the two jobs goes to the heart of the conception of a corporation. Is a company a sandbox for the CEO, or is the CEO an employee? If he's an employee, he needs a boss, and that boss is the board. The chairman runs the board. How can the CEO be his own boss?"

***In our view, shareholder value is enhanced by an independent board chair who can provide a balance of power between the CEO and the board, and support strong board leadership. The primary duty of a board of directors is to oversee the management of a company on behalf of its shareholders. But if a CEO also serves as chair, we believe this presents a conflict of interest that can result in excessive management influence on the board and weaken the board's oversight of management.***

An independent board chair has been found in academic studies to improve the financial performance of public companies. A 2007 Booz & Co. study found that in 2006, all of the underperforming North American companies whose CEOs had long tenure lacked an independent board chair *(The Era of the Inclusive Leader,* Booz Allen Hamilton, Summer 2007). A more recent study found worldwide, companies are now routinely separating the jobs of chair and CEO: in 2009 less than 12 percent of incoming CEOs were also made chair, compared with 48 percent in 2002 *(CEO Succession 2000-2009: A Decade of Convergence and Compression,* Booz & Co., Summer 2010).

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**     97

*We believe that independent board leadership would be particularly constructive at JPMorgan, where there have been numerous federal and state investigations into our company's mortgage foreclosure practices (JPMorgan 2010 Form 10-K, p. 9).*

We urge shareholders to vote for this proposal.

(Emphasis in italics added.)

276.    In response to this proposal, Defendants Dimon, Bell, Bowles, Burke, Cote, Crown, Futter, Jackson, Raymond and Weldon caused the Company to file a statement in opposition which urged shareholders to vote against the proposal, essentially assuring shareholders that the Board's oversight of management was excellent, that no changes were needed, and that there was no conflict in Dimon serving as both Chairman and CEO.  The Company's position stated:

**Board response to proposal 5:**

The Board of Directors recommends that shareholders vote AGAINST this proposal for the following reasons:

**Implementing the proposal is unnecessary because the Firm's board leadership structure already provides the independent leadership and oversight of management sought by the proponent.** The fundamental objective of the proposal is to require that an independent director (per NYSE rules) lead the Firm's Board of Directors and oversee management. All but one of the current Board members are independent according to NYSE standards, including the Board's Presiding Director.

(Emphasis in original.)

277.    The Company's opposition statement also told shareholders:

Independent oversight of management by the Board

•       Independent directors comprise more than 90% of the Board and 100% of the Audit, Governance and Compensation Committees.

- • Board and Committee agendas are prepared based on discussions with all directors and recommendations of management.

- • Committee Chairs, all of whom are independent, approve agendas and materials for their committee meetings.

- • All directors are encouraged to request agenda items, additional information and/or modifications to schedules as they deem appropriate.

- • Independent directors regularly meet in executive session.

**Introducing a separate Chairman at this time and with this CEO would not provide appreciably better direction for and performance of the Firm and could be detrimental to interests of shareholders.** *The Firm's Board of Directors has no established policy on whether or not to have a non-executive chairman and believes that it should make that judgment based on circumstances and experience. The Board has determined that the most effective leadership model for the Firm currently is that Mr. Dimon serves as both Chairman and Chief Executive Officer. The Board believes it is functioning effectively under its current structure, and that the current structure provides appropriate oversight.*

(Emphasis in bold in original; emphasis in italics added.)

278.    These statements were false and misleading because, as alleged in more detail herein, the Director Defendants knew that the Board was not exercising effective oversight of management, that Dimon and other high-level management had intentionally disregarded and overridden the Company's underwriting standards and internal controls, and that management was doing so in order to benefit themselves financially to the detriment of the Company.

279.    Based on the false statements in the 2012 Proxy, the directors up for re-election or election were all elected as directors, and the shareholder proposal was defeated.  Had the true information been revealed or disclosed to shareholders in the Proxy soliciting materials, it would have been material because there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.  Indeed, at the 2012 Annual Meeting, approximately 40% of JPMorgan's shareholders voted in favor of the proposal to establish and independent Chairman.  Many more shareholders would have likely voted in favor of the

1   proposal but for the false and misleading statements the Director Defendants caused the

2   Company to include in the proxy soliciting materials.

3         280.   The falsity of the statements that the Director Defendants drafted, reviewed,

4   and/or approved for inclusion in the 2011 and 2012 Proxy Statements is further evidenced by the

5   fact that the Director Defendants had begun receiving internal reports beginning in 2011 and

6   early 2012 indicating that the Board's risk oversight of management was materially deficient and

7   inadequate both with respect to the CIO and the RMBS/mortgage areas of business.  Indeed,  the

8   January 15, 2013 Board Review Committee Report noted that, beginning in 2011 and 2012,

9   including prior to the time JPMorgan filed its 2012 Proxy on April 4, 2012, JPMorgan began

10  changing some of the important Board governance processes associated with the Board's

11  oversight of management.  Thus, for example, in March 2012 the Directors began mandating

12  attendance by risk officers of different divisions of JPMorgan at *every* Risk Policy Committee

13  meeting.  As the January 15, 2013 Report notes:  "The chief risk officers of the Investment Bank,

14  the Consumer Bank, and the Commercial business typically attended all meetings of the Risk

15  Policy Committee, while the chief risk officers of the other lines of business and CIO generally

16  attended only meetings at which their units were on the agenda *until March 2012, when, at the*

17  *direction of the CRO, they also began to attend all meetings of the Committee*."

18        281.   Similarly, in March 2012 the Company made a significant change to the Board's

19  oversight of risk management by mandating the inclusion of a separate section in a report to the

20  DRPC relating to the CIO.  As the January 15, 2013 Report notes:  "The General Market

21  Discussion reports to the Risk Policy Committee did not include a  separate section relating to

22  CIO *until March 2012, when changes were made to the template for the reports*."

23        282.   These substantial changes to the processes governing the Board's oversight of risk

24  management provided the Director Defendants with actual knowledge that the Board was not

25  providing effective oversight of management relating to serious and material risks faced by

26  JPMorgan.  Nonetheless, the Director Defendants approved the statements directly to the

27  contrary in the 2011 and 2012 Proxy, thereby violating their duty of candor and good faith and

28  violated the federal proxy laws.

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**        100

283.     Additional specific information about the Director Defendants' knowledge of the falsity of the statements in the 2011 and 2012 Proxy Statements is contained below in the demand futility section.

284.     The falsity of the statements in the 2011 and 2012 Proxy Statements is also revealed in the contradictory statements which appear in the 2013 Proxy.  As alleged in more detail *infra* in the demand futility allegations, the 2013 Proxy also acknowledged widespread and material deficiencies in the Board's oversight over management, and announced significant and material corporate governance changes at JPMorgan to attempt to remedy some of those deficiencies.

## VI.

## RESPONSIBILITIES OF OFFICERS AND DIRECTORS

285.     The fundamental principle of the corporate law governing JPMorgan is that that the business and affairs of JPMorgan are managed by and under the direction of JPMorgan's Board of Directors.  In exercising its powers, corporate directors are charged with an unyielding fiduciary duty to protect the interests of the corporation and to act in the best interests of the shareholders.  The JPMorgan Board of Directors who are named Defendants in this action owed JPMorgan the highest fiduciary duties and were obligated to protect and defend the interests of JPMorgan.

286.     The corporate directors of JPMorgan owed and owe the company a duty of care and a duty of loyalty.  The duty of care includes a duty by each director of JPMorgan to inform himself or herself, prior to making a business decision, of all material information available to the director and to consider all alternatives.  The more significant the decision, the greater is the requirement to probe and consider alternatives.  In this case, the corporate directors of JPMorgan knew that the company was increasingly involved in and reliant on mortgage loan origination and securitization, primarily in the subprime market, to drive JPMorgan's profits and financial success.  The profits from the mortgage loan origination and mortgage loan securitization process were critical to JPMorgan's ability to hit its profitability and revenue targets, and, in turn, to allow the JPMorgan executives to obtain massive compensation packages.  The critical

importance of the mortgage loan and RMBS business to JPMorgan, and the fact that it was built primarily on subprime mortgages, placed upon the JPMorgan directors an obligation to ensure that the policies and procedures surrounding mortgage loan origination and mortgage loan securitization were appropriate.  The JPMorgan directors therefore had a responsibility to ensure that appropriate information and reporting systems were in place, especially in regards to the risks and legal ramifications of JPMorgan's subprime mortgage loan origination, securitization and sales business.  The failure of the JPMorgan directors to implement such procedures and policies and the failure of the JPMorgan directors to exercise due diligence and the greatest care in the performance of their responsibilities constituted breaches of their fiduciary duties to the company and its shareholders.

287.    Corporate directors also owe a duty of loyalty to the corporation that they serve. That duty of loyalty is a broad and all-encompassing, and it imposes on corporate directors a special obligation to serve the interests of the corporation above their own interests.  The duty of loyalty embodies both an affirmative duty to protect the interests of the corporation and an obligation to refrain from conduct that would injure the corporation and its shareholders in any way.  Corporate directors must put the best interests of the corporation and its shareholders above his or her own interest.

288.    In this case, the members of JPMorgan's Board of Directors put their own interests ahead of that of the company.  The decision to push forward into the subprime mortgage loan origination and securitization business without adequate safeguards, policies and procedures was made because it increased the personal profits of the Defendants, while putting JPMorgan at substantial risk and exposing JPMorgan to substantial civil penalties, fines and settlements, and potential criminal exposure.  As such, the Defendants violated their duty of loyalty to JPMorgan.

289.    JPMorgan's Board members are and at all times were the fiduciaries of JPMorgan and its shareholders.  Their duty was to personally assure themselves that JPMorgan did not face substantial exposure to civil and criminal penalties, fines and settlements for engaging in illegal and improper conduct in the origination, securitization, marketing and sale of subprime mortgages and MBS.  Their duty was to personally assure themselves that there were policies

and procedures in place to ensure that JPMorgan originated mortgage loans in a lawful manner, that mortgage loans were appropriately and legally securitized and that the sale of RMBS was done in a legal and proper manner. Their duty was to personally assure themselves that the origination of mortgage loans and the securitization of mortgage loans into RMBS, particularly subprime mortgage loans, were accomplished in a manner that was in the best interests of JPMorgan and its shareholders. The members of JPMorgan's Board of Directors failed in that duty by choosing to place their own self-interest in maximizing their personal benefit over the best interests of the company and its shareholders.

290. The Defendants who are officers of JPMorgan also had a fiduciary duty to ensure that JPMorgan conducted itself in a lawful manner and that internal controls, policies and procedures were in place to prevent the company from engaging in illegal and fraudulent conduct, irrespective of whatever short-term gains could be obtained from such misconduct. Defendant Dimon, in particular, as both an officer and director of JPMorgan, had the highest duty to ensure that JPMorgan engaged in legal conduct. In this case, the Defendants pushed JPMorgan aggressively into the subprime mortgage field, allowing the company to originate mortgage loans with minimal to no underwriting standards, securitize those subprime mortgage loans into low quality RMBS investments and then market and sell those subprime RMBS to investors through misrepresentations and the concealment of material facts. This was done because it allowed JPMorgan to pump its profits and ensure that executives, such as Dimon, reaped lucrative bonuses and salaries.

291. Defendants all were involved in the subprime mortgage crisis, in pushing JPMorgan into the highly risky subprime business and/or in failing to ensure that adequate processes were in place to protect against the risks to which such business exposed JPMorgan, both in terms of direct losses from these RMBS investments, and in potential liability, fines, penalties and settlements. Defendants also were and are responsible for the significant reputational harm suffered by JPMorgan, as well as the potential adverse impact government actions and regulation will have on JPMorgan as the result of JPMorgan's misconduct in the sale of RMBSs.

