**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE JPMORGAN CHASE DERIVATIVE LITIGATION** | No. 1:17-cv-05066-JFK |

**SHAREHOLDER PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**

## <u>TABLE OF CONTENTS</u>

**Page**

I.  INTRODUCTION ............................................................................................ 1

II.  BACKGROUND ............................................................................................ 2

    A.  The Settlements Reveal Defendants' Misconduct ................................. 3

    B.  Procedural History ............................................................................... 4

III.  ARGUMENT ................................................................................................. 5

    A.  OTHER LAWSUITS DO NOT PRECLUDE THIS ACTION ............................. 5

        1.  The Court Should Protect Plaintiffs' Due Process Rights and Reject Defendants' Invitation to Dismiss on the Basis of Preclusion.................. 5

        2.  Res Judicata Does Not Preclude Plaintiffs' Claims .................................. 9

            a.  **Siegal Is Not a Basis for Res Judicata ....................................... 10**

            b.  ***Asbestos Workers* Is Not a Basis For Res Judicata ................. 11**

            c.  ***Steinberg* Is Not a Basis For Res Judicata................................ 12**

        3.  Collateral Estoppel Does Not Apply To Plaintiffs' Allegations Of Demand Futility.................................................................................................. 13

        4.  There is No "Law of the Case" Regarding Preclusion ............................. 15

    B.  THE AMENDED COMPLAINT ADEQUATELY ALLEGES THAT DEMAND

        ON THE BOARD IS EXCUSED AS FUTILE .................................................. 16

        1.  The Allegations Raise a Reasonable Doubt That a Majority of the Directors Could Independently and Disinterestedly Consider a Demand  16

        2.  A Majority of the Board Lack Independence or Have an Interest in the Transactions ........................................................................................ 17

        3.  A Majority of The Board Faces A Substantial Likelihood Of Liability ... 20

            a.  **The Exculpatory Clause In JPMorgan's Charter Does Not Relieve Defendants Of Their Fiduciary Duty Of Care............ 20**

          b.     **The Amended Complaint Adequately Pleads a Breach of Duty of Loyalty Based on a Failure of Oversight ............................. 21**

               i.     Defendants Utterly Failed to Implement and/or Monitor a System of Internal Controls ................................................ 21

               ii.    Defendants Consciously Disregarded Red Flags .............. 23

          c.     **The Defendants Face a Substantial Likelihood of Liability for Other State Law Claims ............................................................ 29**

               i.     Plaintiffs sufficiently allege corporate waste ................... 29

               ii.    Plaintiffs sufficiently allege unjust enrichment ............... 30

IV.    CONCLUSION ........................................................................................... 31

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Abbott Labs. Deriv. S'holders Litig.*,
  325 F.3d 795 (7th Cir. 2003) ...............................................................................26

*Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*,
  554 F. Supp. 2d 538 (D. Del. 2008)....................................................................24

*Alidina v. Internet.com Corp.*,
  2002 Del. Ch. LEXIS 156, at *28 (Del. Ch. Nov. 6, 2002)..................................23

*Am. Int'l Group, Inc. v. Greenberg*,
  965 A.2d 763 (Del. Ch. 2009)..............................................................................25

*Arduini v. Hart*,
  774 F.3d 622 (9th Cir. 2014) ...............................................................................11

*Aronson v. Lewis*,
  473 A.2d 805 (Del. 1984) .........................................................................19, 20, 33

*Asbestos Workers Local 42 Pension Fund v. Bamman*,
  2015 WL 2455469 (Del. Ch. May 22, 2015) .......................................................18

*Asbestos Workers Phila. Pension Fund v. Bell*,
  43 Misc. 3d 1024(A), 2014 WL 1272280 (Sup. Ct. N.Y. Cty. Mar. 28, 2014)............... *passim*

*Atlas v. Accredited Home Lenders Holding Co.*,
  556 F. Supp. 2d 1142 (S.D. Cal. Jan. 4, 2008) ...................................................30

*ATR-Kim Eng Fin. Corp. v. Araneta*,
  2006 Del. Ch. LEXIS 215 (Dec. 21, 2006)..........................................................26

*Bansbach v. Zinn*,
  1 N.Y.3d 1 (2003) ................................................................................................17

*Brautigam v. Blankfein*,
  8 F. Supp. 3d 395 (S.D.N.Y. 2014) .....................................................................17

*Carroll v. McKinnell*,
  2008 N.Y. Slip Op. 50567(U), 19 Misc. 3d 1106(A), 859 N.Y.S.2d 901 (Sup.
  Ct. 2008) .............................................................................................................18

*Christianson v. Colt Indus. Operating Corp.*,
  486 U.S. 800 (1988)............................................................................................19

*In re Citigroup, Inc.*,
    964 A.2d 106 (Del. Ch. 2009)........................................................................29

*In re Citigroup, Inc. S'holders Litig.*,
    2003 Del. Ch. LEXIS 61 (June 5, 2003).......................................................29

*Collins & Aikman Corp. v. Stockman*,
    2009 U.S. Dist. LEXIS 43472 (D. Del. May 20, 2009)...............................23

*In re Converium Holding AG Sec. Litig.*,
    2007 LEXIS 67660, at *6 (S.D.N.Y. Sept. 14, 2007)..................................30

*Cook v. McCullough*,
    2012 U.S. Dist. LEXIS 114621 (N.D. Ill. Aug. 13, 2012)...........................25

*In re Countrywide Derivative Litigation*,
    554 F. Supp. 2d 1044 ........................................................................25, 27, 28

*Dana v. Morgan*,
    232 F. 85 (2d Cir. 1916)...............................................................................10

*David B. Shaev Profit Sharing Account v. Armstrong*,
    2006 Del. Ch. LEXIS 33 (Del. Ch. Feb. 13, 2006)......................................29

*Del. Cty. Emples. Ret. Fund v. Sanchez*,
    124 A.3d 1017 (Del. 2015)............................................................................20

*Dilaura v. Power Auth. of Ny*,
    982 F.2d 73 (2d Cir. 1992)............................................................................19

*In re Dow Chemical Co. Derivative Litigation*,
    2010 WL 66769 (Del. Ch. Jan 11, 2010)................................................29, 30

*In re EZCORP Consulting Agreement Deriv. Litig.*,
    130 A.3d 934 (Del. Ch. 2015)........................................................................9

*Faulkner v. Nat'l Geographic Enters.*,
    409 F.3d 26 (2d Cir. 2005)............................................................................12

*Rich ex rel. Fuqi Int'l v. Yu Kwai Chong*,
    66 A.3d 963 (Del. Ch. 2013)..........................................................................25

*Ginezra Assoc. LLC v. Ifantopoulos*,
    70 A.D.3d 427 (N.Y. App. 2010) .................................................................12

*In re Goldman Sachs Mortgage Servicing S'holder Deriv. Litig.*,
    42 F. Supp. 3d 473 (S.D.N.Y. 2012)......................................................28, 30

*Harold Grill 2 IRA v. Chênevert*,
　Civ. No. 7999-CS, 2013 Del. Ch. LEXIS 150 (Del. Ch. June 18, 2013) ...............................28

*Henik v. LaBranche*,
　433 F. Supp. 2d 372 (S.D.N.Y. 2006)..................................................................10, 11, 17, 18

*IBJ Schroder Bank & Trust Co. v. Mellon Bank, N.A.*,
　730 F. Supp. 1278 (S.D.N.Y. 1990)...........................................................................................9

*Interoceanica Corp. v. Sound Pilots*,
　107 F.3d 86 (2d Cir. 1997)......................................................................................................16

*In re JPMorgan Chase & Co. Deriv. Litig.*,
　2014 U.S. Dist. LEXIS 46363 (S.D.N.Y. Mar. 31, 2014) ......................................................22

*In re J.P. Morgan Chase & Co. S'holder Litig.*,
　906 A.2d 808, 822 (Del. Ch. 2005).........................................................................................22

*In re Lear Corp. S'holder Litig.*,
　967 A.2d 640 (Del. Ch. 2008).................................................................................................24

*Levin v. Kozlowski*,
　2006 N.Y. Slip Op. 52142(U), 13 Misc. 3d 1236(A), 831 N.Y.S.2d 354 (Sup.
　Ct. 2006) ..................................................................................................................................18

*Levine v. Smith*,
　591 A.2d 194 (Del. 1991) .......................................................................................................20

*Lewis v. Vogelstein*,
　699 A.2d 327 (Del. Ch. 1997).................................................................................................32

*Liona Corp. v. PCH Assocs. (In re PCH Assocs.)*,
　949 F.2d 585 (2d Cir. 1991)....................................................................................................19

*Malpiede v. Townson*,
　780 A.2d 1075 (Del. 2001) ...............................................................................................24, 30

*Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*,
　845 A.2d 1040 (Del. 2004) .....................................................................................................21

*Marvel Characters v. Simon*,
　310 F.3d 280 (2d Cir. 2002)....................................................................................................16

*McCall v. Scott*,
　239 F.3d 808 (6th Cir. 2001) ..................................................................................................29

*MCG Capital Corp. v. Maginn*,
　2010 Del. Ch. LEXIS 87 ........................................................................................................33

*Michelson v. Duncan*,
    407 A.2d 211 (Del. 1979) ................................................................32, 33

*Middlesex Ret. Sys. v. Quest Software Inc.*,
    527 F. Supp. 2d 1164 (C.D. Cal. 2007) ..............................................32

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ................................................................30

*O'Reilly v. Transworld Healthcare, Inc.*,
    745 A.2d 902 (Del. Ch. 1999) .............................................................30

*In re Oxford Health Plans, Inc. Sec. Litig.*,
    192 F.R.D. 111 (S.D.N.Y. 2000) ..................................................20, 29