# VII.

## DEMAND FUTILITY ALLEGATIONS

292.     Plaintiffs bring this action derivatively in the right of and for the benefit of JPMorgan to redress injuries suffered and to be suffered by JPMorgan as a result of the Defendants' breaches of fiduciary duty and gross mismanagement.  Plaintiffs and their counsel will adequately and fairly represent the interests of JPMorgan in enforcing and prosecuting its rights.  Plaintiffs incorporate by reference into this section all the foregoing factual allegations, which demonstrate that demand on the Board of Directors is futile.

293.     At the time this action was initially filed, JPMorgan had ten directors – Dimon, Bell, Bowles, Burke, Crown, Jackson, Raymond, Weldon, Flynn, and Bammann.  In situations involving an even number of board members, a derivative plaintiff must establish that at least half the board members lack independence or are interested.  Demand on the Board which existed when this action was first filed would have been a futile and wasteful act since at least five of the ten members of such Board were not disinterested and could not have fairly and impartially evaluated any demand made on the Board of Directors.

294.     Based upon the Defendants' acts and omissions in direct violation of their fiduciary duties of care, good faith, candor, honesty and loyalty, a pre-suit demand on the JPMorgan Board of Directors to bring the claims asserted in this Complaint is excused as a futile and useless act.  JPMorgan's Board of Directors personally profited from the wrongdoing alleged in this Complaint.  In fact, members of the JPMorgan Board of Directors had the largest financial incentive for engaging in the misconduct alleged in this Complaint, since JPMorgan's involvement in the subprime business was a key driver of JPMorgan's profitability, which significantly bolstered the compensation to JPMorgan executives and directors.  The Directors had final supervision and oversight over JPMorgan's business operations, and permitted and/or authorized JPMorgan to engage in the illegal and improper conduct described above, in violation of their duties of oversight.  The lack of internal controls at JPMorgan and the push for profitability without regard to risks to the company resulted in massive harm to JPMorgan.

295.     The fact that the Defendants allowed and/or authorized JPMorgan to enter into the high risk subprime business without adequate internal controls and risk management policies is an abdication of the responsibilities of the Defendants.  As fiduciaries of JPMorgan, the Defendants each had a duty to understand and be aware of JPMorgan's business operations, in particular those business operations that constitute a major portion of JPMorgan's revenue and profits.  In this case, the Defendants had a duty to understand that the subprime mortgage business was a major part of JPMorgan's profits and that internal controls, procedures and policies were necessary to ensure that this business was done legally and properly.  Instead, the JPMorgan Board of Directors failed to implement internal controls, policies and procedures to prevent JPMorgan from engaging in illegal and improper conduct.

296.     Plaintiffs have not made any demand on JPMorgan's Board of Directors to investigate and prosecute the malfeasance alleged herein.  Such a demand is excused in this case because:  (i) making a demand would be a futile and useless act as the majority of JPMorgan's directors are not able to conduct an independent and objective investigation of the alleged wrongdoing; and (ii) the wrongful conduct of defendants is not subject to protection under the business judgment rule.  Under such circumstances, the demand requirement is excused since making such a demand on the Board of Directors would be futile.

## A.     DEMAND IS FUTILE AS TO DEFENDANTS BELL, BOWLES AND JACKSON

297.     During the Relevant Period, Defendants Bell, Bowles and Jackson were members of the Company's Audit Committee.  As Audit Committee members, Defendants Bell, Bowles and Jackson were required to review the Company's financial statements and press releases for accuracy and to make any needed corrections.  Such defendants either failed or refused to do so and allowed Dimon and others to make and continue to make misleading statements or omit material facts concerning the company's exposure to risk.  For these reasons, Bell, Bowles and Jackson cannot adequately and appropriately consider a demand on the JPMorgan Board of Directors.

---

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**     105

298.     As a result of their membership on the Audit Committee, such directors had several duties as set forth in the Audit Committee's Charter.  These duties included, but were not limited to, meeting with the General Auditor, the independent registered public accounting firm, and executive management in separate private sessions to discuss any matters that the Audit Committee or these persons believe should be discussed.  The Audit Committee had the duty to report regularly to the Board, including the review of any issues that arise with respect to the quality or integrity of the corporation's financial statements or the corporation's compliance with legal or regulatory requirements.  The Audit Committee had the duty to establish procedures for the receipt, retention and treatment of complaints received by the corporation regarding accounting, internal accounting controls or auditing matters, and for the confidential, anonymous submission by corporation employees of concerns regarding questionable accounting or auditing matters.   The Audit Committee had compliance and regulatory oversight responsibilities, including the duty to receive from the General Auditor, periodically, and from management, as appropriate, communications and presentations on significant operating and control issues in internal audit reports, management letters, and regulatory authorities' examination reports, and on the initiation and status of significant special investigations; and initiate such other inquiries into the affairs of the corporation as it deems necessary or appropriate.  The Audit Committee also was responsible for obtaining periodic presentations from management and the independent registered public accounting firm on the identification and resolution status of material weaknesses and reportable conditions in the internal control environment, including any significant deficiencies in the design or operation of internal controls that could adversely affect the corporation's ability to record, process, summarize and report financial data, and on any fraud, whether or not material, that involves management or other employees who have a significant role in the corporation's internal controls.  The Audit Committee was also to review with management the corporation's program for compliance with laws and regulations and review the record of such compliance; and review significant legal cases outstanding against the corporation or its subsidiaries and other regulatory or legal matters that may have a material impact on the corporation's financial statements.   Finally, the Audit Committee had the duty to

take into consideration the Board's allocation of responsibility for review of credit risk, market risk and fiduciary risk to the Board's Risk Policy Committee, discuss with management guidelines and policies for assessing and managing the corporation's exposure to risks, including reputation risk, the corporation's major financial risk exposures and the steps management has taken to monitor and control such exposures.

299.    As the Audit Committee Charter demonstrates, Defendants Bell, Bowles and Jackson had a heightened duty to make themselves aware of all risks and deficiencies in the Company's internal controls, including the internal controls affecting any of the Company's subsidiaries.  They were required to meet regularly with both management and the Company's auditors to discuss all the issues identified above.  The Audit Committee is also specifically required to establish procedures for the receipt and review of internal complaints from employees.

300.    Upon information and belief, as a result of their membership on JPMorgan's Audit Committee, Defendants Bell, Bowles and Jackson were advised of internal complaints by JPMorgan employees concerning the failure by JPMorgan and its subsidiaries/affiliates[13] to comply with the Company's due diligence and underwriting standards.  These were not low-level employees but were senior persons who relayed their complaints initially to a JPMorgan Executive Director in charge of due diligence and  a JPMorgan Managing Director in trading, telling them that they believed JPMorgan should not purchase the loans due to the severity of the internal violations.  These are exactly the type of internal complaints that are required to be relayed to Audit Committee members.  JPMorgan was required to admit to a Statement of Facts as part of its $13 billion settlement announced on <u>November 19, 2013 (a true and correct copy of which is attached hereto as Ex. A)</u>, in which JPMorgan settled with the U.S. Department of Justice to resolve claims against JPMorgan by the Justice Department, several State Attorneys General, the Federal Deposit Insurance Corporation, the National Credit Union Administration and the Federal Housing Finance Agency relating to RMBS activities by JPMorgan.  That

---

[13] Including J.P. Morgan Securities LLC (f/k/a J.P. Morgan Securities, Inc.) and affiliated JPMorgan entities.

Statement of Facts specifically noted the credible and high-level internal complaints which JPMorgan's Managing Directors and Executive Directors had received in 2006-2007 regarding these serious deficiencies in JPMorgan's internal controls, including management's intentional manipulation and disregard of the internal controls.  The Statement of Facts noted that:

> "In one instance [between 2006 and 2007], JPMorgan's due diligence revealed that several pools from a single third-party originator contained numerous stated income loans (i.e., loans originated without written proof of the borrower's income) where the vendor had concluded that borrowers had overstated their incomes.  Initially, due diligence employees and at least two JPMorgan managers decided that these pools should be reviewed in their entirety, and all unreasonable stated income loans eliminated before the pools were purchased.  After the originator of the loan pools objected, JPMorgan Managing Directors in due diligence, trading, and sales met with representatives of the originator to discuss the loans, then agreed to purchase two loan pools without reviewing those loan pools in their entirety as JPMorgan due diligence employees and managers had previously decided; waived a number of the stated income loans into the pools; purchased the pools; and subsequently securitized hundreds of millions of dollars of loans from those pools into one security.  In addition, JPMorgan obtained an agreement from the originator to extend contractual repurchase rights for early payment defaults for an additional three months.
>
> ***Prior to JPMorgan purchasing the loans, a JPMorgan employee who was involved in this particular loan pool acquisition told an Executive Director in charge of due diligence and a Managing Director in trading that due to their poor quality, the loans should not be purchased and should not be securitized. After the purchase of the loan pools, she submitted a letter memorializing her concerns to another Managing Director, which was distributed to other Managing Directors. JPMorgan nonetheless securitized many of the loans. None of this was disclosed to investors***."

(Emphasis added.)

301.     Upon information and belief, Defendants Bell, Bowles and Jackson, as members of the Audit Committee, received reports from management and/or the Company's internal and external auditors concerning the complaints made by these JPMorgan employees.  Indeed, the reports were voiced to senior JPMorgan executives, including Managing Directors and Executive Directors, and at least one of the complaining employees "***submitted a letter memorializing her concerns to another Managing Director, which was distributed to other Managing Directors.***" Upon information and belief, after being advised of these complaints concerning serious and

material violations and deficiencies in JPMorgan's internal controls, Defendants Bell, Bowles and Jackson did nothing and refused to take action to remedy the serious deficiencies, thus *abdicating their fiduciary duties* as directors of JPMorgan.  Abdication of fiduciary duty by a director constitutes egregious conduct, and eliminates the protection of the business judgment rule to the conduct of the director.

302.    Indeed, the Statement of Facts to which JPMorgan admitted in November 2013 (Ex. A hereto) makes clear that JPMorgan *consciously ignored these complaints* in its zealous pursuit of profits, since JPMorgan went ahead and purchased the loans and then securitized them into RMBS or other securities which JPMorgan in turn sold to investors.

303.    As the Statement of Facts demonstrates, JPMorgan was presented beginning in at least 2006 on a daily basis with reports from an outside audit firm, Clayton, regarding its analysis of the quality (or lack thereof) of the loans being purchased by JPMorgan.  According to an internal Clayton "Trending Report," JPMorgan was told that a significant portion of the loans that Clayton reviewed for their respective sponsor entities "failed to meet guidelines." Moreover, these loans were not properly approved as "exception loans" because they did not have any "compensating factors."  JPMorgan was also informed that 27% of the loans reviewed by Clayton for JPMorgan Acquisition were not underwritten according to represented underwriting standards.  JPMorgan and the Audit Committee therefore were or should have been well aware that the Company was securitizing bad loans and it were well aware that the Company's representations to investors that the RMBS were safe, low risk investments, were false.  Further, upon information and belief, as Audit Committee members, Defendants Bowles and Jackson were presented with the findings of the reports generated by the Clayton firm beginning in 2006, yet did nothing to correct the serious deficiencies noted therein.

304.    Defendants Bowles and Jackson failed to cause the Company to disclose the red flags revealed by Clayton's review to investors in the RMBS, thus breaching their duties of candor, loyalty, and good faith.  According to Clayton's "Trending Report," JPMorgan "waived in" to its pools over 50% of the defective loans that Clayton had identified as being outside the guidelines.  The magnitude of the percentage of non-conforming loans being waived in by

---

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**    109

1   JPMorgan was a very material fact that was required to be reported to the Audit Committee

2   under the Company's policies and the Audit Committee's Charter (as noted *supra*), thus

3   indicating that Bowles and Jackson had actual knowledge of these highly unusual circumstances.