*Papilsky v. Berndt*,
    466 F.2d 251 (2d Cir. 1972) ................................................................10

*Parfi Holding AB v. Mirror Image Internet, Inc.*,
    954 A.2d 911 (Del. Ch. 2008) ...............................................................9

*PenneCom B.V. v. Merrill Lynch & Co.*,
    372 F.3d 488 (2d Cir. 2004) .........................................................16, 17

*In re Pfizer Inc. S'holder Deriv. Litig.*,
    722 F. Supp. 2d 453 (S.D.N.Y. 2010) .........................................29, 33

*In re ProQuest Sec. Litig.*,
    527 F. Supp. 2d 728 (E.D. Mich. 2007) .............................................32

*Rahbari v. Oros*,
    732 F. Supp. 2d 367 (S.D.N.Y. 2010) ................................................31

*Rales v. Blasband*,
    634 A.2d 927 (Del. 1993) ...........................................................20, 21

*Ross v. Bernhard*,
    396 U.S. 531 (1970) ................................................................................9

*Ryan v. Gifford*,
    918 A.2d 341 (Del. Ch. 2007) .............................................................33

*In re SAIC Deriv. Litig.*,
    948 F. Supp. 2d 366 (S.D.N.Y. 2013) ................................................28

*Sanders v. Wang*,
    1999 Del. Ch. LEXIS 203 (Nov. 8, 1999) ..........................................24

*Siegal v. J.P. Morgan Chase & Co.*,
  2012 WL 8161652 (Sup. Ct. N.Y. Cty. Aug. 16, 2012) ................................................. *passim*

*In re Smith Barney Transfer Agent Litig.*,
  884 F. Supp. 2d 152 (S.D.N.Y. 2012).................................................................................31

*Smith v. Bayer Corp.*,
  564 U.S. 299, 131 S. Ct. 2368, 180 L. Ed. 2d 341 (2011)....................................................10

*In re Sonus Networks, Inc., S'holder Deriv. Litig.*,
  499 F.3d 47 (1st Cir. 2007)................................................................................................11

*Steinberg v. Dimon*,
  2014 WL 3512848 (S.D.N.Y. July 16, 2014) ............................................... *passim*

*Stone v. Ritter*,
  911 A.2d 362 (Del. 2006) ....................................................................... *passim*

*In re Taser Int'l S'holder Derivative Litig.*,
  2006 U.S. Dist. LEXIS 11554 (D. Ariz. Mar. 17, 2006) ..........................................24

*In re Tower Air, Inc.*,
  416 F.3d 229 (3d Cir. 2005).................................................................................................24

*United States SEC v. Syron*,
  934 F. Supp. 2d 609 (S.D.N.Y. 2013).................................................................................31

*In re Veeco Instruments, Inc. Sec. Litig.*,
  434 F. Supp. 2d 267 (S.D.N.Y. 2006).................................................................................21

*In re Vivendi Universal, S.A. Sec. Litig.*,
  No. 02 Civ. 5571 (RJH) (HBP), 2009 WL 855799 (S.D.N.Y. Mar. 31, 2009) ......................10

*In re Wal-Mart Stores, Inc. Del. Deriv. Litig.*,
  167 A.3d 513 (Del. Ch. 2017)................................................................................... *passim*

*Wood v. Baum*,
  953 A.2d 136 (Del. 2008) ........................................................................................20, 23

**Statutes**

18 U.S.C. § 1350.................................................................................................................32

**Rules**

Federal Rules of Civil Procedure
  Rule 23 ..............................................................................................................................9
  Rule 23.1 .................................................................................................................9, 10, 19

I.     **INTRODUCTION**

This action arises out of JPMorgan's creation and sale of subprime residential mortgage-backed securities ("RMBS") to investors, which subjected JPMorgan to **$13 billion dollars** in civil and regulatory fines and penalties, as well as potential criminal liability. Although the wrongdoing at issue took place primarily from 2005 to 2007, it only became public in 2013 through government settlements. Plaintiffs have been diligently pursuing their claims since then. Beyond a single dismissed claim, the transferring court solely considered issues pertaining to personal jurisdiction and transfer. Therefore, although defendants have filed prior motions to dismiss, the issues of preclusion and demand futility—now presented by Defendants' Motion—have never been ruled on. This Court should find that Plaintiffs' claims are ripe and that demand is futile, and allow this case to proceed.

This case, unlike the others to which Defendants point, has always contained fundamental differences from previously-dismissed complaints, including substantially more robust allegations. In addition to allegations absent from other cases, this case also focuses on the manner in which Defendants targeted the California mortgage market by seeking out loan pools that originated in or were acquired by dubious California-based originators and which consisted of risky California-based mortgages. Moreover, the Court should adopt the reasoning of *In re Wal-Mart Stores, Inc. Del. Deriv. Litig.*, 167 A.3d 513 (Del. Ch. 2017), which brought Delaware law up to date concerning the lack of privity that had allowed subsequent derivative suits to be deemed precluded in the past. The dismissals in *Steinberg*, *Asbestos Workers*, and *Siegal*, do not bar this action, as such a finding would violate Plaintiffs' Due Process rights. The Court should reject Defendants' suggestions of preclusion.

Defendants also move to dismiss on grounds that Plaintiffs have not properly alleged

demand futility.  This argument fails as well.  Indeed, the Complaint alleges specific facts demonstrating demand futility.  It explains why a majority of the Board cannot independently consider a demand, with specific allegations applicable to Defendants Bell, Bowles, and Jackson (¶¶223-51, 297-316), Defendant Dimon (¶¶223-51, 317-24), Defendants Crown and Flynn (¶¶223-51, 325-40), Defendant Burke (¶¶223-51, 341-44), Defendant Raymond (¶¶223-51, 345-47), Defendant Weldon (¶¶223-51, 348-51), and the current board of directors (¶¶352-55).  Plaintiffs have also adequately alleged that these directors face a substantial likelihood of liability for breaching their fiduciary duties of care and loyalty (¶¶356-67), and for engaging in corporate waste (¶¶368-71) and unjust enrichment (¶¶372-76).  Because making a demand on the Board would be futile, Plaintiffs should be permitted to pursue their claims through this action.

For all of these reasons, and as further explained below, the Defendants' Motion to Dismiss should be denied in its entirety.

## II.    BACKGROUND

Plaintiffs brought this action against the Defendants for their misconduct in exposing JPMorgan to substantial harm, including but not limited to billions of dollars in settlements and potential prosecution.  ¶9.[1]  This misconduct relates to JPMorgan's origination of subprime mortgage loans and the later securitization of those subprime mortgage loans into subprime RMBSs.  *Id.*  Those subprime RMBSs were ultimately marketed and sold by JPMorgan to investors, who suffered billions of dollars in losses.  *Id.*  In addition, Plaintiffs allege that Defendants' conduct was targeted at the California market.  ¶194.  This action was brought in order to obtain redress for the harm Defendants' misconduct caused JPMorgan.  ¶17.

---

[1] Citations to Plaintiffs' Amended Complaint are indicated throughout as follows: "¶__."

A.      **The Settlements Reveal Defendants' Misconduct**

Defendants' misconduct was the basis for civil and criminal investigations by the U.S. Attorney in the Eastern District of California, California's Attorney General, and other government agencies.  ¶¶8, 14, 17, 238; Compl. Ex. A.  JPMorgan first announced the pendency of the massive government investigation in August 2013.  ¶¶3, 189.  In November 2013, JPMorgan announced a $4.5 billion settlement with 21 major institutional investors relating to RMBS trusts issued by JPMorgan (¶190), as well as a **$13 billion** settlement with the Justice Department and other government entities (¶191).  The $13 billion settlement is the largest settlement ever between the government and a U.S. company.  ¶193.

The settlement followed an extensive investigation, which focused on JPMorgan's misrepresentations regarding RMBSs, including those sold to California's public employee and teacher pension funds from 2004 to 2008.  ¶¶5, 194.  As part of the settlement, "JPMorgan acknowledged that it made serious misrepresentations to the public — including the investing public — about numerous RMBS transactions."  Compl. Ex. A at 1-4, 27-33.  The U.S. Attorney stated that, "the conduct uncovered in this investigation **helped sow the seeds of the mortgage meltdown**."  *Id.* at 1 (emphasis added).

The settlement contained a Statement of Facts, in which JPMorgan acknowledged that it "regularly represented to RMBS investors that the mortgage loans in various securities complied with [JPMorgan] underwriting guidelines," and contrary to these repeated representations, "JPMorgan employees knew that the loans in question did not comply with those guidelines and were not otherwise appropriate for securitization, but they allowed the loans to be securitized — and those securities to be sold — without disclosing this information to investors."  *Id.* at 27.

The settlement was entered in California because the Defendants took advantage of

particularly risky practices and loan pools originating there.  For example, as detailed in the

Complaint, an internal memo, referred to within JPMorgan as the "Howler Letter," was a

whistleblower's warning about loans by California-based originator, GreenPoint.  ¶235.  It is not

surprising that a whistleblower would draw particular attention up the chain within JPMorgan to the

risks taken by JPMorgan in targeting the California RMBS market, given what was already known

to the Defendants about those risks.  Indeed, over 50 percent of the loans in the ten prospectuses

addressed by the $13 billion settlement consisted of loans on properties in California.  ¶¶194-222.

 The Defendants are members of JPMorgan's Board of Directors and Board sub-committees.