4        305.    Defendants Bowles, Bell and Jackson failed to take action in conformity with

5   their duties as Audit Committee Members, ***abdicated their fiduciary duties*** and acted in ***bad***

6   ***faith*** because they failed to disclose these facts in JPMorgan's filings with the SEC.  The

7   Statement of Facts specifically states that "***None of this was disclosed to investors.***"  Bowles has

8   been a director since 2006, and Jackson has been a director since 2004.  Also, at all relevant

9   times, Jackson has served as Chairman of the Audit Committee.  Thus, Bowles and Jackson had

10   real-time access to all this information, and did nothing to correct the material deficiencies or to

11   report the deficiencies to the public or JPMorgan's shareholders.  Moreover, while Bell did not

12   become a director until 2011, he had actual knowledge or recklessly disregarded these facts after

13   he became a director in 2011.  At such time, JPMorgan was being sued for the very wrongdoing

14   set forth in the Statement of Facts relating to JPMorgan's RMBSs and Bell was required, as a

15   member of the Audit Committee, to review JPMorgan's exposure to such lawsuits and

16   investigate the underlying conduct.  Upon information and belief, as a result of performing his

17   duties as an Audit Committee member, Bell became aware of these facts and yet took no action

18   to cause JPMorgan to publicly disclose the material facts, thus breaching his duties of candor and

19   good faith.  Breaches of the duties of good faith and candor by a director are non-indemnifiable

20   and subject a director to personal liability.  Thus, Bell, along with Bowles and Jackson, face a

21   substantial likelihood of liability for breaching their duties of good faith, care, and candor while

22   serving as directors of JPMorgan, including as members of its Board's Audit Committee, during

23   the Relevant Period.

24        306.    The frequent meetings which JPMorgan Audit Committee members were required

25   to have with management were cited by JPMorgan as supposed proof during the Relevant Period

26   that its board was actively and effectively supervising management.  For example, in its 2010

27   Proxy Statement, JPMorgan opposed a shareholder proposal which sought to separate the roles

28   of Chairman and CEO.  At the time, Defendant Dimon occupied both roles.  In the 2010 Proxy,

the Company opposed the shareholder proposal (Proposal No. 8), stating as follows: "**The Board provides independent oversight of management.** Independent directors comprise more than 90% of the Board and 100% of the Audit, Governance and Compensation Committees. Board and Committee agendas are prepared by the Chairman based on discussions with all directors. The Committee Chairs, all of whom are independent, review and approve the agendas and materials for their committee meetings. At each regularly scheduled Board meeting, the non-management directors generally meet in executive session with no members of management present and may discuss any matter they deem appropriate, including evaluation of the CEO and other senior officers."

307.    The statement above in the Company's 2010 Proxy Statement that "**The Board provides independent oversight of management**" was approved by Defendants Jackson and Bowles. Their approval of this statement constituted bad faith and a breach of the duty of candor since Jackson and Bowles knew that they and the other JPMorgan directors were not in fact exercising effective and independent oversight of management, but instead were abdicating their duties as directors and allowing management, including Dimon, to recklessly pursue profits at the expense of violating the Company's internal controls and subjecting the Company to billions of dollars of potential exposure to investors who were buying the Company's RMBSs and other mortgage-backed securities.

308.    Demand is also futile as to Defendants Bell, Bowles, and Jackson because they all face a substantial likelihood of liability for breaching their fiduciary duty of candor by approving the Company's 2012 Proxy Statement. The 2012 Proxy Statement, like the 2010 Proxy Statement, contained a shareholder proposal which advocated for a lead independent director serving as Chairman, rather than Dimon continuing to serve as both Chairman and CEO. As with the 2010 Proxy, JPMorgan opposed the shareholder proposal, but went further in its comments in defense of the status quo, vehemently representing to shareholders that its outside directors exercised effective oversight of management. Indeed, JPMorgan went so far as to say that divesting Dimon of his role as Chairman (and limited his role to CEO) could actually hurt

shareholders' interests.  The 2012 Proxy Statement was approved by Defendants Dimon, Bell,

Bowles, Burke, Crown, Jackson, Raymond and Weldon, and stated:

> The Board of Directors recommends that shareholders vote AGAINST this
> proposal for the following reasons:
>
> **Implementing the proposal is unnecessary because the Firm's board leadership
> structure already provides the   independent leadership and oversight of
> management sought by the proponent.** The fundamental objective of the   proposal
> is to require that an independent director (per NYSE rules) lead the Firm's
> Board of Directors and oversee   management . . . .
>
> **Introducing a separate Chairman at this time and with this CEO would not
> provide appreciably better direction for   and performance of the Firm and
> could be detrimental to interests of shareholders.** The Firm's Board of Directors
> has   no established policy on whether or not to have a non-executive chairman
> and believes that it should make that judgment based on circumstances and
> experience. The Board has determined that the most effective leadership model
> for the Firm currently is that Mr. Dimon serves as both Chairman and Chief
> Executive Officer. ***The Board believes it is  functioning effectively under its
> current structure, and that the current structure provides appropriate
> oversight protections.*** The Board does not believe that introducing a separate
> Chairman at this time and with this CEO would  provide appreciably better
> direction for and performance of the Firm, and instead could cause uncertainty,
> confusion   and inefficiency in board and management function and relations.
>
> Accordingly, the Board recommends a vote against this proposal.

(Emphasis in bold in original; emphasis in italics added.)

309.     At the time Defendants Dimon, Bell, Bowles, Burke, Crown, Jackson, Raymond

and Weldon approved this statement in the 2012 Proxy, they knew or consciously ignored the

fact that these statements were false because they had begun receiving internal reports beginning

in 2011 and early 2012 indicating that the Board's risk oversight of management was materially

deficient and inadequate both with respect to the CIO and the RMBS/mortgage areas of business.

Indeed,  the January 15, 2013 Board Review Committee Report noted that, beginning in 2011

and 2012, including prior to the time JPMorgan filed its 2012 Proxy on April 4, 2012, JPMorgan

began changing some of the important Board governance processes associated with the Board's

oversight of management.  Thus, for example, in March 2012 the Directors began mandating

attendance by risk officers of different divisions of JPMorgan at *every* Risk Policy Committee

meeting.  As the January 15, 2013 Report notes:  "The chief risk officers of the Investment Bank,

the Consumer Bank, and the Commercial business typically attended all meetings of the Risk

Policy Committee, while the chief risk officers of the other lines of business and CIO generally

attended only meetings at which their units were on the agenda ***until March 2012, when, at the***

***direction of the CRO, they also began to attend all meetings of the Committee***."

310.     Similarly, in March 2012 the Company made a significant change to the Board's

oversight of risk management by mandating the inclusion of a separate section in a report to the

DRPC relating to the CIO.  As the January 15, 2013 Report notes:  "The General Market

Discussion reports to the Risk Policy Committee did not include a  separate section relating to

CIO ***until March 2012, when changes were made to the template for the reports***."

311.     These substantial changes to the processes governing the Board's oversight of risk

management provided Defendants Dimon, Bell, Bowles, Burke, Crown, Jackson, Raymond and

Weldon with actual knowledge that the Board was not providing effective oversight of

management relating to serious and material risks faced by JPMorgan.  Nonetheless, Dimon,

Bell, Bowles, Burke, Crown, Jackson, Raymond and Weldon approved the statements directly to

the contrary in the 2012 Proxy, thereby violating their duty of candor and good faith.

312.     In addition, Defendants Bell, Bowles, and Jackson, as members of the Audit

Committee, received a detailed report just days after the 2012 Proxy was filed which provided

them with additional actual knowledge of the material deficiencies in the Board's oversight of

management.  As the January 15, 2013 Report noted:  "Internal Audit performed an audit of

market risk and valuation practices for EMEA  (Europe, Middle East, Africa) credit in CIO as of

December 31, 2011, and issued its report on the audit on March 30, 2012.  The audit examined

the controls supporting market risk  management and valuation practices for CIO's investment

credit portfolio and synthetic credit  portfolio.  The audit resulted in a rating of "Needs

Improvement" based on, among other things, deficiencies in the valuation processes, the use of

unapproved models in the calculation of risk, lack of appropriate documentation and cataloguing

of risk measurement methodologies, the  failure by CIO explicitly to measure portfolio

sensitivity to certain risk measures, and the lack of  a documented stress testing methodology

such that Audit was unable to fully assess the stress  testing framework and related scenario

outputs.  Consistent with Internal Audit's standard  practice, a summary of the audit findings and conclusions was provided to the Audit Committee,  in connection with its meeting on April 17, 2012, but not to the Risk Policy Committee.

313.    Despite receiving this report on April 17, 2012, Defendants Bell, Bowles and Jackson failed to correct the materially misleading statements in the 2012 Proxy which had just been issued, thereby breaching their duties of good faith and candor.  Significantly, they received the report on April 17, 2012, which was well before the actual Annual Meeting, which was held on May 15, 2012 in Tampa, Florida.  Bell, Bowles and Jackson could and should have disclosed this material information to shareholders prior to the Annual Meeting so that the shareholders could have been fully informed prior to voting on the matters set forth in the Proxy, including the proposal to divest Dimon of his role as Chairman, which had been proposed with a view to increasing the effectiveness of board oversight of management.

314.    Demand is also futile as to Bell, Bowles and Jackson because they are interested. As Board members, Bell, Bowles and Jackson made a base total of approximately $245,000 each year from the company, including cash and stock awards.  To maintain their lucrative compensation, and ensure the value of their shares, Bell, Bowles and Jackson have an interest in continuing to cover up for Defendant Dimon's misconduct, as well as their own.  As such, Bell, Bowles and Jackson cannot independently consider a demand on the board, both to protect themselves and to protect Dimon.

315.    Demand is also futile as to Bowles because Bowles' relationship with JPMorgan prevents her from independently considering a demand.  Bowles is the Chairperson of Springs Industries, Inc. and its subsidiaries have all benefited from extensions of credit from JPMorgan. Since Dimon, as CEO, has control over the credit lines of Bowles's company, Bowles cannot render an independent judgment as to any demand made on JPMorgan's Board of Directors. Moreover, Bowles' company is especially indebted to Dimon for the credit and financing it received from JPMorgan during the time of the wrongdoing alleged herein.  After the financial crisis began in 2007 and thereafter, the credit markets seized up and credit was extremely difficult to obtain.  The following is a quote from Springs Industries' 2008 Annual Report to

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**       114

shareholders: "In September, the speculative bubble burst. The bankruptcy of a large North American financial institution with global presence made the credit markets panic, followed by a severe global liquidity contraction, which paralyzed the worldwide credit system and a significant adjustment in prices of the assets and commodities that were overstated due to many years of cheap and abundant credit." Springs Industries was especially vulnerable during this time and benefitted from the financing it obtained from JPMorgan. Bowles and her company remain especially indebted and grateful to Dimon for the financing they received during this difficult time, thus clouding Bowles' judgment and making it impossible for her to impartially and independently consider a demand to bring suit against Dimon and the other defendants named herein.

316.   Demand is also futile as to Defendant Jackson because he has benefited from extensions of credit provided by JPMorgan directly to him. As CEO, Dimon is in a position to influence the extension of credit, so Jackson is not independent of Dimon or JPMorgan.

**B.     DEMAND IS FUTILE AS TO DEFENDANT DIMON**

317.   Demand is futile as to Defendant Dimon because: (a) Dimon faces a substantial likelihood of liability for his individual misconduct; (b) JPMorgan admits Dimon is not independent and disinterested, as least under NYSE standards which govern the requirements to be an "independent" director; (c) Dimon breached his duties of candor and loyalty and acted in bad faith. Dimon cannot be indemnified by JPMorgan for such conduct, and such conduct eliminates the protection of the business judgment rule; and (d) Dimon received improper personal financial benefits from his wrongdoing, making him interested in the subject matter of this lawsuit.