¶¶27-40.  They had specific oversight duties with respect to the facts of this case.  The Amended

Complaint identifies each of the Defendant's tenure and membership on the JPMorgan Board and

sub-committees (¶¶28-40) and his or her corresponding fiduciary duties (¶¶285-291).  Board

committees assist the JPMorgan Board in its oversight function.  The Board exercised its oversight

of risk management principally through two committees: the Audit Committee and the Risk Policy

Committee.  ¶266.  These committees were required to meet regularly and received reports from

JPMorgan executives regarding the issues overseen by the respective committees.  ¶¶240-62.

 Defendants' misconduct harmed JPMorgan, giving rise to the claims asserted by Plaintiffs in

this action, but despite the strong basis for asserting such claims, conflicts of interest precluded the

Board from bringing suit.  ¶¶292-355.

 **B.** **Procedural History**

 This action was originally brought in the United States District Court for the Eastern

District of California on November 20, 2013.  *See* Case No. 13-cv-02414-KJM-EFB (EDCA),

Dkt. No. 1.  A Consolidated Complaint was filed on March 3, 2014.  *Id.* at Dkt. No. 29.  The

Court granted Defendants' first motion to dismiss for lack of personal jurisdiction with leave to

amend, and granted Plaintiffs leave to take limited jurisdictional discovery in order to amend

their complaint. *Id.* at Dkt. No. 69 (dated October 24, 2014). Thus ensued well over one year of

motion practice and attempted stonewalling by Defendants regarding jurisdictional discovery.

*See generally id.* at Dkt. Nos. 74-115. Plaintiffs' filed an Amended Consolidated Complaint on

April 28, 2016. *Id.* at Dkt. No. 122 ("Amended Complaint").

On June 30, 2017, after considering Defendants' second motion to dismiss, the Court

dismissed Plaintiffs' federal claim (Section 14(a) of the Exchange Act) and, holding that it did

not have specific personal jurisdiction over the Defendants as to the state law claims, transferred

those claims to this Court. *Id.* at Dkt. No. 141. The Court did not rule on issues of preclusion

and demand futility, raised by Defendants, as to the remaining state law claims. *Id.* Thus,

contrary to the implication in Defendants' Motion, no court has ever ruled on Defendants'

arguments regarding preclusion and demand futility. Defendants now renew their motion to

dismiss the Complaint on those bases.

## III.    ARGUMENT

### A.    OTHER LAWSUITS DO NOT PRECLUDE THIS ACTION

Defendants' preclusion arguments are contradicted by *In re Wal-Mart Stores, Inc. Del.*

*Deriv. Litig.*, 167 A.3d 513 (Del. Ch. 2017) ("*Wal-Mart*"). Dismissing Plaintiffs' Complaint on

res judicata and/or collateral estoppel grounds would violate their Due Process rights, and, in any

event, res judicata and collateral estoppel do not operate to preclude Plaintiffs' Complaint.

#### 1.    The Court Should Protect Plaintiffs' Due Process Rights and Reject Defendants' Invitation to Dismiss on the Basis of Preclusion

On July 25, 2017, the Chancellor of Delaware's Court of Chancery issued an opinion that

holds significant impact for this case. *See* 167 A.3d 513 (Del. Ch. 2017). In *Wal-Mart,* the

Chancellor addressed the following issue central to this matter: does dismissal of a previous

stockholder plaintiff's derivative action for failure to plead demand futility preclude subsequent

stockholders from pursuing derivative litigation?  *Wal-Mart*, 167 A.3d at 515.  The Chancellor

held to the contrary, finding that preclusion would violate the Due Process rights of the

subsequent stockholders, and recommending that the Delaware Supreme Court follow the rule

proposed in *In re EZCORP Consulting Agreement Deriv. Litig.*, 130 A.3d 934 (Del. Ch. 2015):

> as a matter of Delaware law and as a matter of due process, a
> judgment cannot bind 'the corporation or other stockholders in a
> derivative action until the action has survived a Rule 23.1 motion to
> dismiss, or the board of directors has given the plaintiff authority to
> proceed by declining to oppose the suit.'  *EZCORP* thus endorses a
> bright-line rule drawing a distinction between the pre-and post-
> demand futility phases of derivative litigation.

*Wal-Mart*, 167 A.3d at 516 (quoting *EZCORP*, 130 A.3d at 948 (citing *Smith v. Bayer Corp.*, 564

U.S. 299, 131 S. Ct. 2368, 180 L. Ed. 2d 341 (2011)) (footnote omitted).

Recognizing this, Defendants go to lengths to try to undermine the Chancellor's opinion

in *Wal-Mart* (Defs. Br. at 13-15).  Each of their arguments is unavailing.

Defendants' assertion that the Chancellor drew a flawed analogy between class and

derivative actions is plainly wrong.  First, it is long and well-recognized that derivative actions

"have been described as one kind of 'true' class action."  *Ross v. Bernhard*, 396 U.S. 531, 541

(1970); *Parfi Holding AB v. Mirror Image Internet, Inc.*, 954 A.2d 911, 940 (Del. Ch. 2008),

*appeal dismissed and motion denied by*, 2009 WL 189862, 966 A.2d 348 (Del. 2009); *see also*

*IBJ Schroder Bank & Trust Co. v. Mellon Bank, N.A.*, 730 F. Supp. 1278, 1282 (S.D.N.Y. 1990).

Second, as the Chancellor well-noted, the rules providing for class actions (Fed. Civ. P. 23)

and derivative actions (Fed. Civ. P. 23.1), "share similar texts and structures" and afford

similar "procedural protections" including "court approval and appropriate notice in cases of

settlement, voluntary dismissal, or compromise" as well as the court's ability to "determine the course of proceedings" and to require "appropriate notice." *Wal-Mart*, 167 A.3d at 526.  Third, a derivative action and class action are similar in that they are susceptible of becoming unrepresentative — i.e., they cease to be representative actions when a Rule 23.1 motion to dismiss is granted in the derivative setting or class certification is denied in the class action setting. *Id.* at 527 ("[w]hen a court denies a stockholder the authority to sue on behalf of the corporation by granting a Rule 23.1 motion to dismiss, the purported derivative action is no more a representative action than the proposed class action in *Bayer* that was denied certification.").[2]

Indeed, Defendants' argument is belied by case law they themselves cite.  *See Papilsky v. Berndt*, 466 F.2d 251 (2d Cir. 1972) (cited in Defs. Br. at 14).  The *Papilsky* recognized that there are important Due Process reasons why in a representative action like a derivative action, prior dismissals should not necessarily have res judicata effect.  *Papilsky*, 466 F.2d at 260.

Defendants' public policy argument — i.e., the notion that adoption of the approach recommended in *Wal-Mart* would "have significant negative consequences" (Defs. Br. at 15) or lead to a parade of horribles wherein shareholder plaintiffs relitigate the demand futility question into infinity — is also unpersuasive.  Indeed, the case they cite in that regard*, Henik v. LaBranche*, 433 F. Supp. 2d 372 (S.D.N.Y. 2006), like *Papilsky* and like *Wal-Mart*, recognized that there are valid reasons (such as lack of adequacy of representation) why prior dismissals should not have preclusive effect and that permitting subsequent stockholder suits to proceed

---

[2] One of the cases that Defendants cite in support of the argument that *Wal-Mart* drew a false analogy between class actions and derivative actions is *Dana v. Morgan,* 232 F. 85 (2d Cir. 1916), a case decided in 1916 — some 50 years before the 1966 adoption of the modern class action rules, *see In re Vivendi Universal, S.A. Sec. Litig.*, No. 02 Civ. 5571 (RJH) (HBP), 2009 WL 855799 (S.D.N.Y. Mar. 31, 2009) (noting "the adoption of the modern class action device in the United States in 1966"), and the 1966 adoption of the derivative action rule.  *Wal-Mart*, 167 A.3d at 525.  It is also worth noting that Defendants omit from the language quoted from *Dana* the recognition that stockholder suits can be brought in a representative capacity, much like a class action.  *Dana*, 232 F. at 90.

will not lead to endless relitigation, but rather, permit stockholders to protect their rights when they have not been adequately represented in the first instance. *See Henik*, 433 F. Supp. 2d at 381. In fact, Defendants concede that prior dismissals will not have preclusive effect where there was lack of adequate representation in the prior action. Defs. Br. at 13. That is the case here, for as discussed below, none of the other allegedly preclusive actions contains as robust allegations or is based on the targeting of California mortgage markets.[3]

And, in any event, the Chancellor in *Wal-Mart* anticipated and dispatched with the very public-policy argument raised by Defendants, noting that upon dismissal of a stockholder derivative action, plaintiffs were unlikely to merely file repetitive actions but would file more refined, particularized and tailored complaints. *Wal-Mart*, 167 A.3d at 529-30. This enables courts, utilizing principles of *stare decisis* and comity, to dispatch with efforts at mere relitigation. *Id.* ("rarely does another stockholder file a substantially similar complaint simply to try again. What can and does happen is that a second stockholder plaintiff will file a more refined complaint with more particularized allegations or more tailored legal theories after doing additional homework . . ."). So too, here. Moreover, "where the plaintiff is essentially litigating against his own company over the right to sue" the plaintiff has an "economic incentive to conserve the resources of the defendants" thus making it more likely that the plaintiff will not simply relitigate after a prior dismissal absent a truly meritorious case. *Id.* at 530.[4]

---

[3] As observed in *Wal-Mart*, the adequacy of representation in the earlier suit (the one upon which preclusive effect is supposed to be predicated) may not be addressed in that earlier action and, indeed, may not be evaluated in the first instance until the issue of preclusion arises in the subsequent stockholder derivative action. 167 A.3d at 528 ("As a practical matter, the first time a court may evaluate the adequacy of a named plaintiff's representation in a derivative action is when it applies the issue preclusion test in a subsequent case.").