318.   Dimon has been named as a defendant in at least one federal class action in the Southern District of New York alleging that he and the Company violated Section 10(b) of the Securities Exchange Act of 1934 Act and Rule 10b-5 thereunder when he disseminated or approved false statements regarding JPMorgan's business operations. If Dimon pursued this

1  derivative action, it would expose his own repeated misconduct in conducting the operations of

2  JPMorgan.

3          319.   Dimon *personally benefitted* from the alleged wrongdoing, and made

4  $134,147,916 from 2005 to 2012.  Since his compensation was determined by the Compensation

5  & Management Development Committee, he is also financially beholden to that Committee and

6  its members, and is unable to fairly and independently evaluate any claims against the

7  Defendants who are members of that Committee.

8          320.   Dimon cannot render an independent decision to pursue the actions because he is

9  and was a high-ranking offer of JPMorgan and allowed the various wrongdoings to occur

10 throughout his tenure as CEO.   JPMorgan's 2013 Proxy Statement admits that Dimon is not

11 independent under NYSE standards. Dimon personally oversaw JPMorgan's shift towards the

12 origination, securitization, marketing and sale of subprime RMBS.  He also issued misleading

13 statements and concealed material facts, as listed above, regarding the extent of JPMorgan's

14 involvement in the subprime mortgage market and the extent of JPMorgan's culpability for such

15 involvement.  Dimon therefore faces substantial likelihood of liability for breaching his fiduciary

16 duties to JPMorgan shareholders.

17         321.   Upon information and belief Dimon received actual knowledge of the internal

18 complaints by JPMorgan employees which are discussed in the Statement of Facts (Ex. A).   As

19 CEO of the Company, Dimon received reports from management and/or the Company's internal

20 and external auditors concerning the complaints made by these JPMorgan employees.  Indeed,

21 the reports were voiced to senior JPMorgan executives, including Managing Directors and

22 Executive Directors, and at least one of the complaining employees "*submitted a letter*

23 *memorializing her concerns to another Managing Director, which was distributed to other*

24 *Managing Directors."*  All the Managing Directors and Executive Directors at JPMorgan

25 ultimately report to Dimon.  Upon being advised of these complaints concerning serious and

26 material violations and deficiencies in JPMorgan's internal controls, upon information and belief

27 Defendant Dimon did nothing and refused to take action to remedy the serious deficiencies, thus

28 *abdicating his fiduciary duties* as an executive and director of JPMorgan.  Abdication of

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**     116

fiduciary duty by a director constitutes egregious conduct, and eliminates the protection of the business judgment rule to the conduct of the director.

322.    Moreover, beginning in 2006, Dimon also began receiving the Clayton Trending Reports and thus had actual knowledge of the material deficiencies in a high percentage of the loans being purchased by JPMorgan as well as the very high percentage (50%) of such non-conforming loans that JPMorgan was "waiving in" notwithstanding the fact that the loans did not meet JPMorgan's underwriting standards and did not have sufficient other redeeming qualities to warrant purchase by JPMorgan.  Far from taking action in compliance with his fiduciary duties as a JPMorgan director to correct this wrongful conduct which exposed JPMorgan to billions of dollars in damages, Dimon consciously approved this conduct because it generated profits for JPMorgan at the time and increased his compensation.  Dimon thereby financially benefitted from both his own wrongdoing and the wrongdoing of others at JPMorgan.  Dimon is therefore *interested* in the challenged transactions; as such, any demand on Dimon to sue himself and the other directors named herein would be a futile and useless act.

323.    Indeed, the Statement of Facts which JPMorgan admitted to in November 2013 (Ex. A hereto) makes clear that JPMorgan *consciously ignored these complaints* in its zealous pursuit of profits, since JPMorgan went ahead and purchased the loans and then securitized them into RMBS or other securities which JPMorgan in turn sold to investors.

324.    In addition to this abdication of duty, Defendant Dimon acted in *bad faith* because he failed to disclose these facts in JPMorgan's filings with the SEC.  The Statement of Facts specifically states that "*None of this was disclosed to investors.*"  Dimon has been JPMorgan's Chairman and CEO during the entire Relevant Period.  Dimon personally reviewed, approved, and signed most of JPMorgan's SEC filings during the Relevant Time Period, including each annual Proxy Statement and each Annual Report.  Each Proxy Statement and Annual Report sent to shareholders during the Relevant Period was accompanied by a personal letter from Dimon, signed in his capacity as Chairman and CEO of the Company.  Dimon breached his duty of candor by failing to disclose JPMorgan's materially deficient internal controls, violations of law and violations of the Company's own underwriting and due diligence

standards to investors in the Annual Reports, Quarterly Reports, and Proxy Statements filed by JPMorgan during the Relevant Period.

## C.   DEMAND IS FUTILE AS TO DEFENDANTS CROWN AND FLYNN

325.   Demand is futile as to Defendants Crown and Flynn because: (a) they face a substantial likelihood of liability for breaching their duties of care, loyalty, candor, and good faith; (b) they abdicated their fiduciary duties as members of JPMorgan's Risk Policy Committee; and (c) they are interested because they approved false and misleading statements issued by JPMorgan during the Relevant Period.

326.   During the Relevant Period, Defendants Crown and Flynn were members of JPMorgan's Risk Policy Committee ("DRPC").  The purpose of the Board of Director's Risk Policy Committee is to assist the Board in its oversight of management's exercise of its responsibility to:

- 1. Assess and manage the Firm's credit risk, market risk, structural interest rate risk, investment risk, liquidity risk, fiduciary risk and model risk.

- 2. Ensure that there is in place an effective system reasonably designed to evaluate and control such risk throughout the Firm.

- 3. Manage capital and liquidity planning and analysis.

Thus, during the Relevant Period, the Risk Policy Committee performed critical tasks relating to the Company's investment in RMBS and other mortgage-backed securities.  Crown was a member of the Risk Policy Committee from 2005 to 2008, and Chair of the Committee during 2006, 2007 and 2008.  Flynn joined the Board and became a member of the Risk Policy Committee in 2012.  In particular, Crown and Flynn were responsible for ensuring that JPMorgan appropriately managed risk.  In this case, the company was exposed to significant risk from engaging in high risk subprime mortgage loan origination, securitization, marketing and sales.  Crown and Flynn knew or should have known that JPMorgan was exposing itself to billions of dollars in losses based on subprime loans with borrowers that did not have a strong credit history.  Crown and Flynn knew or should have known that JPMorgan would face serious potential legal, regulatory and criminal risks for engaging in illegal activities, including the

marketing and sale of RMBSs.  Once they were informed of the risks and potential losses, they had a duty to disclose this information to the shareholders.  They did not, and violated their fiduciary duties to do so.

327.   **During the Relevant Period, the Risk Committee met jointly with the Audit Committee on a frequent basis (and at least semi-annually) to assess internal controls and risk to the Company.  As noted in the Report of the Review Committee of the Board of Directors of JPMorgan Chase & Co. Relating to the Board's Oversight Function With Respect to Risk Management, dated  January 15, 2013, which gave "particular attention. . . to the role of the Risk  Policy Committee," the Company's Risk Policy Committee played a key role in identifying risks to JPMorgan and evaluating its internal controls.  With respect to the joint meetings of the DRPC and Audit Committee, the Report noted:  "The Risk  Policy Committee and Audit Committee met jointly to receive reports on the risk management control environment for the Firm and for specific lines of business.  The Risk Policy Committee  and Audit Committee also had a joint meeting each year with representatives of the Office of the Comptroller of the Currency ("OCC") and the Federal Reserve Bank of New York, and they  received annual reports of examinations by the OCC and the Federal Reserve Bank's reports of  inspections."**

328.   **The January 15, 2013 Report on the Risk Policy Committee notes, with respect to the Risk Policy Committee, that:  "In recent years, the Risk Policy Committee has met approximately eight  times per year, in conjunction with the regularly scheduled meetings of the Board.  The meetings  lasted approximately two to three hours.  The agendas were established early in the year by the  Chairman of the Committee and the Firm's Chief Risk Officer ("CRO"), with the expectation  that other issues would be added as they arose in the course of the year.  The Chairman typically  met with the CRO the day before each Risk Policy Committee meeting for at least an hour to go  over the agenda and the materials for the meeting, and they also frequently spoke by telephone  and exchanged emails to prepare for meetings.  The chief risk officers of the**

**Investment Bank, the Consumer Bank, and the Commercial business typically attended all meetings of the Risk Policy Committee, while the chief risk officers of the other lines of business and CIO generally attended only meetings at which their units were on the agenda until March 2012, when, at the direction of the CRO, they also began to attend all meetings of the Committee. Other senior officers of the Firm, including the Chief Financial Officer and the General Counsel, and heads of the lines of business attended Risk Policy Committee meetings from time to time."**

329.    JPMorgan's January 15, 2013 report on the Risk Policy Committee also noted that committee members received detailed reports regarding the risks facing JPMorgan. The Report noted: "The Committee members received substantial amounts of written materials a few days before the meetings. These materials included a monthly liquidity overview for the Firm and a report showing the Firm's performance against its risk appetite parameters and other risk and loss tolerances. The regular materials also included detailed reports in a standard form (entitled "Risk Management: General Market Discussion") regarding the Investment Bank, the Commercial Bank, and the Consumer business (but generally not Treasury & Securities Services, Asset Management, or CIO), plus an appendix of supporting data that included reporting on Firmwide and business-specific risk metrics. The appendix contained, among other things, graphs showing measurements of value at risk ("VaR") over the preceding 12 to 20 months for the entire Firm, and specifically for the Investment Bank, Retail Financial Services, and CIO. The appendix also included the results of various stress tests on a Firmwide basis and for specific lines of business and CIO, as well economic and allocated capital for each of the Firm's six lines of business and for the Corporate Sector, which included CIO."

330.    Moreover, the Director's Risk Policy Committee ("DRPC") had the following specific duties, as outlined in the Committee's Charter:

**Duties and responsibilities**

The DRPC shall have the following duties and responsibilities with respect to oversight of:

**A. Management's responsibility to assess and manage the Firm's credit risk,**

---

**market risk, structural interest rate risk, investment risk, liquidity risk, fiduciary risk and model risk.**

The DRPC shall:

- 15. Approve the Firm's Risk Appetite Policy, annually review and approve any material changes to such policy, and receive reports of actual and forecast instances when the Firm has exceeded or is forecast to exceed its risk appetite tolerances.

- 16. Approve such policies as may be designated by the DRPC as Primary Risk Policies, and annually review and approve any material changes to such policies. (See Note 1.)

- 17. Review a report to be submitted periodically by the Chief Risk Officer to the DRPC and to the Audit Committee on:

    The Firm's risk management control environment, including: the establishment, review, and compliance with limits; staffing; independence of the risk function; and the adequacy of reporting structures.

    Any material issues regarding risk management raised by internal audit reports rated less than satisfactory or by regulatory reports identifying issues as matters requiring attention.

    Other matters as required by law, regulation or agreement.

- 18. Meet periodically with the CEOs of the lines of business and with the Chief Investment Officer.

**B. Management's responsibility to ensure that there is in place an effective system of controls reasonably designed to evaluate and control risk throughout the Firm.**

The DRPC shall:

- 19. Review firmwide value-at-risk and stress limits established by management in accordance with the Firm's Risk Appetite Policy and be notified promptly of any excesses.

- 20. Review such other key metrics agreed to with management and performance against such metrics.

- 21. Review reports of significant issues identified by risk management officers, including reports describing the Firm's credit risk profile, information about concentrations including country risks, and material limits excesses.

- 22. Review reports on credit and valuation reserves.

**C. Management's responsibility to conduct capital and liquidity analysis and planning.**

The DRPC shall:

- 23. Review the Firm's capital allocation.

- 24. Unless reviewed and approved by the Board as a whole, review and approve the Firm's Internal Capital Adequacy Assessment Process, the Recovery Plan and the annual capital plan.

- 25. Review liquidity risk guidelines, reports from management pertaining to liquidity risk, and any material changes recommended to existing liquidity or funding guidelines. If liquidity management issues develop between meetings of the DRPC that the Chief Financial Officer believes could have a material adverse impact on the Firm, the Chief Financial Officer will promptly report such issues to the Chairman of the DRPC.