[4] To the extent that Defendants rely upon *Arduini v. Hart*, 774 F.3d 622 (9th Cir. 2014), and *In re Sonus Networks, Inc., S'holder Deriv. Litig.*, 499 F.3d 47, 64 (1st Cir. 2007), Plaintiffs note that neither was a decision from this Circuit, and both were considered quite fully by the Chancellor in *Wal-Mart*. *Wal-Mart*, 167 A.3d at 521-23.

Thus, contrary to Defendants' suggestion that *Wal-Mart* represents a radical departure, it in fact represents a mere recognition of the trend that in representative litigation, where dismissal of a prior derivative action occurs before the plaintiff acquires authority to litigate in a representative capacity for the corporation, Due Process rights are at stake and must be protected. 167 A.3d at 524-25 (citing *EZCORP*, 130 A.3d at 949).

Even assuming without conceding that the required elements of res judicata and/or collateral estoppel were present, reexamination of the legal issue at hand (i.e., demand futility) is appropriate because "there has been a change in the legal landscape after the decision[s] claimed to have preclusive effect." *Faulkner v. Nat'l Geographic Enters.*, 409 F.3d 26, 37 (2d Cir. 2005) (citing Restatement (Second) of Judgments § 28 (cmt. c)). Here, Defendants ask the Court to hold that this action should be precluded because of the dismissals in *Siegal*, *Asbestos Workers*, and *Steinberg*. However, after those decisions were rendered, the Chancellor issued his opinion suggesting adoption of a rule which potentially so changes the "legal atmosphere as to render the rule of collateral estoppel inapplicable." *Faulkner*, 409 F.3d at 600 (quoting *Commissioner v. Sunnen*, 333 U.S. 591, 599-600 (1948)). In light of this, the Court should reject Defendants' invitation to hold this action is precluded based on prior, unrelated dismissals.

## 2.   Res Judicata Does Not Preclude Plaintiffs' Claims

Res judicata only precludes claims in a subsequent suit if the first action received a valid final judgment, involved the same parties, and included the same claims. *See, e.g.*, *Ginezra Assoc. LLC v. Ifantopoulos*, 70 A.D.3d 427, 429 (N.Y. App. 2010).[5]  The Defendants contend that any derivative action that even remotely touches on the Defendants' RMBS activities is foreclosed by

---

[5] Plaintiffs do not contest Defendants' assertion that governing federal law is consistent with New York law regarding res judicata and collateral estoppel. *See* Defs. Br. at 5 n.2.

three cases: *Siegal*, *Asbestos Workers*, and *Steinberg*.[6]  Defendants are wrong.  These cases did not

present the same parties, and did not make the same claims, as asserted here.  Indeed, Defendants

fundamentally misrepresent the Amended Complaint in order to characterize it as something that

has been previously considered.  The Court should reject Defendants' res judicata argument.

<h4>a.      Siegal Is Not a Basis for Res Judicata</h4>

The *Siegal* action asserted claims that predate, and are different from, those in the instant

matter.  Indeed, the *Siegal* decision cited by Defendants was issued more than a year before the

public learned of the government investigation of JPMorgan; therefore, its allegations do not

encompass the issues raised in that investigation and the resulting admissions by JPMorgan.

*Compare Siegal* with Compl. Ex. A.  Even after two amendments, the *Siegal* complaint was only 13

pages long.  *See* Baskin Decl. Ex. A.[7]  The *Siegal* complaint did not identify the legal theory

underlying the claims or expressly state that it is a derivative action.  *Id.*  Rather, each claim ended

with a conclusory paragraph asserting that the defendants participated in the wrongdoing and that

"members of the Board cannot be expected to sue themselves."  *Id.* at ¶¶32, 35, 39, 44.  Despite this

inartful pleading, the *Siegal* court construed the complaint as seeking to assert derivative claims.

*Siegal*, 2012 N.Y. Misc. LEXIS 6101, at *1-2.  Even under the court's generous deciphering of the

allegations, however, the scope of the *Siegal* decision encompassed only: (1) matters relating to the

June 21, 2011 SEC fine imposed on JPMorgan of $153.6 million for misleading shareholders; (2)

authorization of JPMorgan's acquisition of Bear Sterns; and (3) the assumption of Bear Sterns and

---

[6] *Siegal v. J.P. Morgan Chase & Co.*, 2012 WL 8161652 (Sup. Ct. N.Y. Cty. Aug. 16, 2012), *aff'd*, 960 N.Y.S.2d 104 (App. Div.), *appeal denied*, 990 N.E.2d 135 (N.Y. 2013); *Asbestos Workers Phila. Pension Fund v. Bell*, 43 Misc. 3d 1024(A), 2014 WL 1272280 (Sup. Ct. N.Y. Cty. Mar. 28, 2014), *aff'd*, 29 N.Y.S.3d 274 (App. Div. 2016); *Steinberg v. Dimon*, 2014 WL 3512848, at *5 (S.D.N.Y. July 16, 2014).

[7] "Baskin Decl." refers to the Declaration of Stuart J. Baskin in Support of Defendants' Motion to Dismiss the Amended Complaint.

Washington Mutual's RMBS liabilities, exposing JPMorgan to greater financial risk.  These claims are different from, and predate, those alleged in this action.

In addition, *Siegal* does not involve the same parties.  *Siegal* names 20 defendants that are not parties herein.  The instant matter also names four Director Defendants who were not parties in *Siegal* — James Bell, Timothy Flynn, William Harrison, Jr., and Robert Lipp.  *Compare* Amended Complaint *with* Baskin Decl. Ex. A.  The difference in Director Defendants means that demand futility analysis was quite different in *Siegal* than in this action.  Moreover, as the *Siegal* court reiterated several times, "Plaintiff offer[ed] only conclusory allegations" to support his claims.  *Siegal*, at *9.  This Court should not find that this case is in any way precluded by a decision like *Siegal* that involved different parties, different claims, and very different allegations.

### b.    *Asbestos Workers* Is Not a Basis For Res Judicata

The *Asbestos Workers* action was filed in June 2013, months before the public learned of the government investigation of JPMorgan and its admissions as a part of the $13 billion dollar settlement.  *Compare* Compl. Ex. A *with* Baskin Decl. Ex. B.  Therefore, like *Siegal*, *Asbestos Workers* is not a basis for res judicata.  The *Asbestos Workers* plaintiff made claims related to JPMorgan's Asset and Loan Securitization Committee, as well as for authorizing JPMorgan's acquisition of Bear Stearns and Washington Mutual and assumption of their RMBS liabilities.  *Asbestors Workers*, 2014 N.Y. Misc. LEXIS 1377, at *2.  As with *Siegal*, these are fundamentally different claims than those asserted here.  *See, e.g.*, ¶ 1.  The *Asbestos Workers* complaint also names four defendants that the instant Amended Complaint does not, and the *Asbestos Workers* complaint did **not** name three Director Defendants — Timothy Flynn, William Harrison, Jr., and Robert Lipp — named in Plaintiffs' Amended Complaint here.  Therefore, *Asbestos Workers* should not serve as a basis for res judicata in this action.

11

c.     ***Steinberg*** **Is Not a Basis For Res Judicata**

*Steinberg* similarly fails to preclude this action.   The *Steinberg* complaint based its claims

on the following:

> (1) a July 2013 settlement with the Federal Energy Regulatory Commission
> regarding alleged manipulative bidding in the electricity market,
>
> (2) a 2013 investigation by the SEC into a hiring program under which certain
> positions were allegedly given to family members of Asian business owners and
> officials,
>
> (3) a September 2013 settlement with the Consumer Financial Protection Bureau
> and the Office of the Comptroller of the Currency regarding billing practices and
> allegedly erroneous documents filed in delinquent debtor lawsuits,
>
> (4) a December 2013 settlement with European Union regulators regarding
> alleged manipulation of the London Interbank Offered Rate,
>
> (5) a January 2014 deferred prosecution agreement with the U.S. Attorney's
> Office for the Southern District of New York relating to Bernard L. Madoff, and
>
> (6) 2013 settlements of private RMBS-related litigation arising out of the
> origination and securitization.

*Steinberg*, 2014 U.S. Dist. LEXIS 96838, at *2-4.  Only one of six of these claims relates in any

way to this case, and even that claim is different than what is asserted in the Amended Complaint.

The *Steinberg* case included neither the extensive allegations in the Amended Complaint, nor the

focus on the Defendants' conduct targeting California in their RMBS strategy.  Also, like *Siegal*

and *Asbestos Workers*, the *Steinberg* complaint named defendants that the Amended Complaint

does not (Braunstein, Cavanaugh, Cote, Drew, and Gray), and did **not** name three Director

Defendants — Timothy Flynn, William Harrison, Jr., and Robert Lipp — named in the Amended

Complaint.  *Compare* Amended Complaint *with* Baskin Decl. Ex. D.  Therefore, *Steinberg* should

not have res judicata effect in this case.

In sum, the Complaint here goes far beyond the scope of wrongdoing alleged in other

lawsuits.  It is much more detailed than prior cases.  Furthermore, it includes detailed allegations regarding Defendants' targeting of the California mortgage market by seeking out loan pools that originated in or were acquired by dubious California-based originators (¶¶194-221) and consisted of risky California mortgages (¶¶222-62).  In short, this case, the focus and factual allegations herein are distinct from those present in *Siegal*, *Asbestos Workers*, and *Steinberg*, so evidence needed to prove Plaintiffs' claims here may not have been needed to prove the plaintiffs' claims in those actions and, therefore, res judicata will not operate to bar Plaintiffs' claims based on the outcomes in those cases.  *See Interoceanica Corp. v. Sound Pilots*, 107 F.3d 86, 91 (2d Cir. 1997) (quoting *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1463-64 (2d Cir. 1996)).