**D. Management's responsibility to provide effective risk management.**

- 26. The Firm's Chief Risk Officer reports to the CEO and is accountable to the Board, primarily through the DRPC.

- 27. The DRPC shall consult with the CEO and concur in the appointment, evaluation and any replacement, reassignment, or dismissal of the Chief Risk Officer. The DRPC or its Chair shall consult with the CEO and the Compensation & Management Development Committee or its Chair on the compensation of the Chief Risk Officer.

- 28. The DRPC shall review the Chief Risk Officer's proposed priorities, budget and staffing plans annually.

- 29. The Chief Risk Officer and the Chief Risk Officers for each line of business will, at each regularly scheduled meeting, discuss with the DRPC any concerns that they believe could reasonably be material to the Firm or to a line of business. Such officers shall also describe any actions that have been or are planned to be taken to address such concerns.

- 30. If risk management issues develop between meetings of the DRPC that the Chief Risk Officer believes could have a material adverse impact on the Firm, the Chief Risk Officer will promptly report such issues to the Chairman of the DRPC.

- 31. The DRPC shall, together with the Audit Committee, review reports prepared by Internal Audit regarding the performance of the risk management function.

**E. Management's responsibility to manage the Firm's fiduciary risk.**

- 32. The DRPC is responsible for oversight of the Firm's fiduciary risks, including those arising from asset management activities. In that capacity, the DRPC reviews the oversight structure for fiduciary activities, reviews general policies and receives reports regarding these activities.

331.    Based on these facts and duties, upon information and belief Defendants Crown and Flynn, as members of the Risk Policy Committee, and as part of their regular joint meetings

with the Audit Committee, also received actual knowledge of the reports from management and/or the Company's internal and external auditors concerning the complaints made by the JPMorgan employees detailed in the Statement of Facts (Ex. A). Indeed, the reports were voiced to senior JPMorgan executives, including Managing Directors and Executive Directors, and at least one of the complaining employees "***submitted a letter memorializing her concerns to another Managing Director, which was distributed to other Managing Directors.***" Upon being advised of these complaints concerning serious and material violations and deficiencies in JPMorgan's internal controls, upon information and belief Defendants Crown and Flynn did nothing and refused to take action to remedy the serious deficiencies, thus ***abdicating their fiduciary duties*** as directors of JPMorgan. Abdication of fiduciary duty by a director constitutes egregious conduct, and eliminates the protection of the business judgment rule to the conduct of the director.

332.    Indeed, the Statement of Facts which JPMorgan admitted to in November 2013 (Ex. A hereto) makes clear that JPMorgan ***consciously ignored these complaints*** in its zealous pursuit of profits, since JPMorgan went ahead and purchased the loans and then securitized them into RMBS or other securities which JPMorgan in turn sold to investors.

333.    In addition to this abdication of duty, Defendants Crown and Flynn acted in ***bad faith*** because they failed to disclose these facts in JPMorgan's filings with the SEC. The Statement of Facts specifically states that "***None of this was disclosed to investors.***" Crown has been a director since 2004 and served as Chair of the DRPC during the Relevant Period. Thus, Crown had real-time access to all this information and wrongdoing, and did nothing to correct the material deficiencies or to report the deficiencies to the public or JPMorgan's shareholders. Moreover, while Flynn did not become a director until 2012, he had actual knowledge or recklessly disregarded these facts after he became a director in 2012. At such time, JPMorgan was being sued for the very wrongdoing set forth in the Statement of Facts relating to JPMorgan's RMBSs and was required, as a member of the DRPC, to review JPMorgan's exposure to such lawsuits and investigate the underlying conduct. Upon information and belief, as a result of performing his duties as a DRPC member, Flynn became aware of these facts and

1  yet took no action to cause JPMorgan to publicly disclose the material facts, thus breaching his

2  duties of candor and good faith.   Breaches of the duties of good faith and candor by a director

3  are non-indemnifiable and subject a director to personal liability.   Thus, Flynn, along with

4  Crown, face a substantial likelihood of liability for breaching their duties of good faith, care, and

5  candor while serving as directors of JPMorgan, including its Director's Risk Policy Committee,

6  during the Relevant Period.

7       334.   Defendants Crown and Flynn, as members of the DRPC, also acted in bad faith

8  and breached their duty of candor because they failed to disclose known problems with the

9  DRPC's oversight of management.  The DRPC had central responsibility for oversight of the

10  risks directly relating to the Company's Chief Investment Office ("CIO").   The Audit Committee

11  also had very important oversight responsibilities with respect to many aspects of the CIO.  As

12  noted *supra*, the Company's Proxy Statements repeatedly and strenuously assured JPMorgan

13  shareholders and the stock market that JPMorgan did not need to divest Dimon of his role as

14  Chairman because the rest of the Board was allegedly independent and exercised effective risk

15  oversight of management.   Defendants Crown reviewed and approved the Company's 2012 Proxy

16  Statement, which made the following representation on this issue:

17  > The Board of Directors recommends that shareholders vote AGAINST this proposal
>  for the following reasons:

18
19  > **Implementing the proposal is unnecessary because the Firm's board leadership
>  structure already provides the   independent leadership and oversight of
>  management sought by the proponent.** The fundamental objective of the   proposal is

20  > to require that an independent director (per NYSE rules) lead the Firm's Board of
>  Directors and oversee   management. . . .

21
22  > **Introducing a separate Chairman at this time and with this CEO would not
>  provide appreciably better direction for   and performance of the Firm and could

23  > be detrimental to interests of shareholders.** The Firm's Board of Directors has   no
>  established policy on whether or not to have a non-executive chairman and

24  > believes that it should make that judgment based on circumstances and experience.
>  The Board has determined that the most effective leadership model   for the Firm

25  > currently is that Mr. Dimon serves as both Chairman and Chief Executive Officer.
>  The Board believes it is  functioning effectively under its current structure, and

26  > that the current structure provides appropriate oversight protections. The Board does
>  not believe that introducing a separate Chairman at this time and with this CEO would

27  > provide appreciably better direction for and performance of the Firm, and instead
>  could cause uncertainty, confusion   and inefficiency in board and management

28  > function and relations.

---

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**        124

Accordingly, the Board recommends a vote against this proposal.

(Emphasis in original.)

335.     At the time he approved this statement, Defendant Crown[14] knew or recklessly disregarded the fact that the DRPC, of which he served as Chairman, was not providing effective oversight over management.  Crown breached his duty of candor by approving the 2012 Proxy Statement which contained this misrepresentation and not disclosing the true facts to JPMorgan shareholders and the stock market.

336.     The Company's January 2013 internal report concerning the DRPC, although largely a whitewashing of the Board, did admit to deficiencies in the DRPC's oversight of management, although attempting to deflect liability from the Board by attributing the failings to management's alleged failure to "elevate" problems to the DRPC.  Of course, the whole purpose of Board oversight of management is to identify and address all risk, including the risk of fraud, which by its very nature involves management or employees who attempt to hide wrongdoing from the Board and others.  The January 2013 report also noted that extensive corporate governance reforms had been or were being enacted in order to strengthen the DRPC's oversight of management.  The very enactment of such significant corporate governance changes to the DRPC and Audit Committee demonstrate that the Director Defendants repeated assurances in the 2010-2012 Proxy Statements that the Board was exercising effective oversight over management were false and misleading.   The Director Defendants, including Crown, breached their fiduciary duties by approving such statements and not disclosing the true facts.

337.     The breaches of candor by the Director Defendants who approved the Proxy Statements is also evident in JPMorgan's 2013 Proxy Statement, which contains a very different discussion of the Board's alleged effective oversight over management than what appeared in the 2010-2012 Proxy Statements.  In 2013, once again, a shareholder proposal appeared in the Proxy calling for the Board to strip Dimon of his Chairman role in order to provide greater oversight of management, thereby increasing risk management.  Once again, JPMorgan opposed the

---

[14] Defendant Flynn was nominated as a director in the 2012 Proxy Statement and was elected to the Board at the Company's Annual Meeting.

shareholder approval.  However, in its opposition statement, JPMorgan was forced to admit

failures of the Board in exercising oversight of the CIO with respect to the London Whale trading

fiasco.  However, JPMorgan put its spin on the failings by claiming that the very fact that the

Board fixed substantial problems with its oversight responsibility of the CIO demonstrates that the

Board is functioning effectively and can police itself.  While this explanation is self-interested,

JPMorgan cannot deny the fact that the very need to establish ***substantial and extensive corporate***

***governance reforms*** governing the Board's oversight of management is itself an acknowledgment

that, contrary to the Board's repeated protestations in the 2010-2012 Proxy Statements, the Board

was not exercising effective oversight of management, which in turn led to billions of dollars in

losses in settlements relating to the CIO and RMBS.  The relevant portion of the 2013 Proxy

Statement, in which the Board recommended that shareholders vote against Proposal 6, is as

follows:

> **The Board's actions following the losses in CIO demonstrate strong,**
> **independent oversight.** In May 2012, the  Firm announced that there had been
> significant trading losses in a portfolio within the Firm's Chief Investment
> Office ("CIO"). The Firm appointed a Management Task Force to review the
> trading losses and the Board of Directors  established an independent Review
> Committee of the Board (the "Board Review Committee") to oversee the scope
> and work of the Management Task Force review, assess the Firm's risk
> management processes related to the issues  raised in the Management Task
> Force review, and to report to the Board of Directors on the Review
> Committee's  findings and recommendations. The Board Review Committee
> was chaired by the Firm's Presiding Director.
>
> On January 16, 2013, the Firm announced that the Firm's Management Task
> Force and the Board Review  Committee had each concluded their reviews and
> had released their respective reports, which are available on the  Firm's Website
> at www.jpmorganchase.com and are discussed in the Firm's annual report. The
> Management Task  Force report summarizes the key events and sets forth its
> observations regarding the lapses in oversight and  controls that contributed to
> the losses incurred by the CIO. The Management Task Force report also
> describes the  broad range of remedial actions taken by the Firm to respond to
> the lessons it has learned from the CIO events,  including revamping the
> governance, mandate and reporting and control processes of CIO; ***implementing***
> ***numerous  risk management changes, including improvements in model***
> ***governance and market risk; and implementing a  series of changes to the***
> ***Risk function's governance, organizational structure and interaction with the***
> ***Board.***
>
> ***The Board Review Committee Report concurred in the substance of the***
> ***Management Task Force report and also  recommended a number of***

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**          126

*enhancements to the Board's own practice to strengthen its oversight of the Firm's risk   management processes.* The Board Review Committee noted that some of its recommendations were already being   followed by the Board or its Risk Policy Committee or had recently been put into effect. The Board Review Committee's  recommendations  included:

- better focused and clearer reporting of presentations to the Board's Risk Policy Committee, with particular  emphasis on the key risks for each line of business, identification of significant future changes to the business  and its risk profile, and adequacy of staffing, technology and other resources;
- clarifying to management the Board's expectations regarding the capabilities, stature, and independence of the   Firm's risk management personnel;
- more systematic reporting to the Risk Policy Committee on significant model risk, model approval and model  governance, on setting of significant risk limits and responses to significant limit excessions, and with respect to regulatory matters requiring attention;
- further clarification of the Risk Policy Committee's role and responsibilities, and more coordination of matters   presented to the Risk Policy Committee and the Audit Committee;
- concurrence by the Risk Policy Committee in the hiring or firing of the Chief Risk Officer and that it be consulted  with respect to the setting of such Chief Risk Officer's compensation; and
- staff with appropriate risk expertise be added to the Firm's Internal Audit function and that Internal Audit more  systematically include the risk management function in its audits.

The Board Review Committee's recommendations were approved by the full Board of Directors and have been, or  are in the process of being, implemented.

(Emphasis in bold in original; emphasis in italics added.)