### 3.     Collateral Estoppel Does Not Apply To Plaintiffs' Allegations Of Demand Futility

Under New York law, "[c]ollateral estoppel applies when: '(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits.'"  *See Marvel Characters v. Simon,* 310 F.3d 280, 288-89 (2d Cir. 2002) (quoting *Boguslavsky v. Kaplan*, 159 F.3d 715, 719-20 (2d Cir. 1998)).  "Collateral estoppel 'is an equitable doctrine — not a matter of absolute right.  Its invocation is influenced by considerations of fairness in the individual case."  *PenneCom B.V. v. Merrill Lynch & Co.*, 372 F.3d 488, 491 (2d Cir. 2004).

Notably, the court in *Asbestos Workers* rejected the same arguments Defendants are making here, cautioning that under New York law, "[c]ollateral estoppel is a narrow doctrine, requiring 'that an issue in the present proceeding be identical to that necessarily decided in a prior proceeding.'"  *Asbestos Workers* (quoting *Soldiers', Sailors', Marines' and Airmen's Club, Inc. v.*

*Carlton Regency Corp.*, 30 Misc. 3d 352, 356, 911 N.Y.S.2d 774 (Sup. Ct. 2010)).  Accordingly,

the court held that the earlier *Siegal* decision did not collaterally estop the *Asbestos Workers*

plaintiffs from litigating the issue of demand futility because "although similar, the facts at issue

here are not identical to the factual allegations" in prior cases involving the actions of JPMorgan's

Board with regard to RMBSs.  *Id.*

In *Bansbach v. Zinn*, 1 N.Y.3d 1 (2003), the New York Court of Appeals held that an earlier

case that held certain board members were not dominated and controlled by another member with

respect to specific decisions did not "for all time and in all circumstances insulate their conduct

from similar claims."  *Id*. at 11.  Thus, where those same board members later "were personally

implicated in the alleged wrongdoing," the court held, "there being no identity of issue," plaintiffs

were not estopped from litigating demand futility in the second suit.  *Id.*

Likewise, in *Brautigam v. Blankfein*, 8 F. Supp. 3d 395 (S.D.N.Y. 2014), the court

cautioned that "[u]se of collateral estoppel 'must be confined to situations where the matter raised

in the second suit is identical in all respects with that decided in the first proceeding and where the

controlling facts and applicable legal rules remain unchanged,'" and concluded that a plaintiff was

not estopped from asserting demand futility notwithstanding two earlier decisions where "both

[previous] cases involve allegations relating to Goldman's inclusion of troubled loans in RMBS."

*Id.* at 401 (citing *Faulkner v. Nat'l Geographic Enters. Inc.*, 409 F.3d 26, 37 (2d Cir. 2005)).

Cases cited by Defendants (Defs. Br. at 9-12) do not compel a different result, as they

involved cases that were identical or indistinguishable from earlier cases upon which collateral

estoppel was based.  Thus, in *Henik v. LaBranche*, 433 F. Supp. 2d 372 (S.D.N.Y. 2006), demand

futility was previously decided in a prior "almost identical action" and the plaintiffs in the later suit

"ha[d] not contended, nor could they, that the issue presented here is not identical to the issue

considered in" the earlier suit. *Id.* at 377, 379.  In *Levin v. Kozlowski*, 2006 N.Y. Slip Op.

52142(U), 13 Misc. 3d 1236(A), 831 N.Y.S.2d 354 (Sup. Ct. 2006), the court applied collateral

estoppel because "*all* of the allegations of the complaint in the present case were also made in the

Federal Action." *Id.* (emphasis added).  In *Carroll v. McKinnell*, 2008 N.Y. Slip Op. 50567(U), 19

Misc. 3d 1106(A), 859 N.Y.S.2d 901 (Sup. Ct. 2008), the court applied collateral estoppel where

"[t]he complaint (and briefs) in this case do not contain *any* allegations regarding the disinterest and

independence of the Board that are new or different from those contained in the Federal

Complaint." *Id.* (emphasis added); *see also Asbestos Workers Local 42 Pension Fund v. Bamman*,

2015 WL 2455469 (Del. Ch. May 22, 2015) (holding identical issues were decided in prior action).

By contrast, and as discussed above in the context of res judicata, none of the three cases

presented by Defendants (*Siegal*, *Asbestos Workers*, and *Steinberg*) raised **identical** issues to those

alleged here.  Defendants' attempt to point to some similarities between the complaints (Defs. Br.

10-12) does not make these complaints identical as to demand futility.  The Amended Complaint

contains materially different and additional allegations regarding the Defendants' knowledge of the

risks they were taking by concentrating the Company's RMBS portfolio in California sub-prime

mortgages despite known deficiencies in controls on origination and securitization, which obviously

affects the Defendants' independence and disinterestedness, as well as the likelihood of success for

purposes of demand futility.  *See* ¶¶6, 166-73, 194, 228-29, 231-34, 263-84, 300, 302-06, 309-12,

321-24, 331-32.  Because "[t]he factual allegations are not identical to the prior shareholder

derivative actions . . . collateral estoppel is inapplicable to bar this action." *Asbestos Workers*.

### 4.    There is No "Law of the Case" Regarding Preclusion

Defendants state that Judge Mueller's order dismissing the Section 14(a) claim also applies

to the state law claims, and "control[s] as law of the case."  Defs. Br. at 8-9.  Not so.  Judge

Mueller's order did not address the state law claims at issue here.  Her order specifically transferred this case so that <u>this Court</u> could consider the state law claims.  Dkt. No. 141 at 33.  Therefore, there is no law of the case regarding preclusion in the first place.  *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988) (law of the case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case").  Moreover, even if there was such an order, law of the case is discretionary and does not limit this Court's power to reconsider decisions prior to final judgment.  *See Dilaura v. Power Auth. of Ny*, 982 F.2d 73, 76 (2d Cir. 1992) ("This 'doctrine is admittedly discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment.'") (citations omitted); *see also Liona Corp. v. PCH Assocs. (In re PCH Assocs.)*, 949 F.2d 585, 592 (2d Cir. 1991).  In addition, where there has been a recent development in the law which supports Plaintiffs' position, as here (*see* above discussion of *Wal-Mart*), dismissal of Plaintiffs' claims by virtue of law of the case would cause manifest injustice.  *Dilaura*, 982 F.2d at 76 ("intervening change in controlling law" and prevention of "manifest injustice" are grounds to not apply law of the case).

**B.    THE AMENDED COMPLAINT ADEQUATELY ALLEGES THAT DEMAND ON THE BOARD IS EXCUSED AS FUTILE**

**1.    The Allegations Raise a Reasonable Doubt That a Majority of the Directors Could Independently and Disinterestedly Consider a Demand**

A derivative suit is a potent tool "to redress the conduct of a torpid or unfaithful management."  *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984).  Shareholders seeking to vindicate the interests of a corporation through a derivative suit must allege either that they have made a demand on the board of directors or the reasons why such a demand would have been futile.  *See* Fed. R. Civ. P. 23.1; *Stone v. Ritter*, 911 A.2d 362, 366-67 (Del. 2006).  To excuse demand, a

plaintiff need not plead evidentiary facts, nor prove success on the merits. *See Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991); *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993). Rather, in determining demand futility, courts must accept all particularized allegations as true, *Rales*, 634 A.2d at 931, and draw all reasonable inferences in plaintiffs' favor that logically flow from such allegations. *See Del. Cty. Emples. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1019 (Del. 2015). Further, where a complaint advances numerous reasons supporting demand futility, a court must consider the totality of these circumstances to assess whether a reasonable doubt is raised regarding directors' disinterest or independence. *Id*.

Delaware law employs multiple tests in determining whether demand is excused. *In re Oxford Health Plans, Inc. Sec. Litig.*, 192 F.R.D. 111, 116 (S.D.N.Y. 2000) ("the issue is fact intensive and no two cases are alike."). Plaintiffs can demonstrate that demand would be futile by alleging particularized facts that create a "reasonable doubt" that (1) the directors are disinterested and independent; and (2) the challenged transaction was the product of a valid exercise of business judgment. *Aronson*, 473 A.2d at 814-15. "[W]here the subject of a derivative suit is not a business decision of the Board but rather a violation of the Board's oversight duties," *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008), demand futility is shown by "particularized facts creating a reasonable doubt that a majority of the Board would be disinterested or independent in making a decision on a demand." *Rales*, 634 A.2d at 930.

## 2. A Majority of the Board Lack Independence or Have an Interest in the Transactions

Directors are deemed "interested" for purposes of demand futility when they "receive a personal financial benefit from a transaction that is not equally shared by the stockholders." *Rales*, 634 A.2d at 936. Additionally, a director is not considered independent if the board is so under the

director or officer's influence that its discretion is "sterilized."  *See id.*

Defendants concede that Defendant Dimon is interested, but dispute that a majority of the Board is interested, citing to previous court decisions.  Defs. Br. 2 n.1 (citing cases), 17.  Yet, none of the prior decisions purported to make factual findings on the merits.  Moreover, "independence is a fact-specific determination made in the context of a particular case."  *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1049 (Del. 2004).  The Court must make the determination of interest and independence based upon the facts alleged in this Complaint.