338.    Demand is also futile as to Crown because he is interested.  Since 2004, as a Board member, Crown has made a base total of approximately $245,000 each year from the company, including cash and stock awards.  To maintain his lucrative compensation, and ensure the value of his shares, Crown has an interest in continuing to cover up for Defendant Dimon's misconduct, as well as his own.  Crown also earned $40,000 for his service on the Compliance committee and an additional $42,500 for his service as a member of the Mortgage Compliance committee.

339.    Crown is also president of Henry Crown and Company, a family-owned investment company.  Crown has benefited from extensions of credit provided by JPMorgan to Henry Crown and other Crown owned entities.  Additionally, JPMorgan leases office space and retail space from subsidiaries of companies in which Crown and members of his immediate family have indirect ownership interests.

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**          127

340.    Crown has also benefited from charitable contributions by JPMorgan to organizations Crown has served as a trustee.  For these reason, Crown is not independent of Dimon and JPMorgan and cannot adequately evaluate the claims set forth in this Complaint.

**D.    DEMAND IS FUTILE AS TO DEFENDANT BURKE**

341.    Burke faces a substantial likelihood of liability from his individual misconduct. Burke was a director throughout the relevant time period and had a duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true and correct.  He allowed Dimon to make misstatements and to conceal material facts from the public.  Burke's authorization of such misstatements and concealments of material fact constitute a breach of fiduciary duty, for which Burke faces a substantial likelihood of liability.  For these reasons, Burke cannot adequately and appropriately consider a demand on the JPMorgan Board of Directors.

342.    Burke is on the Compensation & Management Development Committee and the Corporate Governance and Nominating Committee.  Burke is responsible for determining the compensation awarded to Dimon.  Burke was in a position to know that the large-scale origination, securitization, marketing and sale of subprime RMBS significantly boosted JPMorgan's profits, allowing Burke to pay out large compensation to Dimon.  Because of his personal involvement in authorizing the award of large compensation to Dimon notwithstanding the underlying wrongdoing that gave rise to the justification of such compensation, Burke cannot fairly and independently adjudicate any demand on the Board of Directors to take action against Dimon or the other Defendants.

343.    Since 2004, as a Board member, Burke made a base total of approximately $245,000 each year from the company, including cash and stock awards.  To maintain his lucrative compensation, and ensure the value of his shares, Burke has an interest in continuing to cover up for Defendant Dimon's misconduct, as well as his own.

344.    Burke is the Executive Vice President of Comcast.  Comcast and its subsidiaries have benefited from extensions of credit provided by JPMorgan. Since Dimon, as CEO, has

control over the credit lines of the company that Burke serves as a senior officer, Burke cannot render an independent judgment as to any demand made on JPMorgan's Board of Directors.

## E.   DEMAND IS FUTILE AS TO DEFENDANT RAYMOND

345.   Raymond faces a substantial likelihood of liability for his individual misconduct. Raymond was a director throughout the relevant time period, and as such had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true.  He allowed Dimon to make misstatements and to conceal material facts from the public.  Raymond's authorization of such misstatements and concealments of material fact constitute a breach of fiduciary duty, for which Raymond faces a substantial likelihood of liability.  For these reasons, Raymond cannot adequately and appropriately consider a demand on the JPMorgan Board of Directors.

346.   Raymond is on the Compensation & Management Development Committee and the Corporate Governance and Nominating Committee.  Raymond is thus responsible for determining the compensation awarded to officers, including Dimon.  Because of his personal involvement in authorizing the award of large compensation to Dimon notwithstanding the underlying wrongdoing that gave rise to the justification of such compensation, Raymond cannot fairly and independently adjudicate any demand on the Board of Directors to take action against Dimon or the other Defendants.

347.   Since 2001, Raymond has received $2,312,078 from JPMorgan, including about $245,000 each year in an annual base payment of cash and stock awards.  To maintain his lucrative compensation, and ensure the value of his shares, Raymond had a continued personal financial interest in covering up Dimon's wrongdoing and as such is not able to fairly and appropriately adjudicate any demand made on the JPMorgan Board of Directors.

**F.      DEMAND IS FUTILE AS TO DEFENDANT WELDON**

348.     Weldon faces a substantial likelihood of liability for his individual misconduct. Weldon was a director throughout the relevant time period, and as such had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true.  He allowed Dimon to make misstatements and to conceal material facts from the public.  Weldon's authorization of such misstatements and concealments of material fact constitute a breach of fiduciary duty, for which Weldon faces a substantial likelihood of liability.  For these reasons, Weldon cannot adequately and appropriately consider a demand on the JPMorgan Board of Directors.

349.     Since 2005, as a Board member, Weldon has received an annual base payment of about $245,000 in cash and stock awards.  To maintain his lucrative compensation, and ensure the value of his shares, Raymond had a continued personal financial interest in covering up Dimon's wrongdoing and as such is not able to fairly and appropriately adjudicate any demand made on the JPMorgan Board of Directors.

350.     Weldon is on the Compensation & Management Development Committee and the Corporate Governance and Nominating Committee.  Weldon is thus responsible for determining the compensation awarded to officers, including Dimon.  Because of his personal involvement in authorizing the award of large compensation to Dimon notwithstanding the underlying wrongdoing that gave rise to the justification of such compensation, Weldon cannot fairly and independently adjudicate any demand on the Board of Directors to take action against Dimon or the other Defendants.

351.     Further, Weldon was the CEO of Johnson & Johnson.  JPMorgan has provided extension of credit to Johnson & Johnson and its subsidiaries.  Dimon, as CEO, has control over the extension of credit.  Weldon in not independent of Dimon or JPMorgan.

**G.      JPMORGAN'S CURRENT BOARD OF DIRECTORS VIOLATED THE FIDUCIARY DUTIES THEY OWED TO THE COMPANY AND TO ITS SHAREHOLDERS**

352.     The acts complained of constitute violations of the fiduciary duties owed by JPMorgan's officers and directors and are incapable of ratification.

353.   The JPMorgan Board of Directors cannot be relied upon to reach a truly independent decision whether to commence the demanded action against themselves and the officers responsible for the misconduct alleged in this derivative complaint because, among other things, the Board is currently dominated by the Individual Defendants, who were personally and directly involved in the acts of mismanagement, abuse of control and waste alleged and who each approved the actions complained of, and to whose directives and views the Board has consistently acceded and will continue to accede.  Their conduct demonstrates that rather than accepting responsibility, Defendants will protect themselves from prosecution by forcing JPMorgan and its shareholders to pay record fines and penalties while entering into agreements that shield the Defendants from liability while themselves shouldering none of the burden they have created.  None of the Defendants are in a position to fairly evaluate his or her own misconduct in this case.

354.   This domination of JPMorgan's Board of Director prevents it from validly exercising its business judgment in a fair and neutral manner, and renders it incapable of reaching an independent decision whether to accept any demand by Plaintiffs to address the wrongs detailed herein.

355.   A majority of the directors received personal and financial benefits while they caused or permitted JPMorgan to engage in the extensive misconduct detailed in this derivative complaint.

## VIII.

## CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

## BREACH OF FIDUCIARY DUTY

## AGAINST THE INDIVIDUAL DEFENDANTS

356.   Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

357.   Each of the Defendants sued under this cause of action owed fiduciary duties to JPMorgan as officers and/or directors of JPMorgan.  Each of the Defendants breached his or her

duty of loyalty, candor and good faith to the company by putting his or her own pecuniary

interests above those of the company.  Each of the Defendants, except Flynn, permitted and/or

authorized JPMorgan to become heavily exposed to the subprime mortgage business, without

regard for risk.  Each of the Defendants, except Flynn, permitted and/or authorized JPMorgan to

weaken its underwriting standards for mortgage loan originations, securitize high risk, low

quality subprime mortgages into RMBS and then market and sell those low quality subprime

RMBS through fraudulent and misleading representations and through the concealment of

material facts.  Each of the Defendants utterly failed to implement any meaningful or effective

reporting or information system or controls in regards to JPMorgan's subprime mortgage

business at any level of the process, consciously failed to monitor or oversee JPMorgan's

subprime mortgage business and knowingly failed to discharge their fiduciary obligations to

JPMorgan.  Considering the nature and risks associated with the RMBS business, such

Defendants abdicated their fiduciary obligations by knowingly allowing JPMorgan's standards to

deteriorate at every level of the subprime mortgage business, from origination to securitization to

marketing and sales.

358.    Each of the Defendants also breached his or her duty of loyalty and candor by

concealing JPMorgan's involvement in the illegal RMBS sales through fraudulent and

misleading representations and through the concealment of material facts.  Each Defendant put

his or her own desire to avoid reputational and litigation risk before the best interests of the

company.

359.    Defendants are also liable for failing to implement and oversee in good faith, and

with loyalty, adequate internal controls sufficient to:  (a) monitor and prevent JPMorgan's

officers, directors and employees from failing to comply with all applicable legal obligations and

requirements; (b) monitor and prevent JPMorgan's officers, directors and employees from

engaging in illegal and/or fraudulent misconduct; (c) remain informed as to JPMorgan's internal

controls and, upon receipt of notice of information of imprudent or unsound conditions or

practices, to make reasonable inquiry in connection therewith, and to take steps to correct such

conditions or practices; and (d) promote a corporate climate that emphasized compliance with

securities laws instead of the systemic violation of applicable legal requirements in the pursuit of illegal gain.

360.     Defendants abused the trust reposed in them by virtue of their positions and breached their fiduciary duty of loyalty by utterly abdicating their duty of oversight.  As a result of their sustained and systematic failure to exercise oversight, Defendants caused or allowed JPMorgan's business to be conducted in violation of legal requirements and regulations known to them.

361.     Defendants specifically owed and owe JPMorgan the highest obligation of good faith and loyalty in the administration of the affairs of JPMorgan, including to conduct adequate due diligence in regards to its business operations, particularly those high risk business operations that are key profit centers for the company and sources of significant risk.  As directors and officers of JPMorgan, the Defendants were and are required to use their abilities to control and manage JPMorgan in a fair, just and equitable manner in order to ensure that the company complied with applicable laws, to refrain from abusing their positions of control, and not to favor their own interests at the expense of JPMorgan and its shareholders.  Defendants violated their fiduciary duties to JPMorgan, including without limitation their duties of good faith, honesty, candor and loyalty.

362.     Defendants participated in or had knowledge of JPMorgan's illegal activities and profited thereby, which constitutes an additional breach of the fiduciary duty owed to the company.

363.     By their acts and omissions alleged herein, Defendants, and each of them, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of JPMorgan in a manner consistent with the best interest of JPMorgan and its shareholders.

364.     The wrongful conduct particularized herein was not due to an honest error in judgment, but rather to the Defendants' gross mismanagement, bad faith and/or reckless disregard of the rights and interests of JPMorgan, and it shareholders.  Defendants made the decisions subject to this action for their own pecuniary gain.

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**     133

365.    As a result of the foregoing, the Defendants have participated in harming JPMorgan and have breached fiduciary duties owed to JPMorgan.  Furthermore, the Defendants knowingly aided, encouraged, cooperated and/or participated in, and substantially assisted the other Defendants in the breaches of their fiduciary duties.

366.    As a result of the Defendants' wrongful conduct, JPMorgan has suffered and continues to suffer economic losses and non-economic losses, all in an amount to be determined according to proof at the time of trial.  As a direct and proximate result of defendants' foregoing breaches of fiduciary duties, JPMorgan has suffered billions of dollars in damages, including, but not limited to the, $13 billion to be paid pursuant to the settlement it reached with the Department of Justice.  JPMorgan faces substantial additional damages including, among other things, reputational and other harm that may arise from ongoing civil and criminal investigations in the Eastern District of California.

367.    The acts of the Defendants named herein, and each of them, were done maliciously, oppressively, and with intent to defraud, and Plaintiffs, derivatively on behalf of JPMorgan, are entitled to punitive and exemplary damages in an amount to be shown according to proof at the time of trial.

## SECOND CLAIM FOR RELIEF

## CORPORATE WASTE

## AGAINST THE INDIVIDUAL DEFENDANTS

368.    Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

369.    As alleged in detail herein, the Defendants had a fiduciary duty to exercise good faith and diligence in the administration of the affairs of JPMorgan and in the use and preservation of its property and assets, and they had the highest obligation of fair dealing.