Defendants argue that certain Defendants receipt of substantial salaries and stock compensation is insufficient, by itself, to establish their interestedness.  Defs. Br. 18-19.  However, Plaintiffs do not merely allege that the Defendants were compensated, but rather that the structure of the Defendants' compensation gave them an incentive to approve and conceal excessive risk-taking that contravened the economic incentives of JPMorgan.  ¶¶51, 68-72, 286, 314, 319, 338, 343, 347, 349.  Such misalignment of incentives is sufficient to establish interestedness and can excuse a demand.  *See Rales*, 634 A.2d at 936-37 (considering two directors interested where their compensation created reasonable doubt that they could act independently); *In re Veeco Instruments, Inc. Sec. Litig.*, 434 F. Supp. 2d 267, 275 (S.D.N.Y. 2006) (directors' compensation made it improbable that he could perform his duties without being influenced by his personal interests).  Further, Plaintiffs have pled other specific facts of benefits received by the Directors from JPMorgan that cast serious doubt on their independence and/or disinterestedness:

- Defendant Bowles' relationship with JPMorgan and Defendant Dimon in light of JPMorgan's extensions of credit to Springs Industries, Inc. (which Defendant Bowles serves as Chairperson) during a period of particular vulnerability (¶315);

- Defendant Jackson's relationship with JPMorgan and Defendant Dimon in light of JPMorgan's extensions of credit directly to Jackson (¶316);

- Defendant Crown's relationship to JPMorgan and Defendant Dimon in light of JPMorgan's extensions of credit to Henry Crown and Company (of which Defendant Crown is the President) and related entities, JPMorgan's leasing of real estate from subsidiaries of companies in which Crown and members of his immediate family have indirect ownership interests, and JPMorgan's charitable contributions to organizations Crown has served as a trustee (¶¶339-40);

- Defendant Burke's relationship with JPMorgan and Defendant Dimon in light of JPMorgan's extensions of credit to Comcast (of which Defendant Burke is the Executive Vice President) and its subsidiaries (¶344); and

- Defendant Weldon's relationship with JPMorgan and Defendant Dimon in light of JPMorgan's extension of credit to Johnson & Johnson (of which Defendant Weldon was the CEO) and its subsidiaries (¶351).

Defendants argue that these allegations do not establish interestedness. Defs. Br. 17-19.

However, the authorities Defendants cite are distinguishable. In *In re J.P. Morgan Chase & Co.
S'holder Litig.*, the plaintiffs "attempt[ed] to rely on a mere inference that because a former executive of a major corporation owns a small percentage of the corporation's outstanding shares and that corporation does business with a national bank, somehow that former executive could not act independently of the bank's CEO as a director of the bank." 906 A.2d 808, 822 (Del. Ch. 2005).
In *In re JPMorgan Chase & Co. Deriv. Litig.*, 2014 U.S. Dist. LEXIS 46363, at *25 (S.D.N.Y.
Mar. 31, 2014), the plaintiffs merely made a vague and conclusory allegation that unspecified directors "had extensive personal loan/extensions of credit, interlocking directorates, and other conflicted relationships" (citations omitted). By contrast, here Plaintiffs have pled particularized allegations of loans and lines of credit extended by JPMorgan either to the Defendants themselves (¶314), or to companies those Defendants own or at which they hold senior executive positions.
¶¶315, 316, 339, 344, 351.

Finally, Defendants incorrectly argue that the Amended Complaint fails to sufficiently allege that the Board was "dominated by" the Defendants. Defs. Br. at 19. Obviously a Board is dominated by its members. Moreover, the Amended Complaint makes specific allegations

19

regarding Dimon's influence and control.  ¶¶28, 49, 278, 293, 314, 317, 320, 325, 338-340.

Plaintiffs further allege that, because the Defendants comprise nearly the entire Board, the Board

itself is dominated by fundamentally interested parties.  ¶¶47-67, 243-44, 267, 271, 278.

>    **3.    A Majority of The Board Faces A Substantial Likelihood Of Liability**

Demand on a board is futile if there is a "substantial likelihood" that directors would face

personal liability for their conduct.  *See Wood*, 953 A.2d at 144 n.11.  Such is the case here, making

it appropriate for Plaintiffs to litigate the claims derivatively for the benefit of JPMorgan.

>    **a.    The Exculpatory Clause In JPMorgan's Charter Does Not
>         Relieve Defendants Of Their Fiduciary Duty Of Care**

The crux of Defendants' argument regarding Plaintiffs' breach of duty of care claim is

premised on erroneous law.  Defendants wrongly contend the § 102(b)(7) exculpatory clause in

JPMorgan's Charter bars a claim for breach of the duty of care.  Defs. Br. at 21.  At the motion to

dismiss stage, Delaware law provides that an exculpatory clause "may properly be invoked and

applied 'only where the factual basis for a claim solely implicates a violation of the duty of care.'"

*Collins & Aikman Corp. v. Stockman*, 2009 U.S. Dist. LEXIS 43472, at *64 (D. Del. May 20, 2009)

(quoting *Emerald Partners v. Berlin*, 726 A.2d 1215, 1223-24 (Del. 1999)) (emphasis added).  As

the Chancery Court stated in *Alidina v. Internet.com Corp.*:

> [W]hen a duty of care breach is not the *exclusive* claim, a court may not dismiss
> based upon an exculpatory provision.  Because the duty of loyalty is implicated in
> this case, the § 102(b)(7) provision cannot operate to negate plaintiffs' duty of
> care claim on a motion to dismiss.

2002 Del. Ch. LEXIS 156, at *28 (Del. Ch. Nov. 6, 2002).  Here, exculpation is not available

because Plaintiffs assert non-exculpated claims beyond breach of the duty of care.  *See* ¶¶358-62,

367 (duty of loyalty, duty of good faith).  Case law cited by Defendants reinforces this principle.

*See, e.g.*, *Stone v. Ritter*, 911 A.2d 362, 367 (Del. 2006) (recognizing § 102(b)(7) does not

exculpate directors from liability for conduct not in good faith or in breach of duty of loyalty); *see also Malpiede v. Townson*, 780 A.2d 1075, 1093 (Del. 2001); *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 648 (Del. Ch. 2008).  Moreover, exculpation is an affirmative defense that is improper to resolve at the pleading stage because of the fact-intensive nature of the inquiry.  *See In re Tower Air, Inc.*, 416 F.3d 229, 242 (3d Cir. 2005); *see also Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp. 2d 538, 560 (D. Del. 2008) (citing *Tower Air* and denying motion to dismiss duty of care claims based on assertion of § 102(b)(7) exculpatory clause); *Sanders v. Wang*, 1999 Del. Ch. LEXIS 203, at *35-36 (Nov. 8, 1999) (same); *In re Taser Int'l S'holder Derivative Litig.*, 2006 U.S. Dist. LEXIS 11554, at *59 (D. Ariz. Mar. 17, 2006) (same).

> **b.     The Amended Complaint Adequately Pleads a Breach of Duty of Loyalty Based on a Failure of Oversight**

Defendants incorrectly argue that the Complaint's failure of oversight allegations do not sufficiently address Defendants' knowledge.  Defs. Br. 21-27.  In *Stone*, the Delaware Supreme Court stated that oversight liability stems from either "utterly fail[ing] to implement any reporting or information system or controls" or "having implemented such a system of controls, consciously fail[ing] to monitor or oversee its operations . . ."  911 A.2d at 370.  In either case, liability requires a showing that the directors knew they were not discharging their fiduciary obligations.  *Id.*

> **i.     Defendants Utterly Failed to Implement and/or Monitor a System of Internal Controls**

Defendants incorrectly argue the Amended Complaint lacks allegations regarding JPMorgan's failure to implement a system of internal controls.  Defs. Br. 22-23.  The Amended Complaint does allege the existence of Board-level internal control committees, and the purported obligations of the Defendants sitting on such committees.  ¶¶268, 273, 274, 297-299, 325-330, 342, 346, 350.  However, allegations that a system of internal controls exists in name only, and that the

board failed to monitor that system, are sufficient to allege a breach of fiduciary duty. *See Rich ex rel. Fuqi Int'l v. Yu Kwai Chong*, 66 A.3d 963, 982-83 (Del. Ch. 2013). For example, in *Yu Kwai Chong*, the court found a breach of fiduciary duty even though the board of directors met regularly and an audit committee oversaw its financial reporting. *Id.* The court found demand was futile because there were "no meaningful controls in place" and the board failed to sufficiently regulate parts of its business. *Id.*; *see also Am. Int'l Group, Inc. v. Greenberg*, 965 A.2d 763, 799 n.128 (Del. Ch. 2009) (allegations that defendant "was able to engage in unlawful conduct despite AIG's internal controls" were sufficient to plead that "Greenberg knew that AIG's internal controls were broken, and that Greenberg chose to do nothing").

Here, it is not simply that there were controls in place that did not prevent all negative potentialities. Rather, it is the case that there were no meaningful controls in place to regulate JPMorgan's RMBS activities. Although JPMorgan tasked third-parties to perform testing of the RMBS loan pools, serious deficiencies were reported but regularly ignored. ¶¶171-72. Indeed, deficiencies in the loan pools were reported, both orally and in writing, to executive and managing directors. Compl. Ex. A. Nonetheless, the control systems were ignored and risky loans were regularly "waived" and included in RMBS securities sold to investors. ¶¶172, 180, 229-30.

This failure to meaningfully monitor is similar to *In re Countrywide Derivative Litigation*, 554 F. Supp. 2d 1044, where the court found allegations about the audit committee's responsibilities sufficient to excuse a demand, reasoning "[i]t defies reason, given the entirety of the allegations, that these Committee members could be blind to widespread deviations from the underwriting policies and standards being committed by employees at all levels." *Id.* at 1082; *see also Cook v. McCullough*, 2012 U.S. Dist. LEXIS 114621, at *21-27 (N.D. Ill. Aug. 13, 2012) (excusing demand based on alleged failure to maintain adequate internal controls).