370.    Defendants wasted JPMorgan's corporate assets by paying or approving the payment of executive and/or director compensation based on the illegal conduct described herein.

371.    As a result of the Defendants' wrongful conduct, JPMorgan has suffered and continues to suffer economic losses and non-economic losses, all in an amount to be determined according to proof at the time of trial.

### THIRD CLAIM FOR RELIEF

### UNJUST ENRICHMENT

### AGAINST THE INDIVIDUAL DEFENDANTS

372.    Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

373.    The Defendants derived compensation, fees and other benefits from JPMorgan and were otherwise unjustly enriched for their management of JPMorgan during the time in which the wrongful practices occurred, to the detriment of JPMorgan.  Defendants profited by engaging in the wrongful conduct set forth above.  These benefits should not be held or retained by the Individual Defendants and should be disgorged back to the company.

374.    Defendants' enrichment is directly and causally related to the detriment of JPMorgan.

375.    These benefits were accepted by Defendants under such circumstances that it would be inequitable for them to be retained without payment.

376.    As alleged above, the Defendants breached their fiduciary duties and/or abused their positions of control at JPMorgan and therefore Defendants are not justified in retaining the benefits conferred upon them.

### FOURTH CLAIM FOR RELIEF

### VIOLATION OF SECTION 14(A) OF THE EXCHANGE ACT

### AGAINST INDIVIDUAL DEFENDANTS DIMON, BELL, BOWLES, BURKE, COTE, CROWN, FUTTER, GRAY, JACKSON, NOVAK, RAYMOND, AND WELDON

377.    Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

378.    The Individual Defendants who were directors at the time, issued, caused to be issued, and participated in the issuance of materially false and misleading written statements and

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**        135

material omissions to shareholders that were contained in the Company's 2011 and 2012 Proxy Statements.  Defendants Dimon, Bowles, Burke, Cote, Crown, Futter, Jackson, Raymond and Weldon are sued herein for the false statements in both the 2011 and 2012 Proxy Statements due to their review, approval, and participation in the issuance of both proxies.  Defendants Gray and Novak are sued herein only with respect to the false statements and material omissions in the 2011 Proxy.  Defendant Bell is sued herein only for the false statements and material omissions in the 2012 Proxy.

379.    The 2011 Proxy Statement soliciting materials were materially false and misleading because they falsely stated that the Company's Board of Directors maintained adequate and effective risk oversight over management and failed to disclose to the Company's shareholders material deficiencies in the Board's oversight of management and internal controls.  By reason of the conduct alleged herein, the Individual Defendants, who caused the issuance of the 2011 Proxy Statement, violated Section 14(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, the Individual Defendants named herein misled and/or deceived its shareholders.  The false statements and material omissions were material because there is a substantial likelihood that a reasonable shareholder would consider the information important in deciding how to vote with respect to the matters contained in the proxy, which were submitted for shareholder approval at the annual meeting.  Among other things, based on the false statements and material omissions contained in the proxy, a majority of shareholders supported the Company's recommendation and voted against a shareholder proposal that would have strengthened Board oversight of management by divesting Defendant Dimon of his role as Chairman and giving the role of Chairman to an independent and outside director.

380.    The 2012 Proxy Statement soliciting materials were materially false and misleading because they falsely stated that the Company's Board of Directors maintained adequate risk oversight over management and failed to disclose to the Company's shareholders material deficiencies in the Board's oversight of management.

381.    The Board of Directors did not believe that it exercised effective oversight of Dimon and other executives, nor that Dimon, as Chairman, exercised effective oversight of himself and other executives at J.P. Morgan.  However, the Board was beholden to Dimon and thus approved the false statements in the proxies to acquiesce Dimon and his demand to continue serving as both Chairman and CEO of the Company, and to defeat the shareholder proposal to separate such dual roles.  Indeed, Dimon had told the Board he would quit JPMorgan if he had been stripped of his role as Chairman, as was revealed the next year when a similar proposal was put on the proxy.[15]

382.    At the time they signed the proxy recommending against splitting the roles of Chairman and CEO, the director defendants did not genuinely believe their recommendation.   A pair of influential shareholder advisory groups, Institutional Shareholder Services (ISS) and Glass Lewis, had recommended that shareholders vote to split Dimon's role as chairman and chief executive.  Glass Lewis stated that an independent chairman is better able to oversee the executives of a company and set a pro-shareholder agenda.  The AFSCME Employees Pension Plan, the Connecticut Retirement Plans & Trust Funds, Hermes Equity Ownership Services and various New York City pension funds also were in favor of a proposal calling on JPMorgan Chase to name an independent chairman.  Moreover, the director defendants knew that, in the past, similar proposals had been made to strip Dimon of his role as Chairman, and the proposal received the favorable vote of approximately 40% of JPMorgan shareholders — a high percentage for a shareholder proposal.

383.    Moreover, the directors who approved the proxy statements were also aware of research showing that dual chairman/CEO roles are not in the best interests of the Company.  For example, a 2009 study by the Corporate Library, a research firm specializing in corporate governance, said businesses with unified CEO-chairmen tend to be less "shareholder friendly."  A board that "retains the dual role out of reluctance to challenge a powerful chief executive may

---

[15] *See, e.g.*, David Bogoslaw, "ISS, Glass Lewis Call for Split of Chairman, CEO at JPMorgan," the Corporate Secretary, May 9, 2013, available at http://www.corporatesecretary.com/articles/proxy-voting-shareholder-actions/12438/iss-glass-lewis-call-split-chairman-ceo-jpmorgan/, last visited April 1, 2016.

not be a strong protector of shareholder interests in other respects," the research firm said. Because of their knowledge of all this information, the Board's recommendation in the proxy to vote against the separation of Dimon's dual roles as Chairman and CEO was false, and the Board did not genuinely believe its recommendation was in the best interests of the Company.

384. The Board also knowingly agreed to include the false statements in the proxies since it believed that, had it admitted its own ineffectiveness in oversight of management, such admission would have led to their own personal liability for breaching their fiduciary duties as Board members. Thus, the Board acted in bad faith and in a disloyal manner.

385. By reason of the conduct alleged herein, the Individual Defendants, who caused the issuance of the 2011 and 2012 Proxy Statements, violated Section 14(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, the Individual Defendants named herein misled and/or deceived its shareholders by falsely portraying material facts concerning the Board's risk oversight of management. As a result of the false statements and material omissions, shareholders were deceived. The false statements and material omissions were material because there is a substantial likelihood that a reasonable shareholder would consider the information important in deciding how to vote with respect to the matters contained in the proxy, which were submitted for shareholder approval at the annual meeting. Among other things, based on the false statements and material omissions contained in the proxy, a majority of shareholders supported the Company's recommendation and voted against a shareholder proposal that would have strengthened Board oversight of management by divesting Defendant Dimon of his role as Chairman and giving the role of Chairman to an independent and outside director. The shareholders also voted in favor of the election of all incumbent directors and voted to elect Defendant Flynn to the Board.

386. Defendants Dimon, Bowles, Burke, Cote, Crown, Futter, Jackson, Raymond and Weldon knew or recklessly disregarded the falsity of the statements in both the 2011 and 2012 Proxy Statements. Defendants Gray and Novak knew or recklessly disregarded the falsity of the statements and material omissions in the 2011 Proxy. Defendant Bell knew or recklessly disregarded the falsity of the statements and material omissions in the 2012 Proxy. All such

defendants knew that by October 2005, JPMorgan's share price had declined significantly from past years and JPMorgan's stock was severely underperforming the S&P 500, the Dow Jones Industrial Average, the NASDAQ Composite averages.  More importantly, JPMorgan had underperformed every other major financial institution, including Bear Stearns, WaMu, Morgan Stanley, and Goldman Sachs, all of which were arguably peers of JPMorgan.  All director defendants knew that this created intense pressure on the executives at JPMorgan to increase revenues and profits as quickly as possible.  The senior officers and directors of JPMorgan, including the Director Defendants named herein, were desperate to improve JPMorgan's financial performance, and as a result, approved the intentional overriding of internal controls and protocols at the Company whose purpose was to ensure that JPMorgan acted in a legal and appropriate manner.  Because they approved the overriding of the internal controls at the Company, the Director Defendants knew that the Board, and especially Dimon, was not exercising effective oversight of management.  Moreover, the Director Defendants knew that if shareholders voted to strip Dimon of his role as Chairman, an independent director would have to take concerted and substantial steps to improve the internal controls at JPMorgan, and to actually enforce the existing internal controls which were being ignored and consciously overridden.  Because the Director Defendants were active participants in the scheme with Dimon to continue earning unlawful profits by overriding the Company's internal controls, they knowingly agreed to include the false statements and material omissions in the 2011 and 2012 Proxies in an effort to deceive shareholders with respect to the items submitted for shareholder voting at such annual meetings.

387.    As further evidence of their knowledge of the false statements in the 2011 and 2012 Proxy statements, the Director Defendants were well aware, prior to the issuance of the proxy statements, that Dimon had admitted significant lapses in his oversight of management.  In testimony given before the FCIC on January 13, 2010, Defendant Dimon stated that "the underwriting standards of our mortgage business should have been higher."  Defendant Dimon confessed that JPMorgan "misjudged the impact of more aggressive underwriting standards and should have acted sooner and more substantially to reduce the loan-to-value ratios."

388.     In his March 30, 2012 annual letter to shareholders, Defendant Dimon reaffirmed that JPMorgan, during the relevant time period, had materially loosened its underwriting standards and issued problematic loans to borrowers.  Defendant Dimon acknowledged that "avoiding making bad loans — as we all learned again in this crisis — also is important" and that "traditional mortgage underwriting loosened over time."  All Director Defendants, including Dimon, knew or should have known that JPMorgan's underwriting standards were deteriorating and in fact were being intentionally overridden, but this was allowed to occur because JPMorgan's profitability was significantly boosted because of the disregard of internal controls.

389.     Despite their knowledge or reckless disregard of the truth, the Director Defendants did not admit their own complicity in failing to provide effective oversight of management.  Instead of admitting their own responsibility, which would have been highly material to shareholders in deciding how to vote in the 2011 and 2012 annual elections, the Director Defendants attempted to deflect attention away from themselves and fellow director Dimon in the proxy statement by blaming others for the Company's problems.  Also, the Director Defendants knew that Dimon himself had repeatedly blamed others publicly for JPMorgan's problems and had never admitted his or the Board's ineffective oversight of management.  For example, in the March 30, 2012 letter to shareholders, Defendant Dimon blamed the subprime mortgage crisis on "unscrupulous mortgage officers" who were "miss-selling mortgages" and on "some mortgage borrowers" who were "lying on mortgage documents."  Defendant Dimon wrote in that letter that "[w]e [JPMorgan] were one of the better actors in this situation — but not good enough; we made too many mistakes.  We generally were a better underwriter."  Defendant Dimon went on to write that "[m]any of our problems were inherited from Bear Stearns and WaMu."  In this manner, Defendant Dimon sought to deflect the blame on a few "rogue" mortgage officers and "bad" mortgage borrowers, concealing the massive systematic problems at JPMorgan, and the Director Defendants' own failure to exercise effective oversight of management, that led the company to the massive settlements announced in November 2013.