Here, the Audit Committee and Risk Policy Committees were ultimately responsible for monitoring JPMorgan's adherence to internal underwriting and due diligence standards.  ¶¶298, 299, 326, 327.  Either Defendants meaningfully monitored and learned of the facts admitted in the government settlement, but took no action to rectify the problems, or there was an utter failure to implement and monitor a system of internal controls.

## ii.     Defendants Consciously Disregarded Red Flags

Defendants also argue that Plaintiffs failed to allege that Defendants learned of and ignored red flags.  Defs. Br. 23-27.  This is disingenuous at best, as the allegations are based on the facts and misconduct JPMorgan admitted led to the largest financial crisis of this generation and record-breaking civil liability.  *See* Compl. Ex. A.

Claims based on "red flags" create the inference that the directors had constructive knowledge of the violations.  *See ATR-Kim Eng Fin. Corp. v. Araneta*, 2006 Del. Ch. LEXIS 215, at *76-77 (Dec. 21, 2006) (holding that the board "consciously abandoned any attempt to perform their duties independently and impartially" because it "never bothered to check" the company's assets); *see also In re Abbott Labs. Deriv. S'holders Litig.*, 325 F.3d 795, 809 (7th Cir. 2003) (applying Delaware law, the court found that "[g]iven the extensive paper trail in Abbott concerning the violations and the inferred awareness of the problems, the facts support a reasonable assumption that there was a sustained and systematic failure of the board to exercise oversight").

Indeed, here, the Amended Complaint alleges a variety of red flags that together support an inference that the Defendants knew or should have known that there were material weaknesses in the internal controls and failed to correct such weaknesses.  *See Stone*, 911 A.2d at 370, 373.  First, Defendants, particularly Defendant Dimon, were aware that portfolios of JPMorgan's subprime loans were defaulting at alarming rates by 2005-2006.  ¶186.  JPMorgan continued to securitize and

sell billions of dollars in RMBSs to investors while publicly vouching for the quality of JPMorgan's due diligence and internal controls, but it sold almost $12 billion dollars of its own holdings.  ¶188.

Second, the Defendants were aware of the importance of due diligence and internal controls regarding RMBSs because JPMorgan was one of the largest issuers of RMBSs, securitizing approximately $16.8 billion in 2006 and $28.9 billion in 2007.  ¶141.  Courts have found demand futility sufficiently pled where, as here, the failure in oversight was related to a "fundamental part of [JPMorgan]'s business."  *Countrywide*, 554 F. Supp. 2d at 1081 (failure of oversight was related to the "quality of the loans originated and adherence to underwriting standards").  For example, in *Countrywide*, the plaintiffs alleged that the board and board committees were responsible for monitoring the performance of the company's loan portfolio and demand futility was alleged where a "widespread Company culture [] encouraged employees to push mortgages through without regard to underwriting standards."  554 F. Supp. 2d at 1081-82.

As in *Countrywide*, JPMorgan here sought to maximize revenue by increasing its securitization of subprime RMBSs.  ¶¶141-61.  From 2005 to 2007, JPMorgan purchased billions of dollars of loans from originators, including subprime originators, in order to securitize and re-sell billions in RMBSs to investors.  ¶174.  The compensation structure for originating the loans was under the purview of Defendants Burke, Raymond, and Weldon on the compensation and corporate governance sub-committees and placed disproportionate emphasis on securitizing subprime loans, leading to systematic failures of internal control.  ¶¶141-46, 152, 156-57, 278.

Additionally, the Amended Complaint alleges red flags consisting of specific reports from Clayton identifying deteriorating internal controls and failures in due diligence.  And the Amended Complaint alleges, based on new information when the Settlement and Statement of Facts were released, that these reports, including internal reports warning of high-ratios of risky subprime

24

assets in the pools of loans, were circulated amongst the highest levels of JPMorgan executive and managing directors.  ¶¶16, 166-73, 182, 231-34.  The Defendants and members of the Board committees were tasked with reviewing these reports "from management" and taking the necessary corrective actions.  ¶¶196, 298.  It is implausible that the Defendants were not aware of these facts.

Defendants, nevertheless, argue that this is not enough.  However, this same argument was explicitly rejected in *Countrywide*, where the court relied on the fact that the defendants "were members of at least one of five Board Committees that was specifically tasked with monitoring detailed aspects of the Company's financial performance, business operations, and risk exposures." 554 F. Supp. 2d at 1060.  The court held that defendants "were in a position to recognize the significance of these red flags, and, accordingly, investigate the extent to which underwriting standards had been abandoned."  *Id.* at 1062.[8]

Furthermore, the particularized allegations of the Amended Complaint render Defendants' cited authority distinguishable.  For example, Defendants rely on *Stone*, but plaintiffs in that case readily acknowledged that the directors neither "'knew [n]or should have known that violations of law were occurring,' i.e., that there were no 'red flags' before the directors."  *Stone*, 911 A.2d at 364; *see also In re SAIC Deriv. Litig.*, 948 F. Supp. 2d 366, 385-86 (S.D.N.Y. 2013) (alleged wrongful conduct was carried out by managers alone, was not documented to the Board and the Board was not responsible for reviewing "every national (and local) blog, newspaper, Twitter feed, and televised news program for evidence of potential illegality"); *Harold Grill 2 IRA v. Chênevert*,

---

[8] For these reasons, *In re Goldman Sachs Mortgage Servicing S'holder Deriv. Litig.*, 42 F. Supp. 3d 473 (S.D.N.Y. 2012) (cited in Defs. Br. at 24) is distinguishable, as the alleged "red flags" in that case were not found to be equivalent to or of equal weight of those in *Countrywide*.  Contrary to Defendants' assertions (*see* Defs. Br. at 20-23), as in *Countrywide*, Plaintiffs here have alleged that Defendants were charged with oversight (*see, e.g.*, ¶¶264-284), and despite becoming aware of red flags of increased risks, continued to market the RMBSs aggressively.  *See* ¶¶162-88, 240-63.  This is not merely the case of Defendants making simply bad, but well-intentioned, calls about handling risk.  *Compare* ¶¶189-93.

Civ. No. 7999-CS, 2013 Del. Ch. LEXIS 150, at *11 (Del. Ch. June 18, 2013) (complaint failed to identify how a majority of the directors were even "in a position to know" about the allegedly illegal disclosures); *In re Citigroup, Inc.*, 964 A.2d 106, 127-28 (Del. Ch. 2009) (plaintiffs emphasized the directors failed to recognize or prevent a coming market crisis but failed to plead specific allegations of internal reports of deteriorating lending standards); *David B. Shaev Profit Sharing Account v. Armstrong*, 2006 Del. Ch. LEXIS 33, at *16 (Del. Ch. Feb. 13, 2006) (plaintiff conceded that the board "knew nothing" about underlying fraud and the plaintiff failed to show any red flags, reports or anything that would have alerted the board to the underlying fraud); *In re Citigroup, Inc. S'holders Litig.*, 2003 Del. Ch. LEXIS 61, at *7-8 (June 5, 2003) (internal reports and e-mails were confined at the level of Citigroup's operating subsidiaries and thus were insufficient to put the board on notice).[9]

The cumulative effect of red flags alleged in the Amended Complaint and reasonable inferences therefrom is sufficient to demonstrate demand futility because the failures involve a "scheme of significant magnitude and duration which went undiscovered by the directors." *In re Oxford Health Plans, Inc. Sec. Litig.*, 192 F.R.D. 111, 117 (S.D.N.Y. 2000); *see also In re Pfizer Inc. S'holder Deriv. Litig.*, 722 F. Supp. 2d 453, 460 (S.D.N.Y. 2010) (demand is futile "especially when the alleged wrongdoing is of substantial 'magnitude and duration'"); *McCall v. Scott*, 239 F.3d 808, 823 (6th Cir. 2001) (the court viewed all facts taken together and found that "the magnitude and duration of the alleged wrongdoing is relevant in determining whether the failure of

---

[9] Defendants cite to *In re Dow Chemical Co. Derivative Litigation*, 2010 WL 66769 (Del. Ch. Jan 11, 2010) for the proposition that allegations of Defendants pattern of misconduct is irrelevant.  Defs. Br. at 27.  Yet, in *Dow,* one major reason that the past misconduct was found unavailing was that it was of different members of management, while here it is alleged that misconduct occurred under the watchful eye of Dimon and the other members of the very same Board.  *See, e.g.*, ¶¶50-67.

the directors to act constitutes a lack of good faith").