390.    As further evidence of the Director Defendants' knowledge of the falsity of the information they included in the 2011 and 2012 Proxy, on September 23, 2010, Clayton's Vice President Vicki Beal testified that, through its numerous roles as underwriter and sponsor, ***JPMorgan was made fully aware on a regular basis that a significant percentage of its loans failed to meet stated underwriting guidelines***, but were being included anyway in the mortgage pools underlying residential mortgage-backed securities sold to investors.  A report generated as part of the New York Attorney General's ongoing investigation of investment banking misconduct in underwriting mortgage-backed securities stated that Clayton routinely provided the banks with detailed reports of loans that were not compliant with underwriting guidelines, but that the banks, including JPMorgan, routinely ignored Clayton and other third-party due diligence firms and overrode the exclusion of a significant percentage of rejected loans from purchase and securitization.  For example, according to one internal Clayton Trending Report, JPMorgan was told that a significant portion of the loans that Clayton reviewed for their respective sponsor entities "failed to meet guidelines," and that these loans were not properly approved as "exception loans" because they did not have any "compensating factors."  Still, JPMorgan's management and Board chose to maintain market share of mortgage-backed securities instead of protecting JPMorgan against illegal conduct.  As detailed herein, the Director Defendants had access to these reports, and thus knew that Dimon and the Board itself were not providing effective oversight of management, and did not genuinely believe that separating the Chairman and CEO roles was not in the best interests of the Company.

391.    Moreover, the Director Defendants were provided with regular reports concerning the strikingly high number of JPMorgan's loans that were rejected by third-party due diligence firms, yet were then subsequently "waived" into securitizations by JPMorgan.  These facts caused the Director Defendants to know or recklessly disregard the fact that defective loans were regularly being included in JPMorgan's offerings, in systematic violation of the Company's underwriting standards.  As a result of these reports and this knowledge, the Director Defendants were well aware of the Company's intentional overriding of internal controls.

392.    Upon information and belief, as members of the Board's Audit Committee, Defendants Bell, Bowles, and Jackson received reports concerning complaints made by JPMorgan employees to Managing Directors and Executive Directors regarding serious and material violations of and deficiencies in JPMorgan's internal controls.

393.    These known deficiencies, together with other concerns over internal controls and risk management, led to significant changes to the Board's oversight of risk management, which were noted in the January 15, 2013 Board Review Committee Report.  As discussed in detail above, this Report admitted to deficiencies in the DRPC's oversight of management, despite attempts to deflect liability from the Board by attributing the deficiencies to management's failure to "elevate" problems to the DRPC.  In any event, the significant corporate governance reforms noted in the Report, standing alone, demonstrate the Director Defendants' knowledge that the statements in the 2011 and 2012 Proxy Statements regarding effective oversight and internal controls were false and misleading.

394.    Plaintiffs, on behalf of the Company, seek injunctive and equitable relief because the conduct of the Individual Defendants named herein interfered with Plaintiffs' voting rights and choices at the 2011 and 2012 annual meetings.  Plaintiffs do not seek any monetary damages for the proxy law violations.

395.    This action was timely commenced within three years of the dissemination of the false proxy statements and within one year of the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this claim is based.

## PRAYER FOR RELIEF

Plaintiffs, derivatively on behalf of JPMorgan, pray for judgment as follows:

1.    Awarding damages against all Defendants, jointly and severally, in an amount to be proven at trial;

2.    Awarding a preliminary and/or permanent injunction precluding JPMorgan and its Board of Directors from continuing to operate JPMorgan without internal controls for managing and overseeing JPMorgan's RMBS operations.

3.    Awarding any additional appropriate equitable relief, including any injunctive or declaratory relief necessary to change and/or reform JPMorgan's corporate governance, policies and culture.

4.    Awarding restitution, disgorgement of all illicit proceeds generated as a result of the wrongful conduct alleged herein, and punitive damages;

5.    Awarding pre-judgment interest, as well as reasonable attorneys' fees and other costs;

6.    Awarding such other relief as this Court may deem just and proper.

Dated: April 28, 2016                          **COTCHETT, PITRE & McCARTHY, LLP**

    */s/ Mark C. Molumphy*
JOSEPH W. COTCHETT
MARK C. MOLUMPHY
ALEXANDRA P. SUMMER
TORIANA S. HOLMES

*Lead Counsel and Attorneys for Plaintiff Ronald A. Harris, derivatively on behalf of JPMorgan Chase & Co.*

Dated: April 28, 2016                          **LAW OFFICES OF GEORGE DONALDSON**

    */s/ George Donaldson*
    GEORGE DONALDSON
    2298 Durant Avenue
    Berkeley, CA 94704
    Phone: (510) 548-7474
    Fax: (510) 548-7488

*Executive Committee Member and Attorney for Plaintiff Ronald A. Harris, derivatively on behalf of JPMorgan Chase & Co.*

Dated: April 28, 2016                          **HAGENS BERMAN SOBOL SHAPIRO LLP**

    */s/ Peter E. Borkon*
    PETER E. BORKON
Peter E. Borkon
715 Hearst Avenue, Ste. 202
Berkeley, CA 94710

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**          143

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Tel:  (510) 725-3000
Fax: (510) 725-3001

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Steve W. Berman
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Tel:  (206) 623-7292
Fax: (206) 623-0594

*Executive Committee Member*

Dated: April 28, 2016

**BOTTINI & BOTTINI, INC.**

*/s/ Francis A. Bottini, Jr.*
FRANCIS A. BOTTINI, JR.

Francis A. Bottini, Jr.
Yury A. Kolesnikov
7817 Ivanhoe Avenue, Suite 102
La Jolla, CA 92037
Tel:  (858) 914-2001
Fax:  (858) 914-2002

*Executive Committee Member and Attorneys for Plaintiff Jeffrey Shlosberg, derivatively on behalf of JPMorgan Chase & Co.*

Dated: April 28, 2016

**DREYER BABICH BUCCOLA WOOD CAMPORA, LLP**

*/s/ Roger A. Dreyer*
ROGER A. DREYER

Roger A. Dreyer
Stacey L. Roberts
Stephen F. Davids
Stanley P. Fleshman
20 Bicentennial Circle
Sacramento, CA 95826
Tel: (916) 379-3500
Fax: (916) 379-3599

*Executive Committee Member and Attorneys for Plaintiff Richard Ratcliff, derivatively on behalf of JPMorgan Chase & Co.*

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**        144

1

2    Dated: April 28, 2016                **KABATECK BROWN KELLNER LLP**

3                                          */s/ Brian S. Kabateck*
                                            BRIAN S. KABATECK
4

5                                          Brian S. Kabateck
                                           Joshua H. Haffner
6                                          Engine Company No. 28 Building
                                           644 South Figueroa Street
7                                          Los Angeles, CA 90017
                                           Tel: (213) 217-5000
8                                          Fax: (213) 217-5010

9
                                           *Executive Committee Member*
10

11                                         **HARALSON, MILLER PITT, FELDMAN**
                                           **& McNALLY, PLC**
12                                         Gerald Maltz
                                           Peter T. Limperis
13                                         One South Church Avenue, Suite 900
                                           Tucson, AZ 85701
14                                         Tel: (520) 792-3836
                                           Fax: (520) 624-5080
15

16                                         *Executive Committee Member*

17

18

19

20

21

22

23

24

25

26

27

28

---

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**     145

1

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury of all issues that are subject to adjudication by a trier of fact.

Dated: April 28, 2016         **COTCHETT, PITRE & McCARTHY, LLP**

*/s/ Mark C. Molumphy*
JOSEPH W. COTCHETT
MARK C. MOLUMPHY
ALEXANDRA P. SUMMER
TORIANA S. HOLMES

*Lead Counsel and Attorneys for Plaintiff Ronald A. Harris, derivatively on behalf of JPMorgan Chase & Co.*

Dated: April 28, 2016         **LAW OFFICES OF GEORGE DONALDSON**
*/s/ George Donaldson*
GEORGE DONALDSON
2298 Durant Avenue
Berkeley, CA 94704
Phone: (510) 548-7474
Fax: (510) 548-7488

*Executive Committee Member and Attorney for Plaintiff Ronald A. Harris, derivatively on behalf of JPMorgan Chase & Co.*

Dated: April 28, 2016         **HAGENS BERMAN SOBOL SHAPIRO LLP**

*/s/ Peter E. Borkon*
PETER E. BORKON

Peter E. Borkon
715 Hearst Avenue, Ste. 202
Berkeley, CA 94710
Tel: (510) 725-3000
Fax: (510) 725-3001

*Executive Committee Member*

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**     146

1

2     **HAGENS BERMAN SOBOL SHAPIRO
      LLP**
3     Steve W. Berman
      1918 Eighth Avenue, Suite 3300
4     Seattle, WA 98101
      Tel: (206) 623-7292
5     Fax: (206) 623-0594

6     *Executive Committee Member*

7     Dated: April 28, 2016          **BOTTINI & BOTTINI, INC.**

8                                    */s/ Francis A. Bottini, Jr.*
                                     FRANCIS A. BOTTINI, JR.
9

10    Francis A. Bottini, Jr.
      Yury A. Kolesnikov
11    7817 Ivanhoe Avenue, Suite 102
      La Jolla, CA 92037
12    Tel: (858) 914-2001
      Fax: (858) 914-2002
13

14    *Executive Committee Member and Attorneys
      for Plaintiff Jeffrey Shlosberg, derivatively on
15    behalf of JPMorgan Chase & Co.*

16    Dated: April 28, 2016          **DREYER BABICH BUCCOLA WOOD
                                     CAMPORA, LLP**
17

18                                   */s/ Roger A. Dreyer*
                                     ROGER A. DREYER
19

20    Roger A. Dreyer
      Stacey L. Roberts
21    Stephen F. Davids
      Stanley P. Fleshman
22    20 Bicentennial Circle
      Sacramento, CA 95826
23    Tel: (916) 379-3500
      Fax: (916) 379-3599
24

25    *Executive Committee Member and Attorneys
      for Plaintiff Richard Ratcliff, derivatively on
26    behalf of JPMorgan Chase & Co.*

27

28

---

**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**          147

Dated: April 28, 2016

**KABATECK BROWN KELLNER LLP**

*/s/ Brian S. Kabateck*
    BRIAN S. KABATECK

Brian S. Kabateck
Joshua H. Haffner
Engine Company No. 28 Building
644 South Figueroa Street
Los Angeles, CA 90017
Tel: (213) 217-5000
Fax: (213) 217-5010

*Executive Committee Member*

**HARALSON, MILLER PITT, FELDMAN & McNALLY, PLC**
Gerald Maltz
Peter T. Limperis
One South Church Avenue, Suite 900
Tucson, AZ 85701
Tel: (520) 792-3836
Fax: (520) 624-5080

*Executive Committee Member*

1

**VERIFICATION**

2 I, RONALD HARRIS, declare:

3     I am a plaintiff in this action.  I am also a shareholder of JPMorgan Chase & Co. and

4 have been during the relevant time period.  I certify under penalty of perjury that I have read and

5 reviewed the Consolidated Amended Shareholder Derivative Complaint and authorized its filing.

6 Based upon my and my counsel's investigation, the contents of the Consolidated Amended

7 Shareholder Derivative Complaint are true to the best of my knowledge, information and belief.

8 Dated: April 4TH, 2016

9

10                                       RONALD HARRIS

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**

## VERIFICATION

I, Jeffrey Shlosberg, verify that I am a shareholder of Nominal Defendant JPMorgan Chase & Co. (the "Company"). I have reviewed the allegations made in this Amended Consolidated Shareholder Derivative Complaint (the "Complaint"). As to those allegations of which I have personal knowledge, I believe them to be true; as to those allegations of which I lack personal knowledge, I rely upon my counsel and counsel's investigation, and believe them to be true. Having received a copy of the Complaint and reviewed it with counsel, I authorize its filing.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 4, 2016, at Dunellen, New Jersey.

_____
Jeffrey Shlosberg

**<u>VERIFICATION</u>**

I, RICHARD RATCLIFF, declare:

I am a plaintiff in this action.  I am also a shareholder of JPMorgan Chase & Co. and have been during the relevant time period.  I certify under penalty of perjury that I have read and reviewed the Consolidated Amended Shareholder Derivative Complaint and authorized it filing. Based upon my and my counsel's investigation, the contents of the Consolidated Amended Shareholder Derivative Complaint are true to the best of my knowledge, information and belief.

Dated: April  4 , 2016

RICHARD RATCLIFF

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**