           **c.**      **The Amended Complaint Alleges a Breach of Fiduciary Duty Based on Alleged Misrepresentations**

First, the Amended Complaint alleges a breach of fiduciary duty by Defendants because they knew facts and had access to information suggesting JPMorgan's representations were false and made in bad faith.  Defendants are not exculpated for bad faith and breach of duty of loyalty claims.  *See O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 915 (Del. Ch. 1999).  "A strong inference of scienter exists when there are allegations that a defendant 'knew facts or had access to information suggesting that [the company's] public statements were not accurate.'"  *In re Converium Holding AG Sec. Litig.*, 2007 LEXIS 67660, at *6 (S.D.N.Y. Sept. 14, 2007) (quoting *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000)).  "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements."  *Novak*, 216 F.3d at 308.  Moreover, the existence of monitoring systems for tracking adherence to origination standards contributes to an inference of scienter.  *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1156 (S.D. Cal. Jan. 4, 2008).  Based upon Defendants causing the company to issue false and misleading proxy statements (¶¶263-284) as well as Defendants' knowledge that individuals were in receipt of contrary information on sub-committees of the Board, and failure to take action or disclose same, the Court can infer scienter.  ¶¶297-316, 325-26, 341-50.[10]

In addition, Defendants' statements about underwriting standards, risk management, and

---

[10] For this reason, the instant case is distinguishable from *In re Goldman Sachs Mortg. Serv'g*, 42 F. Supp. 3d at 486, and *In re Dow Chem. Co. Derivative Litig.*, No. 4349-CC, 2010 Del. Ch. LEXIS 2, 2010 WL 66769, at *10 (Del. Ch. 2010) (both cited by Defendants at Defs. Br. at 28), as here, Plaintiffs have identified which disclosures were misleading and that Defendants had basis to understand that the facts being disclosed and/or concealed were material.  *Malpiede*, 780 A.2d at 1086 (also cited at Defs. Br. at 28), is also factually distinct on this issue.

loan quality were misleading. Defendants repeatedly made false or misleading statements concerning the most important aspects of JPMorgan's business — the quality of its lending practices and loans, and its ability to manage risk. For instance, the Company's 2006 Form 10-K (signed by Defendants Dimon, Bowles, Burke, Crown, Futter, Jackson, Lipp, Novak, Raymond and Weldon) falsely assured investors that strong underwriting standards were in place. ¶125. JPMorgan's 2006 Annual Report assured investors that JPMorgan had "materially tightened" its underwriting standards and would be "even more conservative" in originating mortgages. ¶124. Defendants concealed their involvement in the subprime mortgage crisis by repeatedly claiming the wrongdoing emanated from businesses it had acquired. ¶¶7, 46. The Amended Complaint identifies other misrepresentations. *See, e.g.*, ¶¶8, 41-42, 80, 89, 93, 111, 138, 141-42, 151-52, 156-57, 178, 228, 232-33, 174, 253. It was not until 2013 that JPMorgan conceded that it made "serious misrepresentations to the [investing] public." ¶7; Compl. Ex. A.

Lastly, Defendants' signatures on SEC filings contribute to a strong inference of scienter. Defendants argue that the Amended Complaint fails to show "that each of the Director Defendants was involved in the preparation in the challenged disclosures." Defs. Br. 28 (citing *Rahbari v. Oros*, 732 F. Supp. 2d 367 (S.D.N.Y. 2010)). But in *Rahbari*, there was no allegation that the board members knew of the improper disclosures when they signed the 10-K and an internal investigation conceded there was no knowledge. *Id.* at 381. Indeed, courts routinely infer scienter based on the signing of SEC filings because for certifications to have any substance, signatories to the certifications must be held accountable for statements therein. *See United States SEC v. Syron*, 934 F. Supp. 2d 609, 636 (S.D.N.Y. 2013) (citing *Howard v. Everex Sys.*, 228 F.3d 1057, 1061 (9th Cir. 2000)); *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 164 (S.D.N.Y. 2012). "It would be wholly inappropriate to permit a signatory to evade liability because he/she did not

prepare the financial report, as Defendants argue, on the ground that the signatory was unaware of the misstatements made therein.  To hold otherwise would effectively eviscerate the entire substance of 18 U.S.C. § 1350, the purpose of which is to ensure that regardless of who prepared the statements, the signatories are attesting to their accuracy and reliability." *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1189-90 (C.D. Cal. 2007); *see also In re ProQuest Sec. Litig.*, 527 F. Supp. 2d 728, 742 (E.D. Mich. 2007) (same).  Dimon signed certifications on Proxies and Annual Reports, and Dimon, Bowles, Burke, Crown, Futter, Jackson, Lipp, Novak, Raymond and Weldon all signed the 2006 Form 10-K.  The Court can infer scienter.[11]

### c.    The Defendants Face a Substantial Likelihood of Liability for Other State Law Claims

### i.    Plaintiffs sufficiently allege corporate waste

Defendants' argument about the award of executive compensation (Defs. Br. 29-30) is inappropriate at the motion to dismiss stage where the waste claim concerns "a transfer of corporate assets that serves no corporate purpose," as is alleged here.  *Lewis v. Vogelstein*, 699 A.2d 327, 336 (Del. Ch. 1997).  Such allegations of waste are "inherently factual and not easily amenable to determination on a motion to dismiss." *Id.* at 339.  The leading Delaware authority, *Michelson v. Duncan*, 407 A.2d 211, 217 (Del. 1979), held that waste occurs when corporate assets are diverted for "unnecessary purposes."  *See id.* at 223, 215.  Plaintiffs here allege Defendants breached their fiduciary duties by gifting millions of dollars in excess compensation to Dimon and the other Directors and did so during a time when short-term profits were emphasized over adhering to internal controls and due diligence standards.  *See, e.g.*, ¶¶ 51, 68-71.  Moreover, as a member of

---

[11] Defendants' suggestion that Plaintiffs have not alleged damages as a result of the breach of fiduciary duty based on misrepresentations is without support. *See, e.g.*, ¶¶358-66.

the Stock Committee, Dimon authorized dividends, stock, the issuance of stock, and administered the dividend reinvestment plan and share repurchase plans.  ¶72.  This meets the standard set forth in *Michelson* and *Lewis.*

### ii.    Plaintiffs sufficiently allege unjust enrichment

Under Delaware law, "[u]njust enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."  *Ryan v. Gifford*, 918 A.2d 341, 361 (Del. Ch. 2007) (citation omitted).  The Amended Complaint alleges that each Defendant benefitted from receiving lavish compensation packages paid for by short-term profits generated from illegal conduct.  ¶¶51, 68-72, 286, 314, 319, 338, 343, 347, 349.  Plaintiffs also allege there was no justification for doing so and no remedy provided by law.  ¶373-76.  These allegations state a claim for unjust enrichment. *See, e.g.*, *MCG Capital Corp. v. Maginn,* 2010 Del. Ch. LEXIS 87, at \*58-59 (reciting elements of unjust enrichment claim in context of claim based on bonus payment).

Defendants cite *In re Pfizer Inc. S'holder Deriv. Litig.*, 722 F. Supp. 2d 453 (S.D.N.Y. 2010), to argue Plaintiffs have failed to allege a causal relationship between the "benefit" and the challenged conduct.  Yet, unlike there, here there are allegations that compensation was of "extraordinary magnitude," *Pfizer*, 722 F. Supp. 2d at 465.  Indeed, Dimon alone received more than $100 million dollars in compensation from 2005 through 2012, receiving his highest compensation in 2007 "at the height of JPMorgan's wrongdoing."  ¶70.  Given this, and given, as well, that Plaintiffs sufficiently allege breaches of fiduciary duties and facts showing compensation received by each Defendant was paid without justification and during a time that JPMorgan has since admitted to false statements in connection with its sale and profit from billions of dollars in RMBSs, ¶¶68-72, 286, 338, 314, 319, 343, 347, 349, there is ample support for this claim.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion in its entirety.


Dated: December 20, 2017                    **COTCHETT, PITRE & McCARTHY, LLP**

                                            */s/ Alexander E. Barnett*
                                            ALEXANDER E. BARNETT
                                            40 Worth Street, 10th Floor
                                            New York, NY 10013
                                            Telephone: (212) 201-6820
                                            Facsimile: (917) 398-7753

                                            JOSEPH W. COTCHETT
                                            MARK C. MOLUMPHY
                                            ALEXANDRA P. SUMMER
                                            TORIANA S. HOLMES
                                            San Francisco Airport Office Center
                                            840 Malcolm Road, Suite 200
                                            Burlingame, CA 94010
                                            Telephone: (650) 697-6000
                                            Facsimile: (650) 697-0577

                                            *Lead Counsel and Attorneys for Plaintiff Ronald A.*
                                            *Harris, derivatively on behalf of JPMorgan Chase*
                                            *& Co.*

                                            **LAW OFFICES OF GEORGE DONALDSON**
                                            George Donaldson
                                            453 Boynton Avenue
                                            Berkeley, CA 94707
                                            Phone: (415) 297-8500
                                            Fax: (510) 548-7488

                                            *Executive Committee Member and Attorney for*
                                            *Plaintiff Ronald A. Harris, derivatively on behalf of*
                                            *JPMorgan Chase & Co.*

                                            **HAGENS BERMAN SOBOL SHAPIRO LLP**
                                            Peter E. Borkon
                                            715 Hearst Avenue, Ste. 202
                                            Berkeley, CA 94710
                                            Tel:     (510) 725-3000
                                            Fax:     (510) 725-3001

31

*Executive Committee Member*

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Steve W. Berman
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Tel:    (206) 623-7292
Fax:    (206) 623-0594

*Executive Committee Member*

**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr.
Yury A. Kolesnikov
7817 Ivanhoe Avenue, Suite 102
La Jolla, CA 92037
Tel:    (858) 914-2001
Fax:    (858) 914-2002

*Executive Committee Member and Attorneys for
Plaintiff Jeffrey Shlosberg, derivatively on behalf of
JPMorgan Chase & Co.*

**DREYER BABICH BUCCOLA WOOD
CAMPORA, LLP**
Roger A. Dreyer
Stacey L. Roberts
Stephen F. Davids
Stanley P. Fleshman
20 Bicentennial Circle
Sacramento, CA 95826
Tel:    (916) 379-3500
Fax:    (916) 379-3599

*Executive Committee Member and Attorneys for
Plaintiff Richard Ratcliff, derivatively on behalf of
JPMorgan Chase & Co.*

**KABATECK BROWN KELLNER LLP**
Brian S. Kabateck
Joshua H. Haffner
Engine Company No. 28 Building
644 South Figueroa Street
Los Angeles, CA 90017

Tel:     (213) 217-5000
Fax:    (213) 217-5010

*Executive Committee Member*

**HARALSON, MILLER PITT, FELDMAN &
McNALLY, PLC**
Gerald Maltz
Peter T. Limperis
One South Church Avenue, Suite 900
Tucson, AZ 85701
Tel:     (520) 792-3836
Fax:    (520) 624-5080

*Executive Committee Member*

